# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
ABIOMED, INC.,                                  )
                                                )
       Plaintiff/Counter-Defendant,        )
                                                )     **Civil Action No.**
    v.                                        )     **16-10914-FDS**
                                                )
MAQUET CARDIOVASCULAR LLC,                      )
                                                )
       Defendant/Third-Party              )
       Plaintiff/Counter-Defendant/       )
       Counter-Claimant,                  )
                                                )
    v.                                        )
                                                )
ABIOMED EUROPE GMBH,                            )
                                                )
       Third-Party Defendant,             )
                                                )
    v.                                        )
                                                )
ABIOMED R&D, INC.,                              )
                                                )
       Third-Party Defendant/             )
       Counter-Claimant.                  )
_____)


## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

**SAYLOR, J.**

     This is an action for patent infringement. Defendant Maquet Cardiovascular, LLC owns

six patents directed to guidable intravascular blood pumps and related methods. Plaintiff

Abiomed, Inc. ("Abiomed") filed this action seeking declaratory judgment that it does not

infringe those patents and that they are invalid.

     The parties have submitted proposed claim constructions of eighteen terms or groups of

terms. The Court held a *Markman* hearing on April 24 and 25, 2018. The construction of the

various terms in dispute is set forth below.

## **Table of Contents**

I.    Background ................................................................................................................... 1

   A.    Parties ................................................................................................................... 1

   B.    The Underlying Technology ................................................................................ 1

   C.    Patents at Issue .................................................................................................... 2

II.    Standard of Review ...................................................................................................... 4

   A.    The Words of the Claim ...................................................................................... 5

   B.    The Specification ................................................................................................. 6

   C.    The Prosecution History ...................................................................................... 8

   D.    Extrinsic Sources ................................................................................................. 9

III.    Analysis ....................................................................................................................... 9

   A.    Intravascular Blood Pump ................................................................................. 14

   B.    Guide Mechanism Terms .................................................................................. 20

       1.    Lumens Generally .................................................................................... 20

       2.    Lumen Arranged Coaxially with the Cannula .......................................... 25

       3.    Elongate Lumen Associated with the Cannula ........................................ 30

       4.    "Delimited by the Outer Cannula Surface" ............................................. 34

   C.    Means-Plus-Function Terms ............................................................................. 42

       1.    "Guide Mechanism" .................................................................................. 44

       2.    "Blood Pressure Detection Mechanism" and "Pressure Sensing Element" ............... 48

   D.    Rotor Terms ....................................................................................................... 51

       1.    Rotor Blade Terms .................................................................................... 51

       2.    Rotor Hub Term ....................................................................................... 54

   E.    Purge-Fluid Terms ............................................................................................ 56

       1.    "Passing Purge Fluid" .............................................................................. 56

       2.    "First Conduit" and "Second Conduit" .................................................... 59

   F.    Miscellaneous Terms ........................................................................................ 63

       1.    Perfusion .................................................................................................. 63

       2.    Measuring Pressure "Proximate" or "Adjacent" the Intravascular Blood Pump ....... 65

       3.    "Distal Tip Member" ................................................................................ 68

       4.    "Cannula Coupled to a Distal End of the Intravascular Blood Pump" ...... 70

# I.   Background

## A.   Parties

Plaintiff Abiomed is a manufacturer of the "Impella" line of intravascular blood pumps, which it has been marketing since June 2008.  (Am. Compl. ¶¶ 4, 8).

Defendant Maquet Cardiovascular is the owner of several patents directed to intravascular blood pumps, including the six at issue in this case:  U.S. Patent Nos. 7,022,100 ("the '100 patent"); 8,888,728 ("the '728 patent"); 9,327,068 ("the '068 patent"); 9,545,468 ("the '468 patent"); 9,561,314 ("the '314 patent); and 9,597,437 ("the '437 patent").

## B.   The Underlying Technology

The patents at issue in this case involve guidance systems for intravascular blood pumps—essentially, miniature pumps that are inserted through a patient's vasculature into the heart for medical purposes.  (*See* '100 patent, col. 1 ll. 48-51; *id.*, col. 17 ll. 52-59).  Intravascular blood pumps are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation."  (*Id.*, col. 1 ll. 22-27).

Among the challenges in developing such pumps are miniaturization (that is, designing a pump that will work effectively but be small enough to be inserted); preventing the pump from damaging the heart or the blood (blood cells are delicate); and providing a method for guiding the device to the heart (such pumps are commonly inserted through the femoral artery in the thigh and guided through the body to the heart).  (*See id.*, col 1 l. 33-col. 2 l. 18).  The patents at issue here principally address the third issue:  safely and effectively guiding the pump into the heart.

A subsidiary challenge is that of keeping blood out of the pump, where it may cause clotting or pump damage, and preventing frictional heating of the system.  ('100 patent, col. 10

ll. 28-44). The patents at issue here also describe a "purge fluid delivery system" for addressing those problems.

Generally, the blood pump systems discussed by the patents and the parties have the following basic structure: At the far end of the system is a cannula (designated 14 below), a small tube through which blood is drawn into the pump. Attached to the cannula is the blood pump itself (12), which includes a rotor, and is housed within a protective shroud. Extending from the back of the pump is a variable assembly (18), sometimes called a catheter, that can house the drive cable for the blood pump, purge fluid lines, and various guide mechanisms.



*FIG. 1*

('100 patent, fig.1).

## C.    <u>Patents at Issue</u>

The amended pleadings include declaratory judgment claims for six patents: U.S. Patent

Nos. 7,022,100 ("the '100 patent"); 8,888,728 ("the '728 patent"); 9,327,068 ("the '068 patent"); 9,545,468 ("the '468 patent"); 9,561,314 ("the '314 patent); and 9,597,437 ("the '437 patent"). These patents belong to the same "patent family," in that they all stem from provisional application No. 60/152,249, filed September 3, 1999. Each subsequent application is either a continuation or division of the previous one; no new material was added to the disclosure. The specifications of the '100, '728, and '068 patents are identical, and the specifications of the '468, '314, and '437 patents are different only in that they explicitly incorporate as Appendices A and B certain material that was incorporated by reference in the other three patents—namely, two patent applications, also owned by Maquet, U.S. Patent App. Nos. 09/280,988 and 09/280,970.[1]

Broadly speaking, the patents are directed to "[a]n improved intravascular blood pump system . . . and related methods involving the broad inventive concept of equipping the intravascular blood pump . . . with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient." (*E.g.*, '100 patent, Abstract). The patents explain that a "significant drawback" of prior-art intravascular blood pumps is that they were "difficult to guide into the appropriate position within the circulatory system of a patient" because "the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart." (*Id.*, col. 2 ll. 6-12). The supplemental guide mechanisms then available had the disadvantage of taking up valuable extra space in the blood vessel and requiring a larger access wound than would otherwise be necessary. (*Id.*, col. 2 ll. 19-39). The patents purport to improve the prior art by equipping the pump with integrated guide

---

[1] The '988 patent application was abandoned and never published (except as it appeared in the patents-at-issue here). The '970 patent application issued as U.S. Patent No. 6,295,877 on October 2, 2001, but expired due to non-payment of maintenance fees on October 2, 2009.

mechanisms.  (*Id.*, col. 2 ll. 47-55).

The patents describe three particular examples of such "integrated" guide mechanisms as "broad aspects of the present invention."  The first is an "'over-the-wire' type guide mechanism," in which "a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient."  ('100 patent, col. 2 ll. 56-66).  A "lumen," in this context, is the central cavity of a tubular structure.  In the "over-the-wire" system, there is in effect a tube within a tube; the innermost tube contains a space (the lumen) through which the guide wire is inserted.  The intravascular blood pump is then advanced along the guide element.  (*Id.*, col. 2 l. 66-col. 3 l. 2).

The second broad aspect is a "'side-rigger' or 'rapid exchange' type guide mechanism," in which "a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula" through which a "guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient."  (*Id.*, col. 3 ll. 3-13).  As with the "over-the-wire" design, the pump and cannula are then advanced along the guide element.  (*Id.*, col. 3 ll. 13-16).

The third broad aspect of the invention is an "intravascular blood pump system" including a "conduit assembly" with a "guide catheter" and a "pump assembly," such that the conduit assembly is "precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology."  (*Id.*, col. 3 ll. 17-36).  "The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud."  (*Id.*, col. 3 ll. 36-39).

## II.     <u>Standard of Review</u>

The construction of claim terms is a question of law, which may in some cases rely on

underlying factual determinations.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*¸ 135 S. Ct. 831, 835, 837-38 (2015); *see Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### A.    The Words of the Claim

The claim-construction analysis normally begins with the claims themselves.[2]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude."

---

[2] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

*Phillips*, 415 F.3d at 1312 (citing *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, the arrangement of the disputed term in the claims is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314. For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another. *Id.* In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

### B. The Specification

"The claims, of course, do not stand alone." *Id.* "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citations and quotation marks omitted). For that reason, the specification must always be consulted to determine a claim's intended meaning. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir.

2006); *see also Phillips*, 415 F.3d at 1315-17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Id.* at 1323. A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect."). "In particular, [the Federal Circuit] ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

## C. The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The doctrine of prosecution disclaimer applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1316. As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution.

*Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *see Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) ("[A] disclaimer or disavowel of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record."). Furthermore, "[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).

### D. Extrinsic Sources

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance. *Id.* at 1318-19. Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion. *Id.* at 1319.

### III. Analysis

There are 18 groups of terms at issue in the patents, which are summarized in the following chart.

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "intravascular blood pump" | "a drive cable-mounted rotor and rotor housing (i.e., body and shroud), which collectively are capable of insertion into a patient's circulatory system" | Ordinary meaning | '100: 16, 17<br>'728: 1, 6, 8, 10, 15<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |
| "guide mechanism" ('100: 16)<br><br>"elongate lumen sized to slideably receive a guide wire" ('468: 1, 22; '437: 1, 28; '314: 1, 20, 27)<br><br>"guide mechanism is configured as a second lumen . . . wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong" ('728: 1; '068: 1)<br><br>"a guide mechanism configured as an elongate lumen . . . a guide wire arranged to be advanced along the lumen" ('728: 10)<br><br>"guide mechanism configured as an elongate lumen and adapted to guide said intravascular blood pump . . . the method comprising: . . . advancing the blood pump system along the guide wire" ('068: 10)<br><br>"elongate lumen having a luminal interior . . . sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong . . . advancing the blood pump along the guide wire to the | The terms to the left should be construed to have the same meaning: "lumen and guide wire not extending through the free space between the rotor blades" | Ordinary meaning | '100: 16<br>'728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| predetermined location" ('068: 20) | | | |
| "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion of] the cannula" | "a guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter" | Ordinary meaning | '728: 10 '068: 10, 20 '314: 1, 20 |
| "an elongate lumen associated with the cannula" | "a permanent lumen formed along the side of the cannula" | Ordinary meaning | '468: 1, 22 '314: 27 '437: 1, 28 |
| "wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | "guide lumen integrally formed within the surface of the cannula" | Ordinary meaning | '728: 1 '068: 1 |
| "a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" | Means plus function: Claimed function—"guiding said intravascular blood pump and cannula to a predetermined location within the circulatory system of the patient" Claimed structures—"(a) a guide wire passing slideably through a central lumen extending through a drive cable assembly, blood pump, and cannula; (b) a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall; or (c) a conduit assembly, including guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly" | Ordinary meaning | '100: 16 |
| "blood pressure detection | Means plus function: | Ordinary | '100: 16 |

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | Claimed function—"to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | meaning | |
| "pressure sensing element configured to sense pressure proximate the intravascular blood pump" | Claimed structures—"(a) a fluid filled column disposed within at least a portion of the cannula, (b) a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, (c) a strain gauge coupled to at least one of the intravascular blood pump and cannula, and (d) calculating blood pressure based on the relationship between the torque and motor current of a motor used to drive the rotor" | | '468: 1<br>'314: 1 |
| "blade extending radially outward from the rotor hub"<br><br>"blade[s] extending radially from the rotor hub" | "blade[s] shaped as an extension of a radius of the rotor hub, not including helical, corkscrew or screw-shaped" | Ordinary meaning | '728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 2, 22<br>'314: 1, 2, 20, 27<br>'437: 1, 28 |
| "a rotor having a rotor hub tapering in the distal direction" | Plain meaning, where patentee disclaimed a hub where any portion tapers in the proximal direction | Ordinary meaning | '728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 2, 22<br>'314: 1, 2, 20, 27<br>'437: 1, 28 |
| "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" | "arranged to operate such that purge fluid is delivered to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream" | Ordinary meaning | '728: 1<br>'068: 1<br>'468: 1, 22<br>'314: 1, 20, 27 |
| "passing purge fluid through the purge lumen to the | "passing purge fluid to the blood pump where the purge | Ordinary meaning | '437: 1 |

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| intravascular blood pump"<br><br>"passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" | fluid does not go through the rotor bearings and into the bloodstream" | | '437: 28 |
| "first conduit . . . second conduit" | "a pair of conduits for introducing and returning purge fluid" | Ordinary meaning | '728: 8<br>'068: 9<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 10, 29 |
| "perfusing / perfusion [of a patient]" | "rerouting blood to a point downstream from the introduction site of the intravascular blood pump into the vasculature of the patient" | Ordinary meaning | '068: 1, 10, 20 |
| "[detect the pressure of the blood] proximate at least one of the intravascular blood pump and cannula" | "at the opening of the blood pump or the cannula | Ordinary meaning | '100: 16 |
| "[detect the pressure of the blood / sense pressure] proximate the intravascular blood pump"<br><br>"[measuring pressure / calculating blood pressure] adjacent the intravascular blood pump" | "at the opening of the blood pump" | Ordinary meaning | '728: 6, 10<br>'068: 7, 10<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 8, 12 |
| "distal tip member" | "rod bonded to the end of the cannula" | Ordinary meaning where the "distal tip member" is not a guidewire | '314: 21<br>'437: 22 |
| "cannula coupled to a distal end of the intravascular blood pump" | Maquet disclaimed a cannula with a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end of | Ordinary meaning | '468: 1, 22 |

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| | the cannula" | | |

The Court will address each term in turn.

## A. Intravascular Blood Pump

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "intravascular blood pump" | "a drive cable-mounted rotor and rotor housing (i.e., body and shroud), which collectively are capable of insertion into a patient's circulatory system" | Ordinary meaning | '100: 16, 17<br>'728: 1, 6, 8, 10, 15<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |

Abiomed argues that the term "intravascular blood pump" should be construed to be limited to "a drive cable-mounted rotor and rotor housing"—in other words, describing a device in which the motor is outside the human body and driven by a cable.[3]  In support of that interpretation, Abiomed contends that (1) all the embodiments described in the patent include a cable-mounted rotor coupled to a motor external to the patient's body; (2) the guide mechanisms described in the specifications indicate that they are specifically designed for pumps that use a rotating drive cable; (3) the patent does not meet the written-description requirement or enable one of skill in the art to make and use a blood pump without a rotating drive cable; and (4) Maquet has given up a broader scope by way of statements made before the PTO.  (Abiomed Opening Br. at 31).  Maquet acknowledges that the only commercial intravascular blood pump available at the time of the invention was the Hemopump, which was a cable-driven rotor pump.

---

[3] It appears that the pump in Abiomed's accused products is designed with a motor that is part of the apparatus inserted into the heart, and that therefore has no drive cable.

(Maquet Opening Br. at 7).  And it does not attempt to argue that its patents teach a person of ordinary skill in the art to make and use a blood pump that is not cable-driven.  Nevertheless, it contends that the description of a cable-driven pump in the specification is merely a preferred embodiment.

Claim terms are to be given their "ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  While a patentee may use the specification to redefine a term, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a work in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term.'" *Id.* (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).  Here, to limit the term "intravascular blood pump"—which, on its own, makes no reference to how the pump is driven—to cable-driven pumps, simply because the only examples in the specification are cable-driven pumps, would be inappropriate.  The specification explicitly recognizes that cable-driven pumps are just an example:  "Intravascular blood pumps comprise miniaturized blood pumps capable of being percutaneously or surgically introduced into the vascular system of a patient, typically to provide left and/or right heart support.  *One type* of intravascular pump is an axial flow blood pump comprising a cable-mounted rotor surrounded by a protective shroud."  ('437 patent col. 1 l. 65-col. 2 l. 3 (emphasis added)).

Abiomed argues that the claims should be limited to cable-driven pumps because the particular guide mechanisms disclosed are specifically designed for cable-driven pumps.  But although the specification repeatedly describes the guide mechanisms in terms of a cable-driven pump and explains how they could be integrated with such a pump, Abiomed has not shown that

the guide mechanisms of the invention actually require a cable-driven pump or even that they contain features that would be useless without such a pump.

Abiomed also contends that the specification repeatedly characterizes the "present invention" as a cable-driven pump, and that such a characterization should be limiting. *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398-400 (Fed. Cir. 2008). But the strongest statements in the specifications describing "the present invention" do not make any specific mention of cable-driven pumps. The patents state: "The present invention is directed at eliminating and/or reducing the effects of the foregoing drawbacks of prior art intravascular blood pumps" and "[t]he present invention overcomes the drawbacks of the prior art by providing an improved intravascular blood pump equipped with integrated features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system." ('437 patent, col. 2 ll. 57-67; *see also id.*, col. 8 ll. 50-64). But the "drawbacks" discussed have to do with difficulty guiding the catheter, not any particular difficulty with the drive cable. And the other statements to which Abiomed points are explicitly termed as "broad aspects" of the present invention, or manifestations or embodiments of those broad aspects. (*See id.*, col. 9 ll. 13-31; *id.*, col. 13 l. 63-col. 14 l. 14; *id.*, col. 15 ll. 5-21; *see generally id.*, col. 3 l. 5-col. 4 l. 4).

Abiomed also points to two parts of the prosecution history. In the notice of allowance for the '068 patent, the examiner stated: "Sammler lacks several critical feature [sic] of the invention. Sammler lacks both a first lumen arranged to deliver purge fluid, and a guide mechanism configured as an elongate lumen. Significantly, Sammler relies on the motor-driven pump of Siess to move blood through vessels (Siess, Figs. 2, 3). Since the motor of Siess occupies the entire cross-section of the lumen, no space remains for a lumen to pass a guide wire

16

or purge fluid." (Abiomed Opening Markman Br. Ex. 8-B at MAQ_00005189).

That history is likewise not dispositive. First, the statement of an examiner in the notice of reasons for allowance does not normally constitute clear and unmistakable disclaimer of scope by the patentee, unless it illuminates the meaning a person of ordinary skill in the art would ascribe to an argument made by the patentee. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005); *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1079 (Fed. Cir. 2003) ("[T]here is no obligation to respond to an examiner's statement of Reasons for Allowance, and the statement of an examiner will not necessarily limit a claim . . . ."). Second, the fact that the motor-driven pump of Siess specifically is incompatible with a lumen that would permit the passage of a guide wire or purge fluid does not mean that every motor-driven pump is so incompatible.

During the IPR proceedings for the '468, '314, and '437 patents, Maquet included an annotated version of Figure 1 of the patents and described it as follows:

> Figure 1 illustrates an exemplary embodiment of the present invention, with guide wire (22) extending out the distal end of the cannula, along with various other features associated with this invention. The above shows the intravascular blood pump, catheter, cannula, and guide mechanism located within the circulatory system. This embodiment is designed to support the function of the left ventricle circulating blood. Once inserted, intravascular pump (12) is located within the aorta (Ex. 1001, 9:13-16, Fig. 1). Cannula (14) traverses the aortic valve, allowing blood to flow from the left ventricle to the pump and then into the aorta (*id.*, 9:28-32, Fig. 1). Also, the above figure shows catheter (18), which moves the intravascular pump through the circulatory system, maintains the pump and cannula in the proper location, and allows for communication between pump features and devices located outside the body (*id.*, 9:58-10:17).

(Abiomed Opening Markman Br. Ex. 16 at 12-13; *see also id.* Ex. 18 at 11-12; *id.* Ex. 21 at 11-12; *id.* Ex. 22 at 11-12). Abiomed contends that the statement that there are "pump features and devices located outside the body" means that Maquet "emphasized that the drive cable is an essential aspect of its claimed invention." (Abiomed Opening Markman Br. at 36). But Maquet

was merely describing Figure 1, which is only an embodiment of the invention, for the purposes of introducing the invention to the PTAB. It did not distinguish any prior art on the basis of the motor being located outside the body, and did not purport to define the claimed invention. It is no more limiting or a disclaimer than the appearance of figure 1 in the patents themselves.

Whether the claims are enabled or supported by adequate written description are not issues before the Court at this time. Nonetheless, the question is worth addressing, because the treatment of this concept is not intuitive.

As to enablement, Abiomed argues that the claims must be limited to cable-driven pumps because the specification does not enable or describe other types of pumps. But that is not strictly correct. "Whether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed . . . ." *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371 (Fed. Cir. 1999); *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1323 (Fed. Cir. 2009). "If the original inventor has at that time enabled the use of an entire class of products, a claim covering that entire class is warranted. But if the class subsequently expands to include other species not conceived at the time of the first patent, the generic claim language will allow the first inventor to capture those new species within the scope of his claim." Mark A. Lemley, *The Economics of Improvement in Intellectual Property Law*, 75 TEX. L. REV. 989, 1009 (1997); *see CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1340 (Fed. Cir. 2003) ("Improvement and selection inventions are ubiquitous in patent law; such developments do not cast doubt on enablement of the original invention."). Thus, for example, an inventor of an improved windshield wiper may claim a car equipped with those improved wipers even if cars are already in the prior art, and that claim may cover a car with an improved engine that did not exist at the time of patenting as long as the car also includes the wipers of the

patented invention. *See Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339-41 (Fed. Cir. 2003) (discussing *In re Hogan¸* 559 F.2d 595 (C.C.P.A. 1977), in depth).

Thus, Maquet may well have a valid patent on guide mechanisms attached broadly to all "intravascular blood pumps" that was fully enabled at the time of patenting. Abiomed may well have significantly improved intravascular blood pumps, but Maquet would not be required to have enabled blood pumps not existing at the time of its application.

The written-description requirement is a separate issue. In *Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc), the Federal Circuit expressly held that the written-description requirement is separate from the enablement requirement, and that a patentee may enable his invention while simultaneously failing to describe it. *Id.* at 1344-45. It is not clear how that doctrine interacts with the newly-discovered-species doctrine of *In re Hogan. See Abbvie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014) (explaining genus-species written description); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247 (Fed. Cir. 2004) (discussing enablement, written description, and new matter in the context of priority to earlier applications); *see also Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1365-66 (Fed. Cir. 2010) (en banc) (Rader, J., dissenting in part and concurring in part) (explaining the effect of having a written-description requirement separate from enablement on genus-species improvement patents).

The Court need not resolve the issue at this stage. For now, it is sufficient to note that Maquet has taken the position that its claim is broad enough to encompass intravascular blood pumps that include cable-driven blood pumps and other types of pumps. It may later have to defend that scope against a challenge under § 112. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012) ("[A] patentee chooses broad claim language

at the peril of losing any claim that cannot be enabled across its full scope of coverage.").  But

that issue will be resolved when and if it is raised.

Accordingly, the term "intravascular blood pump" will be given its ordinary meaning.

**B.**     **Guide Mechanism Terms**

**1.**     **Lumens Generally**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "guide mechanism" ('100: 16)<br><br>"elongate lumen sized to slideably receive a guide wire" ('468: 1, 22; '437: 1, 28; '314: 1, 20, 27)<br><br>"guide mechanism is configured as a second lumen . . . wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong" ('728: 1; '068: 1)<br><br>"a guide mechanism configured as an elongate lumen . . . a guide wire arranged to be advanced along the lumen" ('728: 10)<br><br>"guide mechanism configured as an elongate lumen and adapted to guide said intravascular blood pump . . . the method comprising: . . . advancing the blood pump system along the guide wire" ('068: 10)<br><br>"elongate lumen having a luminal interior . . . sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong . . . advancing the blood pump along the guide wire to the predetermined location" ('068: 20) | The terms to the left should be construed to have the same meaning: "lumen and guide wire not extending through the free space between the rotor blades" | Ordinary meaning | '100: 16<br>'728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 28 |

Abiomed identifies six separate terms that appear in all six patents-in-suit that generally

refer to a guide mechanism made from an elongate lumen and a guide wire (although not all the grouped terms refer to all three of those components). It contends that the guide mechanism/lumen in those claims must not run through the free space between the rotor blades of the pump. Maquet contends that those terms need no construction.

Abiomed's primary argument is that during prosecution Maquet disclaimed any scope that would include guide mechanisms running through the rotor blades. It points to various statements in the prosecution history of Application No. 12/772,810, which later issued as the '728 patent.

First, at an interview with the examiner on February 28, 2014, Maquet distinguished its invention from a combination of two prior-art references, Bedingham and Gordon, as follows:

> Applicant clarified the nature of the invention, noting that the rotors require a space to rotate within the shroud while pumping blood. Applicant noted that Gordon is a catheter, not a blood pump, and therefore does not require an open lumen for a rotor. [I]f Bedingham were modified with guidewire lumen 46 of Gordon, it would occupy space within the shroud and obstruct impeller 56 of Bedingham. Examiner acknowledged that this combination would destroy the teachings of Bedingham.

(Abiomed Opening Markman Br. Ex. 7-H at MAQ_00004714).

Second, it points to an amendment to the '810 application dated March 27, 2014, in which Maquet stated:

> Bedingham does not include simply an open lumen akin to the Gordon catheter. As a result, Bedingham teaches guiding the blood pump into a location by threading a guide wire in through one of a plurality of outlets of the blood pump, through the space between the blades, and out through one of the plurality of inlet [sic] of the blood pump. Modifying the Bedingham device with the structure of the lumen 46 of Gordon would thus result in the lumen 46 and its sidewall being located in the open space between the blades of the blood pump of Bedingham. If such a lumen were so arranged, the blades of the motor would hit the wall of the lumen and be unable to rotate, thereby preventing the blood pump from operating.
>
> Accordingly, one of ordinary skill in the art both could not and would not combine Bedingham, Nix, and Gordon.

(Abiomed Opening Markman Br. Ex. 7-I at MAQ_00004726).

The Examiner relied on that distinction to find the claims patentable over three possible prior-art grounds: (1) Bedingham in view of Gordon or Nix, (2) Bedingham in view of Nix and Masch, and (3) Völker. (Abiomed Opening Markman Br. Exs. 7-J & 7-K ("Additionally, Völker does not provide a separate second lumen for the guide mechanism. Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning.")).

Abiomed lumps the term "guide mechanism," as used in claim 16 of the '100 patent, together with claim terms from the other patents that refer specifically to "lumens." But Abiomed also contends that the larger phrase, "guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient," as it appears in claim 16 of the '100 patent, should be construed as a means-plus-function term. The prosecution history on which Abiomed relies in this section refers specifically to lumens and does not readily apply to so generic a term as "guide mechanism." The Court will therefore address the term "guide mechanism," as used in claim 16 of the '100 patent, below with the other terms alleged to be means-plus-function claims.

As to the other five terms, the Court concludes that Maquet's statements during prosecution indeed serve to disclaim the scope of the patent. Maquet made clear, unequivocal statements that a person of ordinary skill in the art would not combine the prior-art references suggested by the examiner, because the combination would result in a guidewire lumen running through the open space between the blades of the pump and would prevent those blades from turning.

Although that disclaimer appears in the prosecution of the '810 application, which became the '728 patent, it applies with equal force to the later-issued patents. The '068, '468,

'314, and '437 patents all issued from applications that were descendants of the '810 application. Moreover, each descendant was either a continuation or division of the previous application, such that the specifications are identical and no new matter was ever introduced that might widen the scope of the meaning of the claim terms when read in light of the specification. It is generally true that a statement disclaiming claim scope is directed at the particular claims at issue during the prosecution in which the statement is made. However, the Federal Circuit has expanded the effect of disclaimers to claims of other patents in the same family when the statement unambiguously reflects the patentee's own understanding of the scope of its invention. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue."); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306-07 (Fed. Cir. 2007); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 537 F.3d 1340, 1349-50 (Fed. Cir. 2004) ("[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application."); *see also Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) ("We have previously held that where multiple patents 'derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.'" (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005))).

Such is the case here. There is nothing in the claims of the later-issued patents to suggest that Maquet intended to claim what it admitted to be inoperable devices, in which the lumen for the guidewire extended through the free space between the rotor blades. *See Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1274 (Fed. Cir. 2016) (explaining that applying a disclaimer made

during prosecution of one patent to a related patent is not appropriate when the "purported disclaimers are directed to specific claims terms that have been omitted or materially altered in subsequent applications" (quoting *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007))).  Indeed, the examiner of the application that later issued as the '468 patent allowed those claims over Bedingham for the same reason:  "Bedingham also lacks an elongate lumen sized to slidably receive a guide wire.  At most, Bedingham calls for a guide wire that does not pass through a separate lumen, but instead passes through existing openings of the rotor and pump."  (Abiomed Opening Markman Br. Ex. 9-D at MAQ_00009242).

Maquet argues that the examiner's unilateral statements about Völker as to the '728 patent and Bedingham as to the '468 patent do not amount to a disclaimer.  *See Salazar v. Proctor & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).  But they need not be—Maquet had already explicitly disclaimed embodiments in which the guidewire lumen extends through the free space between the rotor blades.  The examiners' later statements merely tend to show that one of ordinary skill in the art, reading the prosecution history in this patent family, would view the claims of the '728 and '468 patents as excluding the inoperable embodiments that would result from applying the teachings of the prior-art references cited.  *Id.* at 1346 ("[T]he Examiner's Statement of Reasons for Allowance may help show that the applicant's own arguments during prosecution constitute a clear disavowal of claim scope.").  Furthermore, Maquet appears to have approved of the examiner's treatment of Völker as of the IPR proceedings of the '728 and '068 patents.  (Abiomed Opening Markman Br. Ex. 12 at 63 (stating in its preliminary patent owner's response that "the Examiner explicitly considered and found the claims [of the '728 patent] patentable over . . . Voelker" and that "the Board should defer to Primary Examiner Kidwell's considered judgment and deny the petition"); Abiomed Opening

Markman Br. Ex. 13 at 64 (same)).

Maquet further contends that at most it disclaimed a *permanent* guide lumen that extended between the free space of the blades, not the use of a temporary one. (Maquet Reply Br. at 21-22). But that is not a fair reading of the patent or the disclaimer. While certain parts of the specification suggest that the guidewire can be removed prior to operation, ('437 patent, col. 12 l. 59-col. 13 l.2; *id.*, col. 14 ll. 44-49), nothing suggests that the guidewire lumen itself is removable. Moreover, the patent's whole purpose is to "provid[e] an improved intravascular blood pump equipped with *integrated* features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system." (*Id.*, col. 2 ll. 64-67 (emphasis added)). Maquet criticized the proposed combination of prior art because "the structure of the lumen . . . of Gordon would thus result in the lumen . . . and its sidewall being located in the open space between the blades of the blood pump of Bedingham." (Abiomed Opening Markman Br. Ex. 7-I at MAQ_00004726). There is nothing about the examiner's proposed combination to suggest that he was rejecting the claims only as they applied to "permanent" lumens, and a person of ordinary skill in the art would not read the exchange that way. Maquet's attempt to narrow its disclaimer is therefore unpersuasive.

Accordingly, the term "guide mechanism" as it appears in claim 16 of the '100 patent will be construed below. The other five terms identified in this group will be construed to include the limitation that the guidewire lumen does not extend through the free space between the rotor blades.

### 2. Lumen Arranged Coaxially with the Cannula

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construc-tion | Patent: claim(s) |
| --- | --- | --- | --- |

| "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion of] the cannula" | "a guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter" | Ordinary meaning | '728: 10<br>'068: 10, 20<br>'314: 1, 20 |
|---|---|---|---|

Abiomed contends that this term must be construed to require that the guidewire lumen pass coaxially through (1) the cannula (as to the '728 and '068 patents) or a portion of the cannula (as to the '314 patent) and (2) the catheter. Maquet contends that the lumen need not pass through either the cannula or the catheter. Although the parties group these claims for construction, they are in fact different and worth reciting separately and in context.

As it appears in claim 10 of the '728 patent, the term is as follows: "wherein the lumen is arranged coaxially with at least one of a distal end or a proximal end of the cannula, and the cannula and the lumen are arranged in series longitudinally." ('728 patent, col. 19 ll. 53-56).

Claims 10 and 20 of the '068 patent state as follows: "wherein the elongate lumen (a) is sized substantially smaller than an inner diameter of the cannula and intravascular blood pump; (b) is arranged coaxially with at least one of a distal end or a proximal end of the cannula, and (c) is arranged in series longitudinally with the cannula," ('068 patent, col. 19 ll. 56-61), and "the elongate lumen (a) having a luminal interior sized smaller than an inside diameter of the cannula and sufficiently large enough to accommodate the guide wire when the guide wire is advanced therealong, (b) arranged coaxially with respect to at least one of a distal end or a proximal end of the cannula, and (c) arranged in series longitudinally with the cannula," (*id.*, col. 20 ll. 49-55).

Claims 1 and 20 of the '314 patent identically read: "an elongate lumen arranged coaxially with at least a portion of the cannula and in series longitudinally with the cannula, and an end of the elongate lumen is adjacent an end of the cannula, the elongate lumen sized to slidably receive the guide wire and having a diameter sized smaller than a diameter of the cannula lumen." ('314 patent, col. 34 ll. 15-21; *id.*, col. 36 ll. 5-11).

Therefore, as to the '728 and '068 patents, the claim language requires that the lumen be arranged coaxially with at least a one of a distal end or a proximal end of the cannula, and, as to the '314 patent, it must be arranged coaxially with at least a portion of the cannula. Every claim requires the lumen to be arranged "in series longitudinally" with the cannula.

During the prosecution of the '728 patent, Maquet attempted to add dependent claim 30, which included the phrase "the guide wire passing through the elongate lumen in the cannula but not extending through the catheter." (Abiomed Opening Markman Br. Ex. 7-G at MAQ_00004679). The examiner rejected that claim for failing to comply with the enablement requirement of 35 U.S.C. § 112. He explained:

> Parent claim 29 has been amended to describe a guide mechanism having a lumen arranged coaxially with the cannula. This describes the embodiment of Figs. 1-5 (¶ [0069], "over-the-wire" guide mechanism 16). The claimed embodiment has a guide lumen that extends through the catheter. Another embodiment describes a guide mechanism that does not extend through the catheter (¶ [0073], Figs 6-9, "side-rigger" guide mechanism 122). However, no single embodiment or combination of embodiments discloses a coaxial guide lumen that passes through an elongate lumen in the cannula and does not extend through the catheter.

(*Id.* at MAQ_00004679-80). In response to this rejection, Maquet simply cancelled claim 30. (Abiomed Opening Markman Br. Ex. 7-I at MAQ_00004723).

As to passing through the catheter, Maquet has clearly disclaimed devices in which a lumen coaxial with the cannula passes through the cannula but not the catheter. "[A] patent applicant cannot later obtain scope that was requested during prosecution, rejected by the Examiner, and then withdrawn by the applicant." *UCB, Inc. v. Yeda Research & Dev. Co.*, 837 F.3d 1256, 1260-61 (Fed. Cir. 2016). That is exactly what happened here: Maquet requested a claim that would cover a lumen coaxial with the cannula that passes through the cannula but not the catheter; the examiner rejected it as not enabled; and then Maquet withdrew the claim. It may not now argue that the claims remaining in the patent cover such lumens.

Maquet contends that any disclaimer in the prosecution of the '728 patent should not apply to the '068 and '314 patents, which are different in scope from (unasserted) claim 10 of the '728 patent. While the claims of the '068 and '314 patent are certainly different in scope in that they contain different and additional limitations, they are not significantly different in scope as to the limitation at issue here. The reason the examiner balked at the addition of claim 30 is that it was not *enabled* by the specification, because the specification did not adequately describe an embodiment in which (1) the lumen was coaxial with the cannula and (2) the lumen did not extend through the catheter. Claims 10 and 20 of the '068 patent and claims 1 and 20 of the '314 patent also recite a lumen that is coaxial with the cannula, and the specification is identical. Therefore, the examiner's objection and Maquet's disclaimer should apply with equal force to the later patents.

The closer question is whether the lumen that is "coaxial" with the cannula must "pass through" the cannula. Maquet contends that it need not, arguing that "a POSA would understand that lumen and cannula elements may share a common axis without physically intersecting one another" because "(a) the lumen at issue is capable of extending through structures other than the cannula, such as the blood pump, drive cable assembly, purge fluid delivery system, and motor coupler" and "(b) neither the lumen nor the cannula is necessarily straight from end to end, and in fact specific embodiments containing non-linear lumens and cannulas are provided." (Maquet Opening Markman Br. at 37).

The Court fails to see how the fact that the cannula may be non-linear would make a person of ordinary skill in the art understand that the lumen and cannula may be coaxial without intersecting. Surely that fact works against Maquet, as the benefit of describing the lumen as coaxial with the cannula in a non-linear configuration is that it neatly explains that the lumen

takes the shape of the cannula by following the curve of the cannula's axis. And while (in a linear configuration), one could describe a lumen that passes through the blood pump and drive-cable assembly but not the cannula as "coaxial" with the cannula, Maquet does not explain how a device so configured could possibly function as a guide mechanism. There is certainly no such embodiment described in the specification or the claims—all of the figures describing a lumen coaxial with the cannula also show the lumen passing through the cannula. ('728 patent, figs.1-5). Indeed, some of the claims require that the lumen be sized substantially smaller than the cannula, and that the guidewire be slidably advanced through the lumen. Those requirements make no sense if the lumen is not to go through the cannula, or is to abruptly terminate before reaching the cannula. Added to that, the examiner—the closest thing to a person of ordinary skill in the art to express an opinion, as neither party has presented expert evidence at this stage— clearly viewed the claims in which the lumen was coaxial with the cannula as claiming the "over-the-wire" embodiment of the invention, in which the lumen passes through the cannula. *See Salazar*, 414 F.3d at 1347 ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed.").

Maquet is correct that nothing in the claims or specification explicitly requires that the lumen coaxial with the cannula pass through the cannula, and generally it is inappropriate to read particular embodiments as limitations on the claims. But claims must be read in light of the specification, and it is equally inappropriate to pluck the claims out of context. *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320-21 (Fed. Cir. 2016); *Trs. of Columbia Univ. v. Symantec Corp*, 811 F.3d 1359, 1364 (Fed. Cir. 2016); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1142-45 (Fed. Cir. 2005) ("Nystrom is not entitled to a claim construction divorced from

the context of the written description and prosecution history . . . .  What *Phillips* counsels is that in the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public—i.e., those of ordinary skill in the art—that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.").  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  Here, not only are there no examples in the specification of a coaxial guide lumen that does not pass through the cannula, but the Court cannot see—and Maquet appears unable to explain—how such a device would function.  Thus, in the context of this specification, the claims cannot reasonably be read to cover a device whose lumen does not pass through at least a portion of the cannula.

Therefore, the term "wherein the lumen is arranged coaxially with [at least one of a distal end or a proximal end] / [a portion of] the cannula" will be construed to mean "a guide lumen that passes coaxially through [at least one of a distal end or a proximal end] / [a portion of] the cannula and extends through the catheter."

### 3.  Elongate Lumen Associated with the Cannula

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "an elongate lumen associated with the cannula" | "a permanent lumen formed along the side of the cannula" | Ordinary meaning | '468: 1, 22 '314: 27 '437: 1, 28 |

Abiomed contends that the term "an elongate lumen associated with the cannula" should

be construed to mean "a permanent lumen formed along the side of the cannula."  Maquet contends that the term should be given its ordinary meaning.

Abiomed contends that every claim that discusses an "elongate lumen associated with the cannula" must be claiming a "side-rigger" design, and that therefore the elongate lumen must be "a permanent lumen formed along the side of the cannula."  Its chain of reasoning is as follows: (1) every elongate-lumen claim contains language that the elongate lumen does not extend through the rotor hub, that the elongate lumen must "slidably receive the guide wire," and that the guide wire does not pass through the rotor hub or the catheter; (2) Maquet acquiesced in the examiner's determination that a "guide wire not passing through the catheter" is inconsistent with an over-the-wire design, but is part of the side-rigger design; and (3) the specification repeatedly and consistently describes the "side-rigger" design as having a "side lumen . . . formed along a length of at least one of the intravascular blood pump and cannula."  ('437 patent, col. 3 ll. 26-29; *see id.*, col. 14 ll.15-21 ("In an important aspect of the present invention, the 'rapid exchange' or 'side-rigger' guide mechanism 122 includes a guide carriage 124 formed along at least a portion of the cannula . . . ."); *id.*, col. 14 ll. 39-44 ("[T]he guide carriage 124 may be formed along the interior surface of the cannula 14."); *id.*, col. 14 l. 63-col. 15 l.4 ("[B]ecause the guide mechanism 122 is disposed along the side of the cannula 14, there is no need to form a central lumen extending through the blood pump 12 . . . .")).

If that were the only evidence, it would not be sufficient to support the construction proposed by Abiomed.  By cancelling "over-the-wire" claims in which the guide wire does not pass through the catheter, Maquet was at most agreeing that such claims were not enabled; it was not necessarily declaring that all claims in which the guidewire does not pass through the catheter are side-rigger claims.  And the portions of the specification Abiomed points to as

describing the elongate lumen as "formed along" the side of the cannula are "preferred embodiments" and do not explicitly define even the "side-rigger" aspect of the invention, much less the invention as a whole. Nonetheless, there is substantial evidence that during the IPR proceedings Maquet disclaimed certain interpretations, and that a narrower construction is accordingly required.

In IPR petitions to the Patent Office, Abiomed cited to Jegaden as part of certain obviousness combinations.[4] Jegaden describes passing a guide catheter through a hole in the cannula and passing the guide wire through the catheter. (Maquet Opening Br. Ex. 21 at 61).



The guidewire, then the catheter, then the cannula are successively advanced into the heart. Once the cannula is in place, the guidewire and catheter are removed. (*Id.* Ex. 21 at 61-63). During the IPRs of the '468, '314, and '437 patents, Maquet took the position that "Jegaden does not teach or suggest a *permanent* lumen at the distal end of the cannula," and therefore it "fail[s] to teach or suggest the claimed 'elongate lumen.'" (Abiomed Opening Markman Br. Ex. 15 at 48 (emphasis added); *id.* Ex. 19 at 47; Patent Owner's Preliminary Response at 44, IPR2017-

[4] O. Jegaden, *Clinical Results of Hemopump Support in Surgical Cases*, in TEMPORARY CARDIAC ASSIST WITH AN AXIAL PUMP SYSTEM 61 (W. Flameng ed., 1991). (Maquet Opening Markman Br. Ex. 21).

01207 (PTAB Aug. 8, 2017)).  That is a clear and unmistakable statement that the "elongate lumen" must be permanent.

During the IPR proceedings, Maquet also distinguished its "elongate lumen" claims from Jegaden by explaining that "Jegaden provides a separate device—a catheter with a guide wire—to guide an unmodified device into a patient.  If anything, this teaches away from the modification Petitioners propose.  Jegaden teaches that instead of modifying the cannula to accommodate a side lumen, a separate catheter should be used."  (Abiomed Opening Markman Br. Ex. 15 at 47; *id.* Ex. 19 at 46-47; *see* Patent Owner's Preliminary Response at 43, IPR2017-01207 (PTAB Aug. 8, 2017)).  By saying that the "elongate lumen" claims are not satisfied unless the cannula is modified to accommodate a side lumen, Maquet has clearly and unmistakably (1) associated the "elongate lumen" claims with the side-rigger design and (2) explained that, in its view, the cannula itself must be modified to support the side lumen. That concession effectively disclaims an embodiment where the "elongate lumen" merely runs through the cannula.

Abiomed concedes that the words "associated with"—and its proposed construction, "formed along"—include "lumens formed along the side of a cannula, [and] lumens formed within a guide carriage that is formed as an extension of either the interior or exterior surface of a cannula."  (Maquet Opening Markman Br. at 38-39; Abiomed Reply at 25).  It is hard to tell exactly what lumen positions Maquet intends to encompass with its ordinary-meaning construction, but once "elongate lumens" that merely run through the cannula are eliminated, then there appears to be no difference between lumens "associated with" versus "formed along"

the cannula.[5]

Accordingly, considering the claims, specification, and prosecution history as a whole, the term "an elongate lumen associated with the cannula" will be construed to mean "a permanent elongate lumen formed along the side of the cannula."

### 4. "Delimited by the Outer Cannula Surface"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | "guide lumen integrally formed within the surface of the cannula" | Ordinary meaning | '728: 1 '068: 1 |

The next disputed term is best understood in connection with the phrase that immediately precedes it. In both the '728 and the '068 patents, the relevant portion of the claim reads:

> a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length;
>
> . . .
>
> a guide mechanism configured as a second lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within the circulatory system of a patient;
>
> *wherein an axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface*, and wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong.

('728 patent, col. 18 ll. 43-59 (emphasis added); '068 patent, col. 18 ll. 48-62 (emphasis added)).

---

[5] Even Maquet's dictionary definitions appear to suggest, in the context of a description of the physical arrangement of components, a physical connection. "'Associated' is defined as: 'to join together; connect; combine' (as a verb); 'accompanying; connected' (as an adjective). (Maquet Opening Markman Br. at 38).

Abiomed contends that those claims are directed to a subset of the "side-rigger" designs, and that the italicized portion should be construed to mean a "guide lumen integrally formed within the surface of the cannula." Maquet contends that there is no reason to believe that the claims are limited to "side-rigger" designs, and therefore the term should be given its ordinary meaning.

Abiomed's argument focuses on the prosecution history for this claim term, which was amended twice. It first appeared in the application that later issued as the '728 patent in claim 15 as the following: "wherein said guide mechanism is configured to accept a guide wire for passage through a side lumen formed in said distal portion of said intravascular blood pump system." (Abiomed Opening Markman Br. Ex. 7-A at MAQ_00004467-68). Maquet did not point to any particular part of the specification as support for this claim—it asserted only that "[n]o new matter has been added." (*Id.* Ex. 7-A at MAQ_00004470). The examiner rejected the claim by citing Bagaoisan (U.S. Patent No. 6,849,068), which shows a side lumen for a guide wire attached to the outside of the cannula:



*FIG. 7A*

(*See* Abiomed Opening Markman Br. Ex. 7-B at MAQ_00004568).

Maquet responded by amending the claim as follows: "wherein said guide mechanism is positioned along a length of the cannula and interior to a region delimited by the outer cannula surface, wherein the guide mechanism is configured to accept allow for a guide wire to slideably

35

advance therealong ~~for passage through a side lumen formed in said distal portion of said intravascular blood pump system~~." (*Id.* Ex. 7-B at MAQ_00004564). It explained: "Claim 15 as amended recites among other things, 'a cannula extending from the shroud and comprising an outer cannula surface, the outer cannula surface having a substantially circular cross-section along a portion of its length', 'a guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within the circulatory system of a patient,' and 'wherein said guide mechanism is positioned along the length of the cannula *and interior to a region delimited by the outer cannula surface*.' Applicants respectfully submit that neither Summers et al., nor Bagaoisan et al., individually or in any proper combination disclose, teach or suggest the amended claim." (*Id.* Ex. 7-B at MAQ_00004568). Maquet did not identify any support for the amendment to claim 15 in its remarks. (*Id.* Ex. 7-B at MAQ_00004567).

Maquet had claimed priority to its 1999 provisional filing. The examiner stated that the support for the amendment came from Figure 9 of the pending application, which did not appear in the 1999 provisional filing, but first appeared in the PCT utility application that eventually issued as the '100 patent in the United States. (Abiomed Opening Markman Br. Ex. 7-C at MAQ_00004580 ("Claim 15 has been amended to call for a guide mechanism described in the specification (¶ [0074], Fig. 9, guide carriage 124 formed along the interior surface of the cannula 14.")).



*FIG 9*

The examiner therefore rejected the 1999 priority date and afforded amended claim 15 (and other claims dependent from it) a priority date of September 1, 2000. (*Id.* Ex. 7-C at MAQ_00004580). He also rejected claim 15 again, this time citing Gordon (U.S. Patent No. 5,938,645), which showed a guide lumen interior to the cannula surface:



(*Id.* Ex. 7-C at MAQ_00004584).

Maquet did not make any argument to distinguish Gordon's guide lumen from the claimed guide mechanism—instead, it distinguished Gordon by citing to other claim amendments (relating to the rotor blades). (Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004625-26). Nevertheless, it did amend the term at issue here to its final form without comment: a guide mechanism "wherein <u>an axis coaxial with and extending through a portion of</u> said guide mechanism ~~positioned along a length of the cannula and~~ <u>extends through</u> a region

delimited by the outer cannula surface, <u>and</u> wherein the guide mechanism is configured to allow for a guide wire to slideably advance therealong." (*Id.* Ex. 7-D at MAQ_00004616).

In the next office action, the examiner again cited to Figure 9 in connection with this claim limitation, explaining that "[c]laim 15 has been amended to describe the 'side-rigger' or 'rapid-exchange' guide mechanism described in the specification (¶ [0074], Fig. 9, guide carriage 124 formed along the interior surface of the cannula 14)." (Abiomed Opening Markmant Br. Ex. 7-E at MAQ_00004633). The examiner again refused to grant priority to 1999 because that material was not included in the provisional filing. (*Id.*). Maquet did not contest the priority determination.

Maquet contends that the term should be given its ordinary meaning. However, of all the terms presented to the Court for construction, this is the most ambiguous on its face. The Court is not certain what the ordinary meaning of the term would be, and Maquet has taken shifting positions as to what it covers.

According to Maquet's opening brief, "a person of ordinary skill would understand the 'region delimited by the outer cannula surface' to encompass the entire cannula, and such person would likewise be capable of determining whether 'an axis coaxial with and extending through' some portion of a guide mechanism extends through, or intersects, such region." (Maquet Opening Markman Br. at 40). By this it appears that Maquet is arguing that the guide mechanism may be anywhere "interior to a region delimited by the outer cannula surface," and that the claim would cover any device where the axis of the guide mechanism even "intersects" the region delimited by the outer surface of the cannula—even if the axis of the cannula and the axis of the guide mechanism are perpendicular to each other. That understanding is clearly too broad. Among other things, nothing in the specification supports a guide mechanism

perpendicular to the cannula and, if such a design would even be operable, it would work in a completely different way from the examples described in the specification.

But then in its reply, Maquet argues that "neither [Bagaoisan nor Gordon] discloses that a portion of the guide mechanism shares an axis with a region delimited by the outer cannula surface. Instead, these figures only show guide mechanism axes that are off-set from the cannula axis. Thus, neither reference discloses the claimed limitation under Maquet's ordinary meaning construction." (Maquet Reply at 30). By this, Maquet seems to change course, and suggest that the guide mechanism axis must be coaxial with the cannula axis. But that understanding is not consistent with the Court's parsing of the claim language—it is not the axis of the cannula that must be coaxial with the axis of the guide mechanism (like an over-the-wire design). It is that *an* axis coaxial with a portion of *the guide mechanism* (that is, the axis of the guide mechanism) must extend through a region delimited by the outer cannula surface (any region, according to Maquet's opening position). There is nothing to suggest that the "guide mechanism . . . configured as a second lumen" must be coaxial with the cannula.

Abiomed contends that the back-and-forth of the prosecution history shows that both the examiner and Maquet intended, with this limitation, to describe the kinds of guide mechanisms described in Figures 8 and 9 of the patents, where the guide lumen is "integrally formed within the surface of the cannula." The first and second iterations of the claim refer respectively to a "side lumen" and a mechanism "positioned along a length of the cannula and interior to a region delimited by the outer cannula surface," which strongly suggest that Maquet set out to claim "side-rigger" type designs. The examiner clearly thought so, as he rejected the claims with reference to two prior-art references describing side lumens—Bagaoisan, with its lumen attached outside the cannula, and Gordon, with its lumen formed along the inside of the cannula—and

cited to Figure 9 of the application, showing a side lumen formed within the cannula wall, as the support for the claim. And, at least with the first amendment, Maquet did not appear to change the side-lumen character of the claim—it just moved the side lumen to the inside of the cannula.

The second amendment is more ambiguous. Nothing about the new text appears to require that the guide mechanism run along or within the side of the cannula. Yet the examiner appeared to think that there was no significant change—he continued to cite Figure 9 as the support for the claim, and even explicitly stated that "[c]laim 15 has been amended to describe the 'side rigger' or 'rapid exchange' guide mechanism." (Abiomed Opening Markman Br. Ex. 7-E at MAQ_00004633).

Abiomed argues that Maquet adopted the examiner's view by failing to contest the examiner's determination that it did not deserve priority going back to the 1999 provisional application. But it appears that the 1999 provisional application covered only the "third broad aspect" of the final invention—the guidable conduit assembly into which the pump assembly can be docked. (*See* U.S. App. No. 60/152,249 (filed Sept. 3, 1999)). Neither party argues that the claim limitation at issue is directed to that embodiment of the invention, as to which the precise position of any guidewire lumen is never described. (*See id.* at 7 ("[T]he task of positioning the conduit assembly 14 within the patient may be advantageously facilitated through the use of any number of well known guidance mechanisms, including but not limited to guide wires, balloon catheters, imaging wires, guide catheters, and/or techniques involving ultra-sound or fluoroscopy."); *id.* at 9; *id.* at 12 ("Moreover, it is contemplated to provide guide structures to the intravascular pump of the present invention. For example, lumens may be provided within such structures as to the pump body 30, the cable drive sheath 46, the catheter section 20 of the conduit assemble 14, etc . . . in order to receive wires for fashioning certain guidance

characteristics, as well for receiving expandable balloon structures for venous applications.");
*see also* '728 patent, col. 13 ll. 19-35). Therefore, even if a failure to contest a priority
determination can sometimes amount to acquiescence in the examiner's description of what the
terms cover, it appears that Maquet would have nothing to gain by protesting the determination
here. Even if it intended to claim more than "side-rigger"-type devices, there was no disclosure
in the provisional application to support any particular guide lumen location in relation to the
cannula.

Nevertheless—and given the ambiguity of the term and Maquet's inability to articulate a
coherent theory of what it believes the claim terms should cover—the examiner's interpretation
of the amendment to claim a "side-rigger"-type design such as that shown in Figure 9 deserves
considerable weight, at least as representative of how one of ordinary skill in the art would
interpret the claims. *Salazar*, 414 F.3d at 1347. However, Maquet specifically amended the
claims to eliminate a reference to the guide mechanism running "along" the cannula in favor of
guide mechanisms "extend[ing] through a region delimited by the outer cannula surface," and
presumably the second-amended claim cannot have an identical scope to the first-amended
claim, regardless of whether the examiner found them to be supported by the same figure of the
application.

The Court accordingly concludes that the meaning of "wherein an axis coaxial with and
extending through a portion of said guide mechanism extends through a region delimited by the
outer cannula surface," considered in light of the claims, the specification, and the prosecution
history, is as follows: the axis of at least a portion of the guide mechanism, "configured as a
second lumen," must run through a region delimited by the outer cannula surface. That
construction includes configurations such as those depicted in Figures 8 and 9 of the '728 and

'068 patents,[6] and configurations such as those depicted in Gordon (which the Court sees no reason to distinguish from Figure 9). It also includes configurations where the second lumen is coaxial with the cannula, such as "over-the-wire"-type designs.[7] It does not, however, include configurations such as those depicted in Bagaoisan. The second lumen must be a separate structural element from the cannula itself, as the terms are listed separately. *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254-55 (Fed. Cir. 2010).

### C. Means-Plus-Function Terms

There are three terms that Abiomed contends should be construed as means-plus-function terms. Maquet contends these terms should be given their plain and ordinary meaning.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts

---

[6] Abiomed concedes that configurations such as that depicted in Figure 8 of the '728 and '068 patents are included in its proposed construction, even though the outer cannula surface protrudes more than it ordinarily would due to the guide lumen disposed in the cannula wall. (Abiomed Opening Markman Br. at 30).



*FIG 8*

[7] Although the Court recognizes that Maquet has conceded that the "over-the-wire" and "side-rigger" designs are distinct and would not be implemented together, those claims do not contain limitations that either clearly indicate one design or are clearly incompatible with any design. (*See* Maquet Reply at 27). General claim language frequently is read to cover more than one embodiment of an invention, and the Court sees no reason that Maquet cannot have generally claimed both designs, even if dependent claims could be limited to one design or the other.

described in the specification and equivalents thereof." 35 U.S.C. § 112(f).[8] "In enacting this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir, 2015). "Permitting an applicant to use a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the '*quid pro quo*' for the convenience of employing § 112, ¶ 6." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007).

If a claim uses the word "means," there is a rebuttable presumption that § 112(f) applies. *Williamson*, 792 F.3d at 1348. Conversely, if a claim does not use the word "means," there is a rebuttable presumption that § 112(f) does not apply. *Id.* While the Federal Circuit in the past described that presumption as "strong," it has abandoned the heightened standard. *Id.* at 1349. Instead:

> The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. *Greenberg* [*v. Ethicon Endo-Surgery, Inc.*], 91 F.3d [1580,] 1583 [(Fed. Cir. 1996)]. When a claim term lacks the word "means," the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails "to recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function."

---

[8] The America Invents Act, Pub. L. 112-29, 125 Stat. 284 (2011), updated § 112 to letter the paragraphs and insert references to joint inventors. *Id.* § 4(c). That amendment became effective on September 16, 2012, and applies to any patent application filed on or after that date. *See id.* § 4(e). As a result, the '100 and '728 patents are subject to the earlier § 112, while the '068, '468, '314, and '437 patents are subject to the new § 112. Happily, the text of the relevant subsection has not changed at all—it has merely transitioned from being referred to as "§ 112 ¶ 6" to "§ 112(f)." For the sake of simplicity, the Court will refer to that subsection as "§ 112(f)" throughout.

*Watts* [*v. XL Sys., Inc.*], 232 F.3d [877,] 880 [(Fed. Cir. 2000)].

*Williamson*, 792 F.3d at 1349.  Furthermore, "[g]eneric terms such as 'mechanism,' 'element,'

'device,' and other nonce words that reflect nothing more than verbal constructs may be used in

a claim in a manner that is tantamount to using the word 'means' because they 'typically do not

connote sufficiently definite structure' and therefore may invoke § 112, para. 6."  *Id.* at 1350

(quoting *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)).

If § 112(f) does apply, then the claims are limited to the corresponding structure

disclosed in the specification.  At that stage, "[i]t is important to determine whether one of skill

in the art would understand the specification itself to disclose the structure, not simply whether

that person would be capable of implementing that structure," and "[i]t is not proper to look to

the knowledge of one skilled in the art apart from and unconnected to the disclosure of the

patent."  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed.

Cir. 2003).

### 1. "Guide Mechanism"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" | Means plus function: Claimed function—"guiding said intravascular blood pump and cannula to a predetermined location within the circulatory system of the patient" Claimed structures—"(a) a guide wire passing slideably through a central lumen extending through a drive cable assembly, blood pump, and cannula; (b) a guide wire passing slideably through a lumen extending through a guide carriage integrally | Ordinary meaning | '100: 16 |

| | formed along at least a portion of the cannula sidewall; or (c) a conduit assembly, including guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly" | | |
| --- | --- | --- | --- |

The term "guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" does not use the word "means," and so there is rebuttable presumption that § 112(f) does not apply. Nonetheless, it is clearly a means-plus-function term. The words "adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" describe a function. As for the words "guide mechanism," "guide" is merely a functional descriptor and "mechanism" is a classic nonce word tantamount to using the word "means." *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) ("We have never found that the term 'mechanism'—without more—connotes an identifiable structure; certainly merely adding the modifier 'compliance' to that term would not do so either."). There is no evidence beyond Maquet's attorney argument that a person of ordinary skill in the art would understand "guide mechanism" to connote a particular, definite structure, and the specification itself clearly uses the term to encompass the prior art:

> To overcome these difficulties [in placing the blood pump in the heart], certain **guide mechanisms** may be employed to assist the physician placing the pump in the appropriate position within the circulatory system. One type of supplemental **guide mechanism** is a guide catheter. . . . While generally effective at providing a guiding feature for such intravascular blood pumps, employing such supplemental **guide mechanisms** is nonetheless disadvantageous in that they consume valuable space within the vessels. . . . The present invention overcomes the drawbacks of the prior art by providing an improved intravascular blood pump equipped with integrated features for selectively guiding the intravascular blood pump to a predetermined location in the patient's circulatory system, i.e. heart and/or vasculature. In so doing, the intravascular blood pump of the present invention eliminates the need for supplemental **guiding mechanisms**, such as a separate, large diameter guide catheter as used in the prior art.

('100 patent, col. 2 ll. 19-55 (emphasis added)).  A person of ordinary skill in the art reading the patent would conclude that the patentee was using the word "guide mechanism" generally to refer to mechanisms for guiding, and that the patent is claiming only certain kinds of "guide mechanisms."  The Court therefore concludes that although the claim does not use the word "means," the use of the generic term "guide mechanism" overcomes the presumption that § 112(f) does not apply.

Maquet argues that even if § 112(f) applies, Abiomed has limited the corresponding structure too narrowly.  It points to text—incorporated by reference into the '100 patent, but reproduced in the '437 patent—that describes additional structural forms that a guide cannula can take.  ('437 patent, col. 22 ll. 23-61).  But the Federal Circuit has held that while the § 112(a) requirement that a patent be enabled can be satisfied by material incorporated by reference, § 112(f) does not allow a patentee to look beyond the text of the specification for the required structure.  *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (explaining that § 112(a) "permits resort to material outside of the specification in order to satisfy the enablement portion of the statute because it makes no sense to encumber the specification of a patent with all the knowledge of the past concerning how to make and use the claimed invention," but that § 112(f) does not have the same "expansive purpose" and merely sets forth "a simple requirement, a *quid pro quo*, in order to utilize a generic means of expression").  In other words, if a patentee wishes to engage in functional claiming, he must clearly set forth in the specification itself the structure he means to include to put the world on notice of the boundaries of his property right.  *Medical Instrumentation*, 344 F.3d at 1220 ("The public should not be required to guess as to the structure for which the patentee enjoys the right to exclude.").  Incorporating material by reference is not sufficient—especially in a case such as

46

this, where the material incorporated by reference is an abandoned application that was never published (except when it was copied into Maquet's subsequent applications more than a decade later).[9]

Apart from the structure described in the material incorporated by reference, Maquet does not attempt to particularly define what structure it contends should be included in the construction; it points only to "the numerous types and configurations of catheters, guide wires, lumens, conduit assemblies, and cannulas that are also disclosed," without any citation to the specification. (Maquet Opening Markman Br. at 43-44). The Court cannot discern from such a vague statement what additional structure, beyond what Abiomed has proposed, Maquet contends should be included. It therefore considers any argument as to additional structures to be waived. *See Saffran v. Johnson & Johnson*, 712 F.3d 549, 562 (Fed. Cir. 2013) ("We have held that structure disclosed in the specification is corresponding structure *only* if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." (quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997))).

Therefore, the term "guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient" will be construed as a mean-plus-function term, with the corresponding structure identified by Abiomed.

---

[9] In *Atmel*, the Federal Circuit was deciding whether the claim was indefinite under § 112(b) for failing to recite any structure at all. *Atmel*, 198 F.3d at 1381-82. Here, there is no dispute as to whether any structure is provided; the question is the scope of that structure. In addition, in *Atmel*, the court held that even though it was not proper to look to the content of the article incorporated by reference, the title of the article, which appeared in the specification, was sufficient to connote structure because it referred to a particular structure that one of ordinary skill would recognize. *Id.* at 1382. Here, the title of the application incorporated by reference was "Steerable Cannula." ('100 patent, col. 18 ll. 25-27). Maquet has provided no evidence that that term alone would sufficiently connote to one of ordinary skill the structures it contends should be included in the construction.

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "blood pressure detection mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | Means plus function: Claimed function—"to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" | Ordinary meaning | '100: 16 |
| "pressure sensing element configured to sense pressure proximate the intravascular blood pump" | Claimed structures—"(a) a fluid filled column disposed within at least a portion of the cannula, (b) a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, (c) a strain gauge coupled to at least one of the intravascular blood pump and cannula, and (d) calculating blood pressure based on the relationship between the torque and motor current of a motor used to drive the rotor" | | '468: 1 '314: 1 |

Abiomed contends that the terms "blood pump detection mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula" and "pressure sensing element configured to sense pressure proximate the intravascular blood pump" should be construed as means-plus-function terms.[10]  Again, neither term uses the word "means," and so there is thus a rebuttable presumption that § 112(f) does not apply.

As compared to the "guide mechanism" term discussed above, the proper treatment of

---

[10] Although not included in the parties' charts as part of the term, the text immediately following "pressure sensing element" in both claims 1 of the '468 and '314 patents reads "configured to sense pressure proximate the intravascular blood pump."

these terms is a closer question. On the one hand, the words "mechanism" and "element" are both nonce words, and the adjectival phrases "blood pressure detection" and "pressure sensing" simply refer to the function of detecting/sensing the pressure of the blood. On the other hand, sensing blood pressure is not a core feature of the invention, which is primarily directed to improved guide mechanisms. Thus, while it was important to distinguish the precise structure of the guide mechanisms claimed (which were new and distinguishable from prior-art guide mechanisms with which the person of ordinary skill might have been familiar), the blood pressure detection mechanisms added to the core invention do not inherently need to be specified in the same way. *See Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019-20 (Fed. Cir. 2017) (holding that "wireless device means" was not a means-plus-function term); *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1582-83 (Fed. Cir. 1996) (holding that "detent mechanism" was not a means-plus-function term).

Furthermore, the specification of the '468 patent indicates that a person of ordinary skill in the art would understand the words "blood pressure detection mechanism" and "pressure sensing element" to have sufficiently definite meaning as the name for structure. First, the patent states:

> It is also contemplated to incorporate various pressure sensing and/or guidability features into at least one of the cannula[] 14 and pump 12. Such features may include, but are not necessarily limited to, those shown and described in . . . U.S. patent application Ser. No. 09/280,970 (filed Mar. 30, 1999) entitled "Pressure Sensing Cannula" . . . . These pressure sensing features may include, but are not necessarily limited to, the use of fluid-filled lumens, piezo-electric pressure sensing elements, strain gauges, and analysis of the torque/current relationship (based on the dynamic pressure differential between the inlet and outlet of the pump).

('468 patent, col. 20 ll. 24-40). The specification of the incorporated application further states:

> Pressure transducers 2224, 2232 are of the type known in the art and each comprises for instance a piezo-electric crystal housed in an integrated circuit (IC) chip (not shown).

. . . .

> An alternative to using pairs of pressure transducers such as transducers 2224, 2232 is the use of a single differential pressure transducer 2254, as shown in FIG. 43. Differential pressure transducers are also well known in the art and comprise for example a piezo-electric crystal electro-mechanically configured to be responsive to a pressure difference between two opposing sides thereof.

(*Id.*, col. 30 ll. 31-34; *id.*, col. 31 l. 64-col. 32 l. 3).[11] The patent not only recites several kinds of structures, which of course would not be sufficient to show that the patentee was not invoking § 112(f), but recites them in such a way as to indicate that the precise structure of the mechanism/element/transducer is unimportant and known.

Thus, from the four corners of the patent itself, it appears that a person of ordinary skill in the art would be aware of various types of pressure transducers that could be used to measure blood pressure in connection with intravascular cannulas. *See Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 885 (Fed. Cir. 2018) (discussing terms including the words "equipment" and "device" and explaining "[a] claim term that has an understood meaning in the art as reciting structure is not a nonce word triggering § 112, ¶ 6"). Abiomed has provided no evidence, beyond the admitted sparseness of the words "mechanism" and "element," to show that a person of ordinary skill would have difficulty determining what structure is meant by these terms. Therefore, the Court holds that Abiomed has not rebutted the presumption that § 112(f) does not apply, and the Court will not construe "blood pressure detection mechanism" or "pressure sensing element" to be means-plus-function terms. Instead, they will be given their ordinary meanings.

---

[11] This material does not appear in the '100 patent, which contains the term "blood pressure mechanism detection." While material that is incorporated by reference is not properly used to determine structure corresponding to a functionally claimed term, the Court sees no reason to ignore it in the initial inquiry as to whether § 112(f) applies.

### D.    Rotor Terms

#### 1.    Rotor Blade Terms

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
| --- | --- | --- | --- |
| "blade extending radially outward from the rotor hub"<br><br>"blade[s] extending radially from the rotor hub" | "blade[s] shaped as an extension of a radius of the rotor hub, not including helical, corkscrew or screw-shaped" | Ordinary meaning | '728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 2, 22<br>'314: 1, 2, 20, 27<br>'437: 1, 28 |

Abiomed contends that the terms "blade extending radially outward from the rotor hub" and "blade[s] extending radially from the rotor hub" should be construed (1) to require that the blades be "shaped as an extension of a radius of the rotor hub," by which it means that the blades cannot be curved, and (2) to exclude helical, corkscrew, or screw-shaped blades. Maquet contends that the terms should be given their ordinary meaning, which does not exclude curved blades.

The specification describes the rotor blades as follows:

The impeller 48 includes a hub 56 and a plurality of blades 58 extending therefrom. . . . The blades 58 are dimensioned to reside in close tolerance with the interior surface of the shroud 36. In operation, the blades 58 impart both an axial and radial vector on the blood which causes it to flow outward through the flow ports 38 formed in the shroud 36.

('437 patent, col. 11 ll. 33-34, 46-51). The figures showing the rotor blades are cross-sections—they seem to show straight blades, but do not clearly indicate one way or the other. (*See id.* figs.3, 14, 18). And they illustrate "exemplary construction[s]" only. (*Id.*, col. 5 ll. 35-36; *id.*, col. 6 ll. 20-21).

The words "blade extending radially outward from the rotor hub" do not appear in the specification, but were first added to the claims of what became the '728 patent in response to obviousness rejections over Summers (U.S. Patent No. 5,112,349) in combination with other

references.  (Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004616, 4618; *id.* Ex. 7-C at

MAQ_00004585).  The examiner indicated its mapping of Summers onto the claims as follows:



Annotated Fig. 3 of Summers et al. (US 5112349)

(*Id.* Ex. 7-C at MAQ_00004585).  Maquet distinguished its claims from Summers by explaining:

> Applicants submit that the Examiner's interpretation of Summers et al. is
> erroneous, and that the structure of Figure 3 of Summers is directed to a moineau-
> type pump.  This type of pump is described in Summers to have a rotor 42 is
> fabricated [sic] of stainless steel material and formed in a helical shape.
> Applicants submit that the Summers rotor appears to have a shape resembling a
> cork-screw of a consistent cross-sectional shape.  Notably, this cork-screw rotor
> does not extend radially from a rotor hub and therefore cannot be construed as a
> blade of the claimed invention.

(Abiomed Opening Markman Br. Ex. 7-D at MAQ_00004625).[12]

The ordinary meaning of "extending radially from the rotor hub" conveys that there is a

central hub with blades sticking out from the sides.  Abiomed focuses on the word "radially" to

suggest that the blades must be straight, arguing that it means "the blade extends like a radius,

---

[12] Abiomed also points to the fact that Maquet distinguished its claims from Masch (U.S. Patent No.
4,728,319), which Abiomed contends shows screw-shaped blades that Maquet disclaimed.  (Abiomed Opening
Markman Br. at 39).  But the examiner never contended that Masch showed a "blade extending radially from the
rotor hub"; he relied on Summers for the blade and contended that a person of ordinary skill would have modified
Summers with the guide mechanism of Masch.  (Abiomed Opening Markman Br. Ex. 7-C at MAQ_00004592-93).
Indeed, a look at Figures 6 and 7 of Masch shows that there is no discernable "blade" separate from a "hub"; rather,
the catheter appears to be one piece with rounded ridges.  Therefore, Maquet's statement that "the structure of a
'blade' is not found in Summers, nor is the structure of a 'blade' taught or suggested in Siess, Masch, or Gordon"
does not clearly and unmistakably disclaim screw-shaped blades.  (*See* Abiomed Opening Markman Br. Ex. 7-D at
MAQ_00004628).

*i.e.*, in a straight line in a single direction from the rotor hub where it originates" and that "[t]o read the claims to include non-radial blades, such as curved blades, for example, would read the modifier 'radially' out of the claim." (Abiomed Opening Markman Br. at 37). But there is nothing in the specification to suggest that the claims are so limited. The specification appears to use the word "radial" in contrast to the word "axial," and to acknowledge that a given feature can include both radial and axial components. (*Cf.* '437 patent, col. 11 ll. 48-53 (speaking about "axial" and "radial" flow of blood, and stating that "[a]s used herein, the term 'axial flow' is deemed to include flow characteristics like that shown in FIG. 3, which include both an axial and slight radial component"; *id.* at col. 24 ll. 53-57 ("Depending on the location of point 1140 and the location of lumen 1136 radially and axially along wall 1122, applied tension to cable 1138 causes cannula 1120 to turn on itself in the direction of pull to thereby assume a curve having a predetermined orientation")). The Court therefore concludes that the term "radially" does not exclude blades that are curved. (*See also* '728 patent, col. 20, ll. 36-42 (contrasting the "blades extending radially from the rotor hub" with "rotor hub having a distal tip extending distally beyond the blades" and the "cannula extending distally from the intravascular blood pump")).

That interpretation accords with the prosecution history. Far from being a disclaimer of "helical, corkscrew, or screw-shaped" blades, Maquet's statements in the prosecution of the '728 patent and addition of the words "extending radially from a rotor hub" indicate that it intended to claim rotor blades that extend outward from the *side* of the rotor hub, and not down from the *bottom* of the rotor hub, as the examiner noted in its annotations to Summers. Indeed, in Maquet's view, the corkscrew-shaped component of Summers was properly termed a "rotor" and not a "blade." There is nothing about Maquet's statements distinguishing Summers that forbids the rotor blades from being curved, as long as they extend radially outward from the rotor hub.

53

Indeed, the examiner went on to reject the new claims as obvious over Bedingham, which has curved blades, (Abiomed Opening Markman Br. Ex. 7-G at MAQ_00004682), and Maquet did not distinguish Bedingham on that ground, (*id.* Ex. 7-I). Therefore there is no clear and unmistakable disclaimer of helical, corkscrew, or screw-like blades.

The terms "blade extending radially outward from the rotor hub" and "blade[s] extending radially from the rotor hub" will therefore be construed to have their ordinary meaning.

### 2. Rotor Hub Term

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "a rotor having a rotor hub tapering in the distal direction" | Plain meaning, where patentee disclaimed a hub where any portion tapers in the proximal direction | Ordinary meaning | '728: 1, 10<br>'068: 1, 10, 20<br>'468: 1, 2, 22<br>'314: 1, 2, 20, 27<br>'437: 1, 28 |

Abiomed contends that the rotor hub must taper *only* in the distal direction, whereas Maquet contends that the rotor hub may have some portion that tapers in the proximal direction.

The specification states that:

> The impeller 48 includes a hub 56 and a plurality of blades 58 extending therefrom. The hub 56 is generally conical and, according to the first broad aspect of the present invention, is hollow throughout to form part of the central lumen of the guide mechanism 16. In this regard, the hub 56 is preferably provided with a gasket or seal member 68 at its distal tip.

('437 patent, col. 11 ll. 33-39). The figures show the rotor hub tapering entirely in the distal direction, but, again, they are only exemplary embodiments. (*Id.*, col. 5 ll. 35-36; *id.*, col. 6 ll. 20-21).

As part of the IPR proceedings for all five patents in which this term appears, Abiomed cited to Aboul-Hosn (Pub. PCT App. WO 99/02204) as invalidating prior art. Figure 7B from Aboul-Hosn (annotated to show proximal and distal directions) is shown below:



Aboul-Hosn Patent, Fig. 7B (annotated)

(Abiomed Opening Markman Br. at 41). Maquet distinguished Aboul-Hosn in its preliminary patent owner's responses by arguing that "while having a pointed tip, [it] tapers in the opposite direction, i.e., it tapers in the proximal direction." (Abiomed Opening Markman Br. Ex. 11 at 46; *id.* Ex. 12 at 47; *id.* Ex. 14 at 47; *id.* Ex. 15 at 38; *id.* Ex. 16 at 38; *id.* Ex. 17 at 37; *id.* Ex. 18 at 40; *id.* Ex. 19 at 36; *id.* Ex. 20 at 34; *id.* Ex. 21 at 37; *id.* Ex. 23 at 37).

The plain meaning of the phrase "rotor hub tapering in the distal direction" does not exclude hubs that also have a proximal-tapering portion—it only requires that the rotor hub taper distally. The specification does not say much about the rotor hub; it merely states that, in one embodiment, the rotor hub is "generally conical," a description that allows for variations in shape. ('437 patent, col. 11 ll. 34-37).

While the Court agrees that Maquet's statements during the IPR proceedings disclaim something, they are not clear and unmistakable disclaimers of rotor hubs that include *any* tapering in the proximal direction. Rather, Maquet's statements are most naturally read to explain that Aboul-Hosn *generally* tapers in the proximal direction, contrary to the claims. But even Maquet acknowledges that its IPR statement shows that it does not view the presence of some small tapering in the distal direction (such as the "pointed tip" of Aboul-Hosn) to meet the

limitation "tapering in the distal direction," and the claim construction should reflect that concession. (*See* Maquet Opening Markman Br. at 28 ("Maquet was explaining that Aboul-Hosn's rotor hub generally tapered in the proximal direction—not the distal direction as required by the limitation-at-issue.")).

Therefore, the term "a rotor having a rotor hub tapering in the distal direction" will be construed as meaning "a rotor having a rotor hub generally tapering in the distal direction."

### E. Purge-Fluid Terms

#### 1. "Passing Purge Fluid"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construc-tion | Patent: claim(s) |
|---|---|---|---|
| "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" | "arranged to operate such that purge fluid is delivered to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream" | Ordinary meaning | '728: 1 '068: 1 '468: 1, 22 '314: 1, 20, 27 |
| "passing purge fluid through the purge lumen to the intravascular blood pump"  "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" | "passing purge fluid to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream" | Ordinary meaning | '437: 1  '437: 28 |

Abiomed contends that the terms "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" should be construed to mean "arranged to operate such that purge fluid is delivered to the blood pump where the purge fluid

does not go through the rotor bearings and into the bloodstream." It also contends that the terms "passing purge fluid through the purge lumen into the intravascular blood pump" and "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" should be construed to mean "passing purge fluid to the blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." Maquet contends that those terms should be given their ordinary meaning.

In support of its construction, Abiomed points to a statement made by Maquet during the IPR of the '728 patent:

> In addition, Figure 10 shows bearings (78) engage [sic] with rotor shaft (81). Petitioners' "gap" theory would require purge fluid to run directly between these bearings. Running purge fluid through these bearings and into the bloodstream provides a mechanism to directly inject foreign bearing particles into the circulatory system (e.g., when the pump operates, the bearings wear, releasing solid particles). A POSITA would recognize that injecting floating particles from bearings into a patient's blood stream is a bad idea.

(Abiomed Opening Markman Br. Ex. 11 at 53).

The Court is not entirely sure what to make of this statement. It directly contradicts statements in the specification that clearly contemplate passing purge fluid through ball bearing assemblies and into the bloodstream. ('437 patent, col. 12 ll. 34-36 ("[T]he purge fluid flows distally around the cable adapter 60, through the ball bearing assemblies 50, 52, and onward past the radial seal 64. This egress of purge fluid past the radial seal 64 can be controlled to effectively thwart the ingress of blood past the radial seal 64, which might otherwise cause clotting and/or pump damage."); *see id.*, col. 18 ll. 8-21).

Nonetheless, Maquet clearly and unmistakably disparaged one-way systems in which the purge fluid runs both (1) through bearing assemblies and (2) into the blood stream. And the public is entitled to rely on those clear statements. *Sightsound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015) (interpreting disparagement as disclaimer); *Chi. Bd. Options*

*Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012) (same).[13]

Maquet argues that it "never stated that ***purge fluid*** cannot enter the blood stream in the claimed invention, only that Aboul-Hosn does not teach a purge fluid line because, *inter alia*, Aboul-Hosn's particular configuration would allow ***solid bearing particles*** to enter the bloodstream if it were to be used as a purge fluid lumen." (Maquet Reply at 19). But Maquet does not attempt to show that purge fluid flowing through the bearing assemblies of the claimed invention would not also carry solid bearing particles into the bloodstream. Maquet's IPR statements thus apply with equal force to the embodiment described in the specification of the patents at issue here, in which the purge fluid flows "through the ball bearing assemblies" and "past the radial seal" into the bloodstream.

Finally, Maquet contends that, even if its IPR statements do amount to a disclaimer, that disclaimer should only apply to the '728 patent, the subject of the IPR proceeding in which the statements were made. But as the Court has explained, courts routinely apply disclaimers across claims of related patents with similar terms. Here, Maquet has unequivocally stated that running purge fluid through the bearings and into the bloodstream is a "bad idea," with no qualifications that would suggest the statement applies only to the circumstances of the '728 patent. It makes no difference that that claim 1 of the '728 patent require "a first lumen in fluid communication with the intravascular blood pump," whereas claim 22 of the '468 patent requires a purge lumen "in fluid communication" with "at least one" of the first and second conduits—the '468 patent claims clearly also require passing purge fluid to the pump. (*See* '468 patent, col. 36 ll. 56-69

---

[13] A statement disclaiming claim scope is not erased simply because it was made as an alternative argument—the public is entitled to rely on it as a statement by the patentee as to what it regards as its invention. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").

(including "a fluid delivery pump configured to deliver purge fluid . . . towards the intravascular blood pump")). And according to Maquet's own statement, passing purge fluid through ball bearing assemblies into the bloodstream is not its invention.

The Court is thus faced with a direct contradiction between the specification and the disclaimer in the IPR. Under the circumstances, the narrower construction controls. Therefore, the term "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" will be construed to mean "[first lumen / purge lumen] . . . arranged to operate such that purge fluid is delivered to the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." The term "passing purge fluid through the purge lumen into the intravascular blood pump" will be construed to mean "passing purge fluid through the purge lumen into the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." The term "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" will be construed to mean "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream."

### 2. "First Conduit" and "Second Conduit"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "first conduit . . . second conduit" | "a pair of conduits for introducing and returning purge fluid" | Ordinary meaning | '728: 8 '068: 9 '468: 1, 22 '314: 1, 20, 27 '437: 10, 29 |

Every claim in which the words "first conduit" and "second conduit" appear also requires

"a first lumen" or "purge lumen" "operatively arranged to deliver purge fluid to the intravascular blood pump" and where "at least one of the first conduit and second conduit [is] in fluid communication with the first lumen" or "purge lumen." Abiomed contends that when read in the context of the claims and the specification, the second conduit must also be part of the purge fluid system, and therefore the terms "first conduit" and "second conduit" should be construed to mean "a pair of conduits for introducing and returning purge fluid." Maquet contends they should be given their ordinary meaning.

Abiomed is correct that the specification generally refers to the purge fluid conduits as part of a two-way system: "[T]he intravascular blood pump system 10 includes . . . a purge fluid delivery system 26 for providing a two-way fluid flow within the drive cable assembly 18 during pump operation. The purge fluid delivery system 26 includes a fluid inlet conduit 28 for introducing pressurized purge fluid from a fluid source (not shown) for delivery into the blood pump 12, and a fluid outlet conduit 30 to withdraw a return flow of purge fluid from the blood pump 12." ('437 patent, col. 9 l. 60-col. 10 l. 2). "The side lumens 76 are provided in fluid communication with the fluid inlet conduit 28, while the central lumen 74 is provided in fluid communication with the fluid outlet conduit 30. The side lumens 76 are thus configured to deliver purge[] fluid into the pump 12, while the central lumen 74 is configured to transport purge fluid away from the pump 12 along the length of the drive cable 62." ('437 patent, col. 12 ll. 22-29).

But those descriptions explicitly concern an "exemplary embodiment." ('437 patent, col. 9 ll. 58-60). And the specification also explains that, even in a two-conduit system, the purge fluid need not use the second conduit:

The pressurized purge fluid within the side lumens 76 may take one of two flow paths upon entry into the pump 12. One flow path passes through the interior of

the pump 12 and onward past the radial seal 64 to prevent the ingress of blood
into the pump body 34 during pump operation. More specifically the purge fluid
flows distally around the cable adapter 60, through the ball bearing assemblies 50,
52, and onward past the radial seal 64. This egress of purge fluid past the radial
seal 64 can be controlled to effectively thwart the ingress of blood past the radial
seal 64, which might otherwise cause clotting and/or pump damage. The other
flow path is directed back out the central lumen 74 for delivery to the fluid outlet
conduit 30. In so doing, this flow path bathes the components of the pump 12
and/or drive cable 62 and thereby reduces frictional heating within the pump 12
and/or the central lumen 74 of the sheath 32 during pump operation.

('437 patent, col. 12 ll. 30-46).[14] That description in the specification seems to describe an

embodiment where, although the system contains both a first and second conduit, only one

conduit is used. Abiomed contends that such a construction would render the other conduit

superfluous. But while superfluity of claim language is indeed discouraged, *see Merck & Co. v.

Teva Pharm. USA Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005), superfluity of system components

is not necessarily problematic.

Abiomed also contends that "the claimed pump would be inoperative if only the outflow

conduit (second port) was connected, as no purge fluid would enter into the pump." (Abiomed

Opening Markman Br. at 44). But the claims only require two conduits, at least one of which is

connected to a lumen operatively arranged to deliver purge fluid to the pump. It is immaterial

which conduit is labeled the "first" or "second"; whichever is connected to the lumen operatively

arranged to deliver purge fluid *to* the pump is the inflow conduit, under the plain meaning of the

text.

Even if the Court were to agree that there appears to be no other possible purpose for this

second conduit described in the specification, to hold that the second conduit must be an

---

[14] The specification also explicitly describes a "one way delivery of purge fluid to the blood pump 12" in
connection with "an alternate configuration of the intravascular blood pump system 130 of the third broad aspect of
the present invention." ('437 patent, col. 17 ll. 58-61, col. 18 8-21). But that discussion does not refer to "conduits"
and so does not inform the construction of the terms "first conduit" and "second conduit."

"outflow" conduit would be to import limitations from the specification into the claims. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Abiomed also points to two portions of the prosecution history in support of its construction. First, it points to the examiner's notice of allowance for the '468 patent, in which the examiner distinguished the allowed claims from prior-art reference Bedingham as follows:

> The claimed invention includes a pair of conduit [sic] for introducing and returning purge fluid (¶ [0061], fluid inlet conduit 28 for introducing pressurized purge fluid, and a fluid outlet conduit 30 to withdraw a return flow of purge fluid). In contrast, Bedingham discloses only a single channel for supplying purge fluid which is not returned through a second lumen but instead mixes with blood.

(Abiomed Opening Markman Br. Ex. 9-D at MAQ_00009242). Although these statements are illuminating as to how a person of ordinary skill in the art would read the patent, such unilateral statements of the examiner cannot be considered a clear and unmistakable disclaimer by the patent owner. *See ACCO Brands*, 346 F.3d at 1079. Furthermore, the examiner's statement is consistent with the ordinary meaning of the claims as requiring two conduits, even if one of them is not being used to return purge fluid from them pump—an invention requiring two conduits is still distinguishable from an invention having only one.

Second, Abiomed points to the statement made by Maquet during the '728 patent IPR discussed above, which it contends disclaimed one-way purge systems. (*See* Abiomed Opening Markman Br. Ex. 11 at 53). But the disclaimer is not as broad as that—it only disclaims purge systems wherein the purge fluid flows *both* through the ball bearing assembly *and* into the blood stream. A one-way purge system that does not go through the ball bearing assembly, for

62

example, may fall within the claims.[15]

Accordingly, the terms "first conduit" and "second conduit" will be given their ordinary meaning.

### F.    Miscellaneous Terms

#### 1.    Perfusion

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "perfusing / perfusion [of a patient]" | "rerouting blood to a point downstream from the introduction site of the intravascular blood pump into the vasculature of the patient" | Ordinary meaning | '068: 1, 10, 20 |

Abiomed contends that the terms "perfusing" and "perfusion" must be construed to mean "rerouting blood to a point downstream from the introduction site of the intravascular blood pump into the vasculature of the patient."  Maquet would give the terms their ordinary meaning.

The terms "perfusing" and "perfusion" appear only in the preambles of the claims at issue.  "'Generally, the preamble does not limit the claims.'"  *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (quoting *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002)).  A preamble may be limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  Examples include when "claims 'depend[] on a particular disputed preamble phrase for antecedent basis'; the

---

[15] The Court acknowledges that the specification does not contain an example of such a system.  As with certain other claim terms, Maquet may face enablement or written description challenges on the broader scope it has sought.  But those are questions for another day.

preamble 'is essential to understand limitations of terms in the claim body'; the preamble 'recit[es] additional structure or steps underscored as important by the specification'; or there was 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'" *Georgetown Rail*, 867 F.3d at 1236 (alterations in original) (quoting *Catalina Mktg.*, 289 F.3d at 808). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose of intended use for the invention.'" *Catalina Mktg.*, 289 F.3d at 808 (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)); *see Georgetown*, 867 F.3d at 1236.

The preamble here is used only to state a purpose of intended use—the body of the claims describe a complete invention without the need for the preamble. Abiomed contends that the preamble "breathes life" into the claims because, if the preamble does not limit method claims 1, 10, and 20 of the '068 patent, they would be identical to apparatus claims 1, 10, and 22 of the '728 patent. The examiner of the '068 patent recognized that although the '068 patent claims methods while the '728 patent claims an apparatus, the '068 claims were not patentably distinct from the already-allowed claims of the '728 patent, because "the blood pump system claimed by [the '728 patent] will perform these steps when used as intended." (Non-Final Rejection at 2, 4, '068 patent file wrapper (Aug. 17, 2015)). He rejected them for obviousness-type double patenting, and Maquet filed a terminal disclaimer giving up any rights in the '068 patent that extended beyond the term of the '728 patent. (Terminal Disclaimer Filed, '068 patent file wrapper (Sept. 10, 2015)).

It is not uncommon for a patentee to claim his invention as both an apparatus and a method in the same patent; given the terminal disclaimer, the situation here is no different from that. The doctrine of claim differentiation does not require the preamble to be limiting in such a

case—the claims are fundamentally different in that one is a method and the other is an apparatus. Abiomed provides no other rationale to depart from the general rule that the preamble is not limiting. Indeed, if the '728 patent claims a complete invention, and (as Abiomed contends) the '068 claims are almost identical, then there is no reason to believe that anything is missing from the body of the '068 claims.

"It is well settled that if the body of the claim sets out the complete invention, and the preamble is not necessary to give life, meaning and vitality to the claim, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003) (quoting *Schumer v. Lab. Comput. Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002).

Accordingly, the Court holds that "perfusing / perfusion [of a patient]" does not limit the claims and therefore does not require construction.

**2. Measuring Pressure "Proximate" or "Adjacent" the Intravascular Blood Pump**

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "[detect the pressure of the blood] proximate at least one of the intravascular blood pump and cannula" | "at the opening of the blood pump or the cannula | Ordinary meaning | '100: 16 |
| "[detect the pressure of the blood / sense pressure] proximate the intravascular blood pump"<br><br>"[measuring pressure / calculating blood pressure] adjacent the intravascular blood | "at the opening of the blood pump" | Ordinary meaning | '728: 6, 10<br>'068: 7, 10<br>'468: 1, 22<br>'314: 1, 20, 27<br>'437: 1, 8, 12 |

| pump" | | | |
|---|---|---|---|

Abiomed contends that "proximate at least one of the intravascular blood pump and cannula" should be construed to mean "at the opening of the blood pump or cannula" and that "proximate the intravascular blood pump" and "adjacent the intravascular blood pump" should be construed to mean "at the opening of the blood pump."  Maquet contends that the terms can be given their ordinary meaning.

Abiomed's argument, again, primarily concerns disclaimer.  In its petition for IPR of the '100 patent, Abiomed argued that prior-art reference Aboul-Hosn taught measuring the pressure as required by the claims.  Maquet responded:

> The Petition cites to a vague disclosure in Aboul-Hosn that states that the catheter may include a feature "to measure pressure in the vicinity of the catheter along its entire length" disclosed as part of the stabilization system embodiment (Petition, 43; Ex. 1004 29:19-25). . . .  This vague disclosure **never states that pressure should be measured near the intravascular blood pump**, and thus it does not disclose either of the requirements for the claimed blood pressure detection mechanism.

> . . . .

> Further, the petition relies on the following statement from Aboul-Hosn:  the reverse flow pump (50) "may be also equipped with sensing devices (not shown) for measuring various body conditions such as blood pressure, the presence of blood, or other parameters that would suggest the need for altering the flow rate of the fluid transport apparatus 10" (Ex. 1004, 23:4-8; Petition, 44).  This disclosure is directed to a different pressure detector than the one sent forth in the claims.

> Claim 16 specifies that the pressure detection mechanism is **located proximate the intravascular pump or cannula** (Ex. 1001, claim 16).  This arrangement allows the pressure detection mechanism to **measure the pressure associated with the pump directly, either at the cannula opening or the pump opening**, which assists operators in locating and operating the pump.  In contrast, the disclosure in Aboul-Hosn (and relied on by the Petition) measures the operation of the pump indirectly.  Aboul-Hosn discloses using a sensor with the reverse flow pump to measure "body conditions" ***not*** pump conditions.  Aboul-Hosn discloses using this sensor to measure a patient's "blood pressure," and that this measurement provides an indication of the efficacy of a pump (Ex. 1004, 23:4-8).

Here a sensor is located in a patient's circulatory system generally and operators can observe whether or not the patient's blood pressure is sufficient. The operators can then infer whether the pump is or is not circulating sufficient blood. In this arrangement the sensor would **not be located near either the pump or the cannula**, because neither of those locations provide an accurate indication of a patient's blood pressure. The pressure in either of these locations would not be indicative of a patient's blood pressure generally, but instead would be indicative of the pressure rise associated with the pump.

(Abiomed Opening Markman Br. Ex. 10 at 52-54 (underlined emphasis added)).

Abiomed focuses on Maquet's statement that the blood pressure detection mechanism of claim 16 is located "proximate the intravascular pump of cannula," which allows it to "measure the pressure associated with the pump directly, either at the cannula opening or the pump opening," and contends that Maquet thereby limited its claims to pressure measurements taken "at the cannula opening or the pump opening." But, read in context, Maquet was merely contrasting its claims, which require measuring the blood pressure around the pump directly, with the claims of Aboul-Hosn, which measure the patient's blood pressure generally and infer the efficacy of the pump from that measurement. In the same discussion, Maquet twice refers to the pressure detection mechanism as being "near" the pump, further communicating that the blood pressure detection mechanism of the claims need only be located close enough to the pump or cannula to be measuring the blood pressure of the area directly. Maquet's statements in the IPR do not clearly and unmistakably require the blood pressure detection mechanism to be specifically located at the opening of the pump or cannula, and are consistent with the ordinary meanings of "proximate" and "adjacent."

Abiomed also contends that the terms "proximate" and "adjacent" are ambiguous and that the specification fails to clarify what they mean. As with the term "intravascular blood pump," Abiomed is free to argue that the claims are indefinite at the appropriate time; for now, it suffices to say that Abiomed has not provided a compelling reason for the claim construction to depart

from the ordinary meaning.

Therefore, the terms "proximate at least one of the intravascular blood pump and cannula," "proximate the intravascular blood pump," and "adjacent the intravascular blood pump" will be given their ordinary meanings.

### 3. "Distal Tip Member"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "distal tip member" | "rod bonded to the end of the cannula" | Ordinary meaning where the "distal tip member" is not a guidewire | '314: 21<br>'437: 22 |

Abiomed contends that the term "distal tip member" in the '314 and '437 patents must be construed to mean a "rod bonded to the end of the cannula" because Maquet has disclaimed all other configurations. Maquet contends that it at most disclaimed configurations where the distal tip member is a guidewire.

The Court agrees with Maquet. The specification states that "[v]arious distal tip configurations can be selected for cannula 1120 depending on the particular application as appreciated by those of ordinary skill in the art." ('437 patent, col. 26 ll. 29-31). It goes on to describe a pigtail shape, which "can be formed by bonding or thermal welding or otherwise attaching a thermoplastic rod 1174 formed into a loop at the distal end of the cannula 1120," and a J-tip wire, which could be "a conventional guidewire movable or fixedly supported in a dedicated lumen" or "supported, rigidly or movably, between layers of material from which the wall 1122 of the cannula 1120 is formed." (*Id.*, col. 26 ll. 31-46). The section concludes by stating: "The above are exemplary modes of carrying out the invention and are not intended to be limiting. It will be apparent to one of ordinary skill in the art that modifications thereto can be

made without inventive departure from the spirit and scope of the invention." (*Id.*, col. 26 ll. 58-62).

In its petition for IPR of the '314 patent, Abiomed pointed to Jegaden as prior art disclosure of a distal tip member. Maquet distinguished Jegaden as follows:

> Jegaden simply shows a conventional guide wire, which cannot be repurposed to be the claimed distal tip member.

> First, the claims demonstrate that the distal tip is attached to the end of the cannula, and cannot be a separate, conventional guide wire. . . .

> The specification further establishes a guide wire is not a "distal tip member," stating how this feature can include a "pigtail shape . . . formed by bonding or thermal welding or otherwise attaching a thermoplastic rod . . . at the distal end of the cannula" (Ex. 1001, 26:33-36). Petitioners ignore this fundamental difference between the claimed "distal tip member" and the separately referenced guide wire explained throughout the specification. Thus, because Petitioners only argument for this limitation relies on a disclosure directed to a guide wire, their argument fails.

> Moreover, the Jegaden guide wire and catheter are never solely at one end of the device, as is required by the claims. When used, they traverse the entire length of the device, even extending outside the patient. The Jegaden guide wire cannot be parsed arbitrarily so that one portion constitutes the claimed "guide wire," but another portion comprises the claimed "distal tip member." Quite simply, the Jegaden guide wire is just that, a guide wire, and cannot be the claimed "distal tip member at one end."

(Abiomed Opening Markman Br. Ex. 18 at 57-59).

Abiomed argues that this is a disclaimer of all J-tip wires, because the guidewire in Jegaden was shown to be shaped like a J; therefore, the only disclosure left in the specification supporting the "distal tip member" is the portion talking about pigtails, which are described as rods bonded to the end of the cannula; therefore, the words "distal tip member" in the claims must be limited to rods bonded to the end of the cannula. There are two principal flaws in that argument.

First, it is true that the specification does not explicitly describe a wide variety of distal

tip configurations. But neither does it attempt to define the term "distal tip member," and there is no reason to read only the particular limitations disclosed by the specification into the claims—quite the opposite. Second, Maquet's statements during the IPR clearly and unmistakably state that the distal tip member cannot be identical to the guidewire—they must be physically separate components. Maquet makes no mention of J-shaped wires, as opposed to other shapes.

Accordingly, the term "distal tip member" will be given its ordinary meaning, except that the "distal tip member" is not a "guidewire."

### 4. "Cannula Coupled to a Distal End of the Intravascular Blood Pump"

| Claim Term | Abiomed's Proposed Construction | Maquet's Proposed Construction | Patent: claim(s) |
|---|---|---|---|
| "cannula coupled to a distal end of the intravascular blood pump" | Maquet disclaimed a cannula with a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end of the cannula" | Ordinary meaning | '468: 1, 22 |

Abiomed contends that the cannula in claim 22 of the '468 patent cannot have a "pigtail, J-shaped, helical, or helix shape, or stem/tail" on its distal end because Maquet disclaimed those cannulas. Maquet contends that the term should be given its ordinary meaning.

During the prosecution of the '468 patent, Maquet attempted to add the following claims, among others:

39. (NEW). The intravascular blood pump system of claim 24 further comprising a pigtail shaped distal tip member at one end.

40. (NEW). The intravascular blood pump system of claim 24 further comprising a J-shaped shaped [sic] distal tip member at one end.

49. (NEW). An intravascular blood pump system, comprising . . . a distal tip member at one end of the cannula, the distal tip member comprising a stem portion, extending distally away from a distal end of the cannula lumen, and a curved tail portion located distal to the stem portion . . . .

50. (NEW). The intravascular blood pump system of claim 49 wherein the elongate lumen is shorter in length than the cannula lumen and the distal tip member is pigtail shaped or J-shaped.

53. (NEW). The intravascular blood pump system of claim 49 wherein when the intravascular blood pump is positioned in the patient to provide left-heart support both the elongate lumen and the tip member are wholly within the left ventricle.

(Abiomed Opening Markman Br. Ex. 9-A at MAQ_00007621-25). Although none of these claims mention helices, the examiner rejected the claims as failing to comply with the enablement requirement:

Claims 39, 40, 49, 50 and 53 call for a pigtail or J-shaped distal tip member, or a stem or tail portion. The specification does not any [sic] feature having a pigtail, J-shaped, helical or helix shape, or stem/tail on the distal end of the cannula. At most, the specification describes several springs located inside the pump assembly (¶ [0064], spring 54; ¶ [0070], spring 94; ¶ [0082], bias spring 156; ¶ [0085], seal spring 182). These helical springs do not project from the distal tip of the cannula, and are not analogous to the claimed pigtail or J-shaped distal tip member. Fig. 19 shows a curved or bent pump, but this does not provide a pigtail shape or stem/tail on the distal end of the cannula.

(Abiomed Opening Markman Br. Ex. 9-B at MAQ_00008885). A subsection of these claims were also provisionally rejected for obviousness-type double patenting. (*Id.* MAQ_00008887 (rejecting claims 24-33, 36, 38-43, 45, 48, 49, and 52)).

Maquet responded to the rejection by cancelling claims 39 and 40, deleting the portions of claims 49 and 50 that referred to a "distal tip member," but leaving claim 53. (Abiomed Opening Markman Br. Ex. 9-C). It also added nineteen new drawings (including figures 30-32, showing the pigtail and J-shaped distal tip members) from the Appendices to the drawings of the pending application. (*Id.* Ex. 9-C at MAQ_00009038). Maquet explained: "Claims 25, 32, 49, 50 and 52 have been amended, while claims 38 through 40 have been cancelled without prejudice or disclaimer. The amendments made to claims 49 and 50 remove limitations directed to the 'distal tip member', and the amendments to dependent claims 25, 32, and 52 have been

made to improve readability." (*Id.* Ex. 9-C at MAQ_00009039).

Abiomed contends that by cancelling or amending claims 39, 40, 49, and 50 in response to the examiner's enablement rejection, Maquet has disclaimed a cannula that has a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end." But any such disclaimer does not seem to the Court to be "clear and unmistakable." First, although the examiner also rejected claim 53 for lack of enablement, Maquet did not cancel or amend that claim, which was eventually allowed. (Abiomed Opening Markman Br. Ex. 9-D at MAQ_00009240). Second, after the rejection, Maquet added the figures depicting the distal tip configurations it was seeking to claim to the specification from the appendices; the examiner did not seem to consider those figures in his rejection. Third, the mere statement that Maquet was cancelling the claims without prejudice or disclaimer would count for little on its own, if it had in fact been forced to surrender claim scope to obtain patentable claims. But Maquet was later successful in claiming cannulas with pigtail and J-shaped distal tip members in what are now the '314 and '437 patents without adding new matter to the specification. (*See* '314 patent, claims 10, 12-13; '437 patent, claims 22-24). Finally, because Maquet did not even try to claim "helical or helix shape" distal tip members, it is certainly not appropriate to hold that it has disclaimed them because the examiner chose to so describe the added claims.

Taken as a whole, the prosecution history does not give the reader a clear and unmistakable impression that Maquet viewed its invention—which in its final form is silent not only as to the shape of the distal tip member, but as to the existence of a distal tip member—to exclude cannulas with a "pigtail, J-shaped, helical, or helix shape, or stem/tail on the distal end." Therefore, the term "cannula coupled to a distal end of the intravascular blood pump" will be given its ordinary meaning.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor, IV
Dated:  September 7, 2018          United States District Judge