_____

|  |  |  |
|---|---|---|
| **ABIOMED, INC.,** | ) | |
| | ) | |
|        **Plaintiff/Counter-Defendant,** | ) | |
| | ) | **Civil Action No.** |
|   **v.** | ) | **16-10914-FDS** |
| | ) | |
| **MAQUET CARDIOVASCULAR LLC,** | ) | |
| | ) | |
|        **Defendant/Third-Party** | ) | |
|        **Plaintiff/Counter-Defendant/** | ) | |
|        **Counter-Claimant,** | ) | |
| | ) | |
|   **v.** | ) | |
| | ) | |
| **ABIOMED EUROPE GMBH,** | ) | |
| | ) | |
|        **Third-Party Defendant,** | ) | |
| | ) | |
|   **v.** | ) | |
| | ) | |
| **ABIOMED R&D, INC.,** | ) | |
| | ) | |
|        **Third-Party Defendant/** | ) | |
|        **Counter-Claimant.** | ) | |

_____

**MEMORANDUM AND ORDER ON MOTION FOR RECONSIDERATION AND/OR**
**CLARIFICATION OF ORDER ON CLAIM CONSTRUCTION**

**SAYLOR, J.**

      This is an action for patent infringement. Defendant Maquet Cardiovascular, LLC owns

six patents directed to guidable intravascular blood pumps and related methods. Plaintiff

Abiomed, Inc. filed this action seeking declaratory judgment that it does not infringe those

patents and that they are invalid.

      The parties submitted proposed claim constructions of eighteen terms or groups of terms.

After a *Markman* hearing, the Court issued its claim-construction opinion on September 7, 2018.

Maquet has filed a motion seeking reconsideration and/or clarification of one of the 18 disputed claim term groups. Specifically, Maquet seeks to have the Court revisit its construction of the "passing purge fluid" terms, which is set forth at pages 56 to 59 of the claim-construction opinion.

In construing the "passing purge fluid" terms, the Court examined Maquet's statement during the '728 patent's IPR that "running purge fluid through . . . bearings and into the bloodstream . . . is a bad idea." (Mem. & Ord. at 57). That statement, the court wrote, "clearly and unmistakably disparaged one-way systems in which the purge fluid runs both (1) through bearing assemblies and (2) into the blood stream." (*Id.*). Thus, the Court concluded, the IPR statement "directly contradict[ed] statements in the specification that clearly contemplate passing purge fluid through ball bearing assemblies and into the bloodstream." (*Id.*). "[F]aced with a direct contradiction between the specification" and the "disclaimer in the IPR," the Court decided that Abiomed's narrower construction of the "passing purge fluid" terms controlled. (*Id.* at 59).

 In seeking reconsideration of the Court's construction, Maquet contends that Abiomed failed to present the entirety of the section of the IPR brief from which its relevant statement was taken. Had the entire section been presented, Maquet contends, its IPR statement would have clearly been understood to have only been speaking about Abiomed's specific "imaginary" version of a prior reference called Aboul-Hosn, and not generally about systems that contemplate passing purge fluid through any part of any bearing assemblies. (Def. Mem. at 12).

Specifically, Maquet contends that Abiomed interpreted Aboul-Hosn as describing a system in which purge fluid is passed through a gap between a shaft and the inner surfaces of

bearings and a magnetic rotor. (*Id.*). It contends that its invention, as described in the specification, "pass[es] purge fluid through bearing assemblies designed to receive purge fluid." (*Id.* at 15). Accordingly, Maquet contends, its system and Abiomed's "imaginary" system are "very different," and thus its IPR statement "should not be expanded" to be understood as a disparagement of the systems described by its patents. (*Id.*).

For the following reasons, the motion for reconsideration will be denied.

**I.    Background**

The facts underlying the Court's claim-construction opinion are set out at length in its Memorandum and Order of September 7, 2018. Familiarity with that opinion is assumed. Some of the background facts relevant to the present motion are repeated below.

**A.    Parties**

Plaintiff Abiomed, Inc. is a manufacturer of the "Impella" line of intravascular blood pumps, which it has been marketing since June 2008.

Defendant Maquet Cardiovascular LLC is the owner of several patents directed to intravascular blood pumps, including the six at issue in this case.

**B.    The Underlying Technology**

The patents at issue in this case involve guidance systems for intravascular blood pumps—essentially, miniature pumps that are inserted through a patient's vasculature into the heart for medical purposes. (*See* '100 patent, col. 1 ll. 48-51; *id.*, col. 17 ll. 52-59). Intravascular blood pumps are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation." (*Id.*, col. 1 ll. 22-27).

Among the challenges in developing such pumps are miniaturization (that is, designing a pump that will work effectively but be small enough to be inserted); preventing the pump from

damaging the heart or the blood (blood cells are delicate); and providing a method for guiding the device to the heart (such pumps are commonly inserted through the femoral artery in the thigh and guided through the body to the heart). (*See id.*, col 1 l. 33-col. 2 l. 18). The patents at issue here principally address the third issue: safely and effectively guiding the pump into the heart.

A subsidiary challenge is that of keeping blood out of the pump, where it may cause clotting or pump damage, and preventing frictional heating of the system. ('100 patent, col. 10 ll. 28-44). The patents at issue describe a "purge fluid delivery system" for addressing those problems.

### C.    Patents at Issue

This lawsuit involves six patents: U.S. Patent Nos. 7,022,100 ("the '100 patent"); 8,888,728 ("the '728 patent"); 9,327,068 ("the '068 patent"); 9,545,468 ("the '468 patent"); 9,561,314 ("the '314 patent); and 9,597,437 ("the '437 patent"). All six belong to the same "patent family," in that they all stem from provisional application No. 60/152,249, filed September 3, 1999. Each subsequent application is either a continuation or division of the previous one; no new material was added to the disclosure. The specifications of the '100, '728, and '068 patents are identical, and the specifications of the '468, '314, and '437 patents are different only in that they explicitly incorporate as Appendices A and B certain material that was incorporated by reference in the other three patents—namely, two patent applications, also owned by Maquet, U.S. Patent App. Nos. 09/280,988 and 09/280,970.[1]

---

[1] The '988 patent application was abandoned and never published (except as it appeared in the patents-at-issue here). The '970 patent application issued as U.S. Patent No. 6,295,877 on October 2, 2001, but expired due to non-payment of maintenance fees on October 2, 2009.

## II.    <u>Standard of Review</u>

The construction of claim terms is a question of law, which may in some cases rely on underlying factual determinations. *Teva Pharm. USA, Inc. v. Sandoz, Inc.¸* 135 S. Ct. 831, 835, 837-38 (2015); *see Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

As set forth in the Court's claim-construction opinion, in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning. The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1313. Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The principal issue here is the weight to be given to the prosecution history. After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower

than it would otherwise be." *Id*. The doctrine of prosecution disclaimer applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1316. As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *see Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) ("[A] disclaimer or disavowal of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record."). Furthermore, "[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).

The present dispute concerns the meaning of terms concerning the delivery and passing of purged fluid. In its claim-construction opinion, the Court construed the term "[first lumen / purge lumen] . . . operatively arranged to deliver purge fluid [to / towards] the intravascular blood pump" to mean "[first lumen / purge lumen] . . . arranged to operate such that purge fluid is delivered to the intravascular blood pump where the purge fluid does not go through the rotor

bearings and into the bloodstream." (Mem. & Ord. at 59). The term "passing purge fluid through the purge lumen into the intravascular blood pump" was construed to mean "passing purge fluid through the purge lumen into the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." (*Id.*). The term "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump" was construed to mean "passing purge fluid through one of the first and second conduits, through the housing and purge lumen to the intravascular blood pump where the purge fluid does not go through the rotor bearings and into the bloodstream." (*Id.*).

The Court's construction derived largely from a statement made by Maquet during the IPR of the '728 patent. During the IPR proceeding, Maquet argued that Abiomed "misread" Aboul-Hosn, a prior reference, because it incorrectly claimed that Aboul-Hosn disclosed a "gap" between the shaft of the pump and the rotor of the electric motor. (IPR Statement at 51). Maquet argued that "[n]o gap is taught or disclosed in Aboul-Hosn." (*Id.*). It gave two reasons for that position.

First, Maquet argued that "Aboul-Hosn could not function if there was a gap as proposed [by Abiomed]." (*Id.* at 52). In substance, it argued that the drive unit used opposing magnets to drive a rotor shaft, one set of which was necessarily affixed to the rotor and one set of which was stationary. (*Id.*). Because the magnetic rotor elements had to be rigidly affixed to the shaft, there could not be a gap between those elements and the shaft—particularly not one filled with lubricating fluid. (*Id.*). In substance, Maquet argued, the rotor would simply spin on the shaft and would not drive the pump.

Second, Maquet argued the following:

In addition, Figure 10 shows bearings (78) engage [sic] with rotor shaft (81). Petitioners' "gap" theory would require purge fluid to run directly between these

bearings. Running purge fluid through these bearings and into the bloodstream
provides a mechanism to directly inject foreign bearing particles into the
circulatory system (e.g., when the pump operates, the bearings wear, releasing
solid particles). A POSITA would recognize that injecting floating particles from
bearings into a patient's blood stream is a bad idea.

(*Id.* at 53). Thus, Maquet clearly, unambiguously, and unmistakably disparaged a one-way

system in which the purge fluid runs both (1) through bearing assemblies and (2) into the blood

stream.

In its claim-construction opinion, the Court noted that the specification of the patents at

issue clearly contemplates passing purge fluid through bearing assemblies and into the

bloodstream. ('437 patent, col. 12 ll. 34-36 ("[T]he purge fluid flows distally around the cable

adapter 60, through the ball bearing assemblies 50, 52, and onward past the radial seal 64. This

egress of purge fluid past the radial seal 64 can be controlled to effectively thwart the ingress of

blood past the radial seal 64, which might otherwise cause clotting and/or pump damage."); *see

id.*, col. 18 ll. 8-21).

There was thus a direct conflict between (1) the disparaging statement in the IPR

(running purge fluid through bearings into the bloodstream is a "bad idea") and (2) the

specification (purge fluid would pass through bearings and egress past the radial seal and into the

bloodstream). The Court concluded that the disparaging statement should be interpreted as a

disclaimer. *See Sightsound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1317 (Fed. Cir. 2015)

(interpreting disparagement as disclaimer); *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,

677 F.3d 1361, 1372 (Fed. Cir. 2012) (same). It therefore adopted, in substance, the construction

proposed by Abiomed.

Maquet argues that the Court failed to consider the context of the section of the IPR brief

in which the disparaging statement was made. But the section in question is very brief, and sets

out two clearly defined alternative arguments as to why Aboul-Hosn could not have included a

"gap" between the shaft and the inner surfaces of the bearings and the rotors. One argument, set forth above, is that the pump simply would not work, because the rotor would spin freely on the shaft rather than driving the shaft. The other argument is that it would be a "bad idea"—presumably, because it would be dangerous to the patient—to inject bearing particles into the bloodstream.

The latter argument was not limited in any way, either expressly or implicitly, by context or otherwise. Maquet perhaps could have made a narrow or technical argument, but it elected not to. It did not say, as it says now, that "passing purge fluid through bearing assemblies designed to receive purge fluid is very different than passing purge fluid through an ill-conceived gap . . . in a system where the rotor is improperly mounted on the same shaft." (Def. Mem. at 15). A person of ordinary skill in the art reading the IPR statement would readily conclude—indeed, no other reasonable conclusion is possible—that Maquet believed that it was a "bad idea" in *any* context to inject bearing particles into the bloodstream.

Maquet also argues that it "never stated that *purge fluid* cannot enter the blood stream in the claimed invention, only that Aboul-Hosn does not teach a purge fluid line because, *inter alia*, Aboul-Hosn's particular configuration would allow *solid bearing particles* to enter the bloodstream if it were to be used as a purge fluid lumen." (Def. Reply at 19). But even assuming the truth of that statement, the claim construction adopted by the Court does not include a limitation that purge fluid cannot enter the bloodstream; rather, it provides that the purge fluid cannot "go through the rotor bearings and into the bloodstream." (Mem. & Ord. at 59).

Furthermore, and in any event, Maquet does not attempt to show that purge fluid flowing through the bearing assemblies of the invention described in the patents would not also carry

solid bearing particles into the bloodstream. All bearings, presumably, are subject to wear, regardless of how they are manufactured. Maquet now contends that a POSITA "would understand that the size and quantity of bearing particles generated by a shaft spinning unsecured and striking the bearings . . . would be substantially different from any bearing particles generated due to normal wear by a magnetic rotor and shaft properly fitted within bearings in a well-designed system." (Def. Mem. at 15). Again, however, it made no such distinction in its IPR statement, or even hint at such a distinction. And the statement it *did* make disparaged the injection of *any* bearing particles into the bloodstream. The disparaging statement made by Maquet in the IPR thus applies with equal force to the embodiment described in the specification of the patents at issue here, in which the purge fluid flows "through the ball bearing assemblies" and "past the radial seal" into the bloodstream.

Finally, Maquet contends that, even if its IPR statements do amount to a disclaimer, that disclaimer should only apply to the '728 patent, the subject of the IPR proceeding in which the statements were made. But, as the Court stated in its earlier opinion, disclaimers apply across all claims of related patents with similar terms. Here, Maquet has unequivocally stated that running purge fluid through the bearings and into the bloodstream is a "bad idea," with no qualifications that would suggest the statement applies only to the circumstances of the '728 patent.

In short, Maquet perhaps did not need to disparage systems where purge fluid passed through bearings into the bloodstream, or did not need to do so in sweeping terms. But it chose to do so, and must live with the consequences of that choice. A person of ordinary skill in the art would understand that disparaging statement to mean that Maquet intended to disclaim any construction of its patents that included such a system. Accordingly, the motion for reconsideration will be denied.

**III.**    **<u>Conclusion</u>**

For the foregoing reasons, the motion for reconsideration and/or clarification of

defendant Maquet Cardiovascular, LLC is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor, IV

Dated: May 22, 2019                  United States District Judge