# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**ABIOMED, INC.,**                                     )
                                                       )
                  **Plaintiff/Counter-Defendant,**     )
                                                       )          **Civil Action No.**
         **v.**                                        )          **16-10914-FDS**
                                                       )
**MAQUET CARDIOVASCULAR LLC,**                         )
                                                       )
                  **Defendant/Third-Party**            )
                  **Plaintiff/Counter-Defendant/**     )
                  **Counter-Claimant,**                )
                                                       )
         **v.**                                        )
                                                       )
**ABIOMED EUROPE GMBH,**                               )
                                                       )
                  **Third-Party Defendant,**           )
                                                       )
         **v.**                                        )
                                                       )
**ABIOMED R&D, INC.,**                                 )
                                                       )
                  **Third-Party Defendant/**           )
                  **Counter-Claimant.**                )
_____)

## MEMORANDUM AND ORDER
## ON ABIOMED'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

**SAYLOR, C.J.**

This is an action for patent infringement. Defendant and counterclaim-plaintiff Maquet

Cardiovascular LLC owns six patents directed to guidable intravascular blood pumps and related

methods. Plaintiff and counterclaim-defendants Abiomed, Inc.; Abiomed R&D, Inc.; and

Abiomed Europe GmbH (collectively, "Abiomed") manufacture the "Impella" line of

intravascular blood pumps. Abiomed filed this action seeking a declaratory judgment that its

Impella products do not infringe Maquet's patents and that they are invalid.  Maquet has filed a counterclaim seeking a declaratory judgment and damages for infringement.  The scope of the case has been narrowed to Claims 16 and 17 of Maquet's Patent No. 7,022,100 ("the '100 patent").[1]

Abiomed has filed a motion for summary judgment of non-infringement.  It contends that it is entitled to a judgment of non-infringement as a matter of law because the Impella products are not literally infringing, nor equivalent under 35 U.S.C. § 112 ¶ 6 or the doctrine of equivalents.

For the following reasons, the motion for summary judgment will be granted.

## I.   Background

The following facts are undisputed except as otherwise noted.[2]

### A.   Factual Background

#### 1.   Parties

Abiomed is a manufacturer of the "Impella" line of intravascular blood pumps, which it has been marketing in the U.S. since June 2008.  (Am. Compl. ¶¶ 4, 8).  Maquet is the owner of several patents directed to intravascular blood pumps, including the '100 patent.  ('100 patent).

#### 2.   The Underlying Technology

The '100 patent involves guidance systems for intravascular blood pumps—essentially, miniature pumps that are inserted through a patient's vasculature, typically into the heart, for medical purposes.  (*See* '100 patent, col. 1 ll. 48-51; *id.*, col. 17 ll. 52-59).  Intravascular blood pumps are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term

---

[1] This case originally concerned infringement of six patents owned by Maquet:  U.S. Patent Nos. 7,022,100; 8,888,728; 9,327,068; 9,545,468; 9,561,314; and 9,597,437.

[2] Many of these facts are drawn directly from the Court's claim-construction order.

2

support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation." (*Id.*, col. 1 ll. 22-27).

Among the challenges in developing such pumps are miniaturization (that is, designing a pump that will work effectively but be small enough to be inserted); preventing the pump from damaging the heart or the blood (blood cells are delicate); and providing a method for guiding the device to the heart (such pumps are commonly inserted through the femoral artery in the thigh and guided through the body to the heart). (*See id.*, col 1 l. 33-col. 2 l. 18). The '100 patent principally addresses the third issue: safely and effectively guiding the pump into the heart.

### 3.   The '100 Patent

Broadly speaking, the '100 patent is directed to "[a]n improved intravascular blood pump system . . . and related methods involving the broad inventive concept of equipping the intravascular blood pump . . . with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient." (*Id.*, Abstract). It explains that a "significant drawback" of prior-art intravascular blood pumps is that they were "difficult to guide into the appropriate position within the circulatory system of a patient" because "the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart." (*Id.*, col. 2 ll. 6-12). The supplemental guide mechanisms then available had the disadvantage of taking up valuable extra space in the blood vessel and requiring a larger access wound than would otherwise be necessary. (*Id.*, col. 2 ll. 19-39). The patent purports to improve the prior art by equipping the pump with integrated guide mechanisms. (*Id.*, col. 2 ll. 47-55).

The '100 patent issued from U.S. Patent Application No. 10/070,178 (the "'178 Application"), which was filed on September 1, 2000. Again, as the litigation has progressed,

the claims have narrowed to encompass only Claim Limitations 16 and 17 of the '100 patent.

Those claims recite:

> 16.  An intravascular blood pump system comprising:  an intravascular blood pump having a cannula coupled thereto, a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient, and a blood pressure detection mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula.

> 17.  The intravascular blood pump system of claim 16 and further, wherein said blood pressure detection mechanism comprises at least one of fluid filled column disposed within at least a portion of said cannula, a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, and a strain gauge coupled to at least one of the intravascular blood pump and cannula.

('100 patent).

The Court's *Markman* order construed the terms "intravascular blood pump" and "blood pressure detection mechanism" according to their ordinary meaning.  (Mem. and Order on Claim Constr. at 20, 48-50).  It construed "guide mechanism" as a means-plus-function term with three claimed structures, where the function is "guiding said intravascular blood pump and cannula to a predetermined location within the circulatory system of the patient."  (*Id.* at 47).  Those claimed structures are:

> (a) a guide wire passing slideably through a central lumen extending through a drive cable assembly, blood pump, and cannula; (b) a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall; or (c) a conduit assembly, including guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly.

(*Id.* at 44-47).

Structure A is colloquially known as an "over-the-wire" guide mechanism, Structure B is known as a "side-rigger" (or "rapid exchange") guide mechanism, and Structure C is known as a "guide catheter" guide mechanism.  (*Id.* at 4).  Maquet alleges that the Impella infringes on

Structure B, the "side-rigger" guide mechanism.

### 4. Side-Rigger Guide Mechanism

As noted, the Court in its *Markman* order construed the side-rigger guide mechanism as "a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall." (Mem. and Order on Claim Constr. at 44-47).[3]

The specification explains that in the "side-rigger" guide mechanism, "a *side lumen* is formed along a length of at least one of the intravascular blood pump and the cannula" through which a "guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient." ('100 patent, col. 3 ll. 3-13 (emphasis added)). The pump and cannula are then advanced along the guide element. (*Id.*, col. 3 ll. 13-16). In the "preferred embodiment" of the specification, "the 'side-rigger' guide mechanism [] includes a lumen [] formed within the guide carriage[]" and "[that] guide carriage [] is preferably formed as an integral extension of the wall of the cannula []." (*Id.*, col. 12, ll. 33-37).

Figures 6-9 of the specification illustrate the side-rigger structure. (*See generally id.*, cols. 11, 12; *id.*, Figs. 6-9). In Figures 6-8, "the guide carriage [] [is] formed along the exterior surface of the cannula 14." (*Id.*, col. 12, ll. 38-40). Figure 9 illustrates "an alternate embodiment wherein the guide carriage [] may be formed along the interior surface of the cannula []." (*Id.*, col. 12, ll. 40-42).

---

[3] The '100 patent's specification states that "the 'rapid exchange' or 'side-rigger' guide mechanism [] includes a guide carriage [] formed along at least a portion of the cannula [], and a suitable guide element (such as guide wire []) dimensioned to pass slidably through a lumen . . . extending through the guide carriage []." ('100 patent, col. 12 ll. 13-19).



(*Id.*, Figs. 6, 8, 9).[4]

### 5.    The Accused Products

Maquet contends that five products in the "Impella" line of intravascular blood pumps infringe the '100 patent:  the Impella 2.5, the Impella 5.0, the Impella CP, the Impella RP, and the Impella CP with SmartAssist.

The Impella line of products consists of FDA-approved guidable heart pumps that are used in hospitals and heart centers.  (Docket No. 764, Ex. 12 ("May 2019 Press Release") at 1). Each of the accused products includes a sensor to detect blood pressure proximate to the pump. (Docket No. 460, Ex. 14 ("Maquet's Third Supp. Infringement Contentions") at 24-31).  The Impella RP passes through the right atrium to provide right-heart support.  (Docket No. 556 ("Maquet Reply to Motion for Leave to Serve Third Supp. Infringement Contentions") at 1). The Impella 2.5, 5.0, and CP are inserted into the left ventricle to provide left-heart support. (*Id.*).  The products vary, among other ways, in motor diameter, blood-flow rate, and price.  (*Id.*).

The "Impella CP with SmartAssist," also known as the "Impella CP Optical," was introduced in 2019, and replaces the piezoelectric blood-pressure sensor of the Impella CP with an optical blood-pressure sensor.  (May 2019 Press Release at 1; *see also* Tr. of Oct. 25, 2019 Hearing at 15-16).  In all other respects, the two products appear to be identical.

---

[4] The "motor assembly" label of Figure 6 is omitted from the depiction of Figure 6 above.  (*See id.*, Fig. 6).

As shown by the illustrations of the Impella 2.5 and the Impella CP depicted below, the accused products all share certain features. All of the accused products have a catheter (shown, but not labelled in the illustrations), a motor, an outlet area, a cannula, an inlet area, and a pigtail. (Docket No. 589, Ex. 5 ("Impella 2.5, 5.0 & CP Instructions for Use ('IFU')"), at 30; Docket No. 589, Ex. 6 ("Impella RP IFU"), at 26-27; May 2019 Press Release at 1).[5] To position the products into the right or left ventricles, a guide wire passes through the outlet area, the space between the rotor blades, the cannula, and out through the pigtail. (*See e.g.*, Impella 2.5, 5.0 & CP IFU at 81-83). The guide wire is then removed before operating the pump. (*Id.* at 22 ("[D]o [not] start the Impella Catheter until the guidewire has been removed."); Abiomed Supp. Mem. at 14-15).

**Impella 2.5**          **Impella CP**



(Impella 2.5, 5.0 & CP IFU at 30).

## II.     Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822

---

[5] The inflow area and outflow area are inverted in the Impella RP, because the Impella RP operates in the right ventricle of the heart. Thus, in the Impella RP, the blood is pushed out of the "distal tip of the cannula," whereas in the other accused products, the blood is drawn in from that location. (*Compare* Impella 2.5, 5.0 & CP IFU at 32, *with* Impella RP IFU at 26-27). The differences are not material to the present dispute. (*See generally* Maquet Opp.; Abiomed Supp. Mem.; *see also* Maquet Opp. at nn. 2, 3; Abiomed Supp. Mem. n. 2).

(1st Cir. 1991) (internal quotation mark omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256–57.

## III.  <u>Analysis</u>

Abiomed has moved for summary judgment of non-infringement on a variety of grounds. It contends that Maquet has disclaimed designs without a side lumen in the cannula sidewall or with a lumen that is distal to the cannula, and that it is also estopped from arguing otherwise.  It also contends that the pigtail is not, in fact, attached to the cannula, but to the inlet cage, and therefore the guide carriage in the accused device is neither "integrally formed" along the cannula sidewall or, indeed, any portion of the sidewall.  It also contends, more fundamentally, that the accused products do not literally infringe, and that Maquet is advancing a broad construction that attempts to recapture subject matter it has disclaimed and to "ensnare" prior art that it has previously distinguished.

Maquet denies that prosecution-history disclaimer or prosecution estoppel applies, and contends that there is a disputed issue of material fact as to whether the pigtail is actually attached to the cannula.  As to the merits, while the precise nature of its response is somewhat unclear, in substance it argues that there is no literal infringement or, at the very least, that the structure is equivalent to the disclosed structures under § 112, ¶ 6, or the doctrine of equivalents applies.  It also argues that the infringement analysis depends on the resolution of disputed issues of fact, and therefore summary judgment is inappropriate.

### A.    Prosecution Disclaimer and Prosecution-History Estoppel

Abiomed first contends that Maquet has disclaimed three types of devices:  (1) devices in which the guide carriage lumen is not "within" the cannula sidewall; (2) devices in which the cannula is not modified to accommodate a side lumen; and (3) devices in which the guide lumen is distal to the cannula.  It further contends that Maquet is estopped from contending that the "side-rigger" structure includes such disclaimed devices.

### 1.    Legal Standard

Prosecution-history estoppel is an important limit on the doctrine of equivalents.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002) ("Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose."); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1238-39 (Fed. Cir. 2001) ("[T]he doctrine of prosecution history estoppel is irrelevant to the determination of literal claim scope." (internal quotation marks omitted)).  Such a claim cannot succeed if it concerns "subject matter relinquished when a patent claim is narrowed during prosecution."  *Conoco, Inc. v. Energy & Envt'l Intern., L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006).

There are two ways in which prosecution-history estoppel can occur:  (1) through a "narrowing amendment to the claim" or (2) "by surrendering claim scope through argument to

the patent examiner." *Id.* For amendment-based estoppel, the patentee bears the burden of showing that the reason for amending the claim "was unrelated to patentability." *Id.* Argument-based estoppel is more forgiving to the patentee; to invoke the doctrine, there must be a "clear and unmistakable surrender of subject matter" in the prosecution history. *Id.* at 1364 (quoting *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.*, 347 F.3d 1314, 1326 (Fed. Cir. 2003)). The court will "not presume a patentee's arguments to surrender an entire field of equivalents through simple arguments and explanations to the patent examiner." *Conoco*, 460 F.3d at 1363.

Although the doctrine of "prosecution-history estoppel" applies to an analysis of infringement under the doctrine of equivalents, "prosecution disclaimer" affects claim construction, and may thus affect the range of equivalents under 35 U.S.C. § 112 ¶ 6. *See Wenger*, 239 F.3d at 1238-39 ("[T]he doctrine of prosecution history estoppel is irrelevant to the determination of literal claim scope." (internal quotation marks omitted)); *Trading Techs. Intern., Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322-23 (Fed. Cir. 2013) (explaining the difference between prosecution-history estoppel and prosecution disclaimer); *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) (distinguishing between doctrine of equivalents and equivalence under § 112 ¶ 6). Like the surrender required for prosecution-history estoppel, the disclaimer must be "clear and unmistakable." *Tech. Prop. Ltd. LLC v. Huawei Techs. Co., Ltd.*, 849 F.3d 1349, 1357-58 (Fed. Cir. 2017). It applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way . . . to maintain their patentability and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

When there are multiple patents in a family, prosecution disclaimer and prosecution-history estoppel may arise from disavowals made during the prosecution of ancestor or later-filed patent applications.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) (disclaimer); *Trading Techs.*, 728 F.3d at 1323 (prosecution-history estoppel); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").

### 2.    Background

#### a.    Proceedings before the PTO

Abiomed points to two statements made in proceedings before the PTO in support of its claim of prosecution-history estoppel or disclaimer.

During an *inter partes* review of the '100 patent, Abiomed cited a conference paper published by Jegaden as part of certain obviousness combinations.  (Docket No. 475, Ex. 15 ("Patent Owner's Preliminary Response, IPR 2017-02134") at 19; *see also* Maquet Opening *Markman* Br., Ex. 21; O. Jegaden, Clinical Results of Hemopump Support in Surgical Cases, in TEMPORARY CARDIAC ASSIST WITH AN AXIAL PUMP SYSTEM 61 (W. Flameng ed., 1991) ("Jegaden")).[6]  That paper describes "running a guide wire and [] French catheter through the distal hole (a hole that was not designed to guide a catheter) of the cannula, as shown in Figure 1 below."  (Patent Owner's Preliminary Response, IPR 2017-02134 at 19) (summarizing Jegaden's

---

[6] Abiomed contended that a combination that included Jegaden rendered the "guide mechanism" term of claim 9 of the '100 patent obvious.  (Patent Owner's Preliminary Response, IPR 2017-02134 at 38-45).  The function and corresponding structure of claim 9 is identical to claims 16 and 17 of the '100 patent.  (*Id.* at 5, 52 (noting that claim 9 requires, among other items, "a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the circulatory system of a patient")).

disclosures)).



Ex. 1033, Fig. 1 (Patent Owner's Annotations in Red Bold)

(*Id.* at 29).

In the IPR proceeding, Maquet took the position that Jegaden did not disclose the side-rigger guide mechanism.  (Patent Owner's Preliminary Response, IPR 2017-02134 at 29, 57).  It explained:

> As can be seen [in Figure 1 above], Jegaden does not include a lumen for a guide wire extending through a guide carriage within the cannula, let alone a guide carriage that is "integrally formed along at least a portion of the cannula sidewall" as [Abiomed contended should be one of the corresponding structures of the "guide mechanism" term].  Similarly, nothing in Jegaden teaches or suggests modifying an existing pump design to include a lumen within the cannula.  In fact, nothing in Jegaden suggests modifying a pump design at all.  Indeed, Jegaden teaches that instead of modifying the cannula to accommodate a side lumen, a separate catheter should be used, a catheter that is passed through a distal hole that was designed with a purpose distinct from using it as a guide mechanism.  In this regard, Jegaden fails to disclose "a guide wire passing slideably through a lumen extending through a guide carriage *integrally formed along at least a portion of the cannula sidewall*," and [Abiomed's] arguments fail.

(*Id.* at 29-30 (emphasis in original) (citations omitted)).

In its *Markman* order, the Court found that Maquet had disclaimed certain subject matter based on the positions it took in other IPR proceedings as to Jegaden's disclosures.  (Mem. and Order on Claim Constr. at 30, 32-33, 34 (citing Patent Owner's Preliminary Response at 43, IPR2017-01207 (PTAB Aug. 8, 2017))).  Specifically, the Court found that Maquet had disclaimed any embodiment where the "elongate lumen" merely runs through the cannula or is

12

not permanent, because Maquet had distinguished Jegaden from the "elongate lumen associated with the cannula" term. (*Id.*). That order explained that "[b]y saying that the 'elongate lumen' claims are not satisfied unless the cannula is modified to accommodate a side lumen, Maquet has clearly and unmistakably (1) associated the 'elongate lumen' claims with the side-rigger design and (2) explained that, in its view, the cannula itself must be modified to support the side lumen." (Mem. and Order on Claim Constr. at 33). For that reason, among others, the Court construed the term to mean "a permanent elongate lumen formed along the side of the cannula." (*Id.* at 34).

In addition, Abiomed points to Maquet's U.S. Patent Application No. 14/966,669 (issued as U.S. patent No. 9,789,238 ("the '238 patent")), which was filed on December 11, 2015. (Docket No. 475, Ex. 20, '238 Patent).[7] In that application, Maquet proposed the following claim language in relevant part:

> 14. A method for providing left-heart support using *an intravascular blood pump system*, the intravascular blood pump system *comprising*:
>
> [1] an *intravascular blood pump* adapted to be guided to a predetermined location within the circulatory system of a patient by a guide wire . . . comprising a *rotor* . . . and a *rotor shroud*;
> . . .
>
> [2] a *cannula* coupled to a *distal end* of *the intravascular blood pump* . . . ; [and]
>
> [3] An elongate lumen associated with the cannula . . . , the entire elongate lumen distal to the intravascular blood pump[.]

(*Maquet v. Abiomed*, 17-cv-12311, Docket No. 138, Ex. 9A at 4-5 of 64; Docket No. 475, Ex. 16-A, at 2-3 ("'238 PH, 8-17-16 Amendment") (emphasis added)).

On June 21, 2017, the examiner rejected the language in question "as failing to comply

---

[7] According to Abiomed, that patent has the same specification as the '100 patent. (*Compare* '100 patent, *with* '238 patent).

with the enablement requirement" and stated that the claim "should be revised to describe that the *entire elongate lumen is distal to one or more of the rotor, first port or rotor shroud.*" (Docket No. 475, Ex. 16-B ("'238 Prosecution History, 6-21-17 Office Action") at 3 (emphasis added)).  The examiner explained his reasoning as follows:  "[the] claim describes the embodiment of Fig. 7, [shown below] which comprises an offset guidewire lumen.  The guidewire lumen extends partially along the pump, on a distal segment of the cannula.  However, the pump also comprises the cannula and the cannula is therefore not entirely distal to the pump."  (*Id.*).



('238 Patent, Fig. 7).[8]

On June 28, 2017, Maquet revised its claim in accord with the examiner's office communication.  (Docket No. 475, Ex. 16-C ("'238 PH, 6-28-17 Amendment") at 2-3, 13 (amending the language in question to "the entire elongate lumen distal to the rotor")).  It stated that "[Maquet] contend[s] that previous claim[] 14 . . . compl[ied] with [the enablement requirement] and therefore traverse the rejection of record as being inappropriate[], however, purely in order to expedite prosecution, [Maquet] [has] amended claim[] 14 . . . in accord[] with the Examiner's suggestions, thereby rendering the Examiner's rejection under [the enablement

---

[8] Figure 7 of the '238 patent is identical to Figure 7 of the '100 patent.  The specification of the '100 patent explains that "FIGS. 7-9 further illustrate the 'side-rigger' or 'rapid exchange' guide mechanism."  ('100 patent, col. 12 ll. 31-42).

requirement] moot."  (*Id.* at 15).

The '238 patent is part of the same patent family as the '100 patent, and is a "child" of

the '100 patent.[9]

### 3.   Analysis

#### a.   Statements in the IPR Proceeding

Abiomed first contends that Maquet (1) has disclaimed all devices in which the guide

carriage lumen is not within the cannula sidewall and the cannula is not modified to

accommodate a side lumen, and (2) is estopped from asserting that such devices infringe the

"side-rigger" structure.  Maquet responds that any contentions of disclaimer or estoppel should

have been raised during the claim-construction phase of the litigation, and Abiomed has

therefore waived any such arguments.

The court has discretion to preclude parties from injecting new claim-construction

theories where the court has prescribed specific procedures and a party has failed to adhere to

them.  *Bettcher Indus. Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 640-41 (Fed. Cir. 2011); *see also*

*SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005).  Failing to timely

raise claim-construction arguments ordinarily results in waiver.  *See Cent. Admixture Pharm.*

*Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) (affirming

district court finding that defendant "waived any argument with respect to [a] term by failing to

raise it during the claim construction phase"); *Fenner Inv., Ltd. v. Microsoft Corp.*, 632 F. Supp.

2d 627, 638 (E.D. Tex. 2009) (noting that where a proposed construction "is contrary to the

---

[9] Specifically, its application was a divisional of U.S. patent application Ser. No. 14/543,815, (now U.S. Pat. No. 9,327,068, issued May 3, 2016), which was a continuation of U.S. patent application Ser. No. 12/772,810, filed May 3, 2010 (now U.S. Pat. No. 8,888,728, issued November 18, 2014), which was a continuation of U.S. patent application Ser. No. 11/375,926, filed March 15, 2006 (now U.S. Pat. No. 7,731,675, issued June 8, 2010), which is a divisional of the '178 Application filed July 19, 2002 (now the '100 patent).  ('238 patent, col. 1 ll. 5-15).

claim construction order and was not raised prior to or even following the claim construction hearing it is waived."); *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2014 WL 252045, at *3-4 (N.D. Cal. Jan. 21, 2014) ("Nor are [courts] obligated to rule on claim construction arguments presented for the first time in summary judgment briefs.").

Here, the Court ordered the parties to submit their opening claim-construction briefs by December 15, 2017.  Reply briefs were filed on January 26, 2018.  After a two-day hearing, the Court issued its memorandum and order on claim construction on September 7, 2018, construing eighteen terms or groups of terms.  On May 22, 2019, it denied Maquet's motion seeking reconsideration of one the claim term groups.  Abiomed thus had ample opportunity to raise its contention of prosecution disclaimer of the subject matter in question, and did in fact raise contentions of prosecution disclaimer as to other terms.  Accordingly, the Court agrees that to the extent not already raised, Abiomed has waived any contentions as to prosecution disclaimer that affect the construction of claims.

As noted, Abiomed also contends that Maquet is estopped from asserting that the purportedly disclaimed devices infringe the "side-rigger" structure, which applies "as part of an infringement analysis." *Trading Techs.*, 728 F.3d at 1322.  It has not pointed to any authority that prosecution-history estoppel must be raised at the claim-construction phase of the litigation. *Cf. Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("Claim interpretation in view of the prosecution history is a preliminary step in determining literal infringement, while prosecution history estoppel applies as a limitation on the range of equivalents if, after the claims have been properly interpreted, no literal infringement has been found."); *id.* ("[T]he range of equivalents that may be accorded a claim due to prosecution history estoppel is [] irrelevant to [] interpretation of those claims.").  Accordingly, that argument

has not been waived, and the Court will consider it.

During the IPR proceeding in question, Abiomed cited to Jegaden as part of certain obviousness combinations.  (IPR2017-02134, Paper 2, IPR Petition at 29).  In response, Maquet argued that "Jegaden teaches that instead of modifying the cannula to accommodate a side lumen, a separate catheter should be used" and "Jegaden does not include a lumen for a guide wire extending through a guide carriage *within* the cannula, let alone a guide carriage that is 'integrally formed along at least a portion of the cannula sidewall' as [Abiomed contended in its petition should be one of the corresponding structures of the 'guide mechanism' term]."  (Patent Owner's Preliminary Response, IPR 2017-02134 at 29-30 (emphasis added)).  Abiomed now argues that Maquet thereby disclaimed all devices in which the guide carriage lumen is not *within* the cannula sidewall, and is estopped from asserting that such devices infringe on the '100 patent.  Under the circumstances, however, Maquet will not be deemed to have made such a disclaimer.

First, that statement is not a clear and unmistakable surrender of all guide carriage lumens that are not within the cannula sidewall.  *See Tech. Prop.*, 849 F.3d at 1357-58.  Among other things, the statement does not in fact clearly convey the idea that the guide carriage lumen *must* be within the cannula sidewall to qualify as a "side-rigger" structure.  Moreover, and in any event, the evidence is insufficient to show that the examiner relied upon that statement.  The petition for *inter partes* review was denied, and Abiomed's obviousness combinations involving Jegaden were never expressly considered.  (Docket No. 475, Ex. 21 ("Decision Denying Institution of *Inter Partes* Review, IPR2017-02134")).  Broadly speaking, the petition was denied because several of the factors in *General Plastic Inds. Co. v. Canon Kabushiki Kaisha*, Case IPR2016-01357 slip op. at 15 (PTAB Sept. 6, 2017) (Paper 19) (precedential) had not been

met.  (*Id.* at 14).

"Although *actual reliance* by the examiner need not be shown, if an estoppel is to rest upon argument made during examination process, the circumstances must be such as to *permit the inference* that such reliance in fact occurred.  A showing that the conduct in question played a material role in the issuance of the patent usually suffices."  *Zenith Laby's, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1425 n.8 (Fed. Cir. 1994) (emphasis added).  Here, the evidence does not permit an inference that Maquet's statement distinguishing Jegaden could have made a difference to the decision.

Accordingly, Maquet is not subject to prosecution-history estoppel based on the statements it made during the IPR proceeding distinguishing Jegaden.

### b.      Statements in the '238 Patent Application

Abiomed also contends that due to a position that Maquet took during its application for the '238 patent, Maquet has disclaimed all devices in which the guide lumen is distal to the cannula, and is likewise estopped from asserting that such devices infringe the "side-rigger" structure.

In that application, as noted, Maquet proposed claim language that stated, in relevant part, "an intravascular blood pump system comprising . . . an elongate lumen associated with the cannula . . . , the entire elongate lumen distal to the intravascular blood pump."  ('238 PH, 8-17-16 Amendment at 2-3).  The examiner rejected the language in question as "failing to comply with the enablement requirement" and stated that the claim "should be revised to describe that the *entire elongate lumen is distal to one or more of the rotor, first port or rotor shroud.*"  ('238 Prosecution History, 6-21-17 Office Action at 3 (emphasis added)).  Maquet revised its claim in response.  ('238 PH, 6-28-17 Amendment at 2-3, 13 (amending the language in question to "the entire elongate lumen *distal to the rotor*" (emphasis added))).

18

As noted, Abiomed has waived any further contentions of prosecution disclaimer, and thus the only issue is whether Maquet is estopped from contending that devices in which the guide lumen is distal to the cannula infringe the '100 patent.

The '238 patent is part of the same patent family as the '100 patent.  ('238 patent, col. 1 ll. 5-15).  But "arguments made in a related application do not automatically apply to different claims in a separate application."  *Trading Techs.*, 728 F.3d at 1323 (quoting *Biogen, Inc. v. Berlex Laby's, Inc.*, 318 F.3d 1132, 1139 (Fed. Cir. 2003)).  Here, the surrender was made in connection with a different claim with different terms in a different patent.  *Cf. ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("[P]rosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language.");  *Ventana Med. Sys. v. Biogenex Laby's, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[P]rosecution disclaimer generally does not apply when the claim term in the descendent patent uses different language.").  Although both claims concern the "side-rigger" structure, claim 14 of the '238 patent and claim 16 of the '100 patent employ different language.  (*Compare* '238 patent, Fig. 7, *with* '100 patent, Fig 7; *compare* '238 PH, 6-28-17 Amendment at 2-3, 13 (amending the language in question to "the entire elongate lumen distal to the rotor"), *with* '100 patent, Claim 16).

Furthermore, and in any event, it is not at all clear that the amendment in fact narrowed the scope of the claims.  The examiner seems to have mistakenly thought that the "pump also comprise[d] the cannula," and thus concluded that the elongate lumen was not "entirely distal" to the pump and should be amended as "*distal to the rotor.*"  ('238 Prosecution History, 6-21-17 Office Action at 3 (emphasis added)).  The reasoning of the examiner is, at a minimum, unclear.  Regardless, there is an insufficient basis in the record to apply the doctrine of prosecution-history

estoppel against Maquet based on the application for the '238 patent.

In sum, Abiomed has waived any contention of disclaimer as to devices (1) in which the guide carriage lumen is not within the cannula sidewall; (2) in which the cannula is not modified to accommodate a side lumen; and (3) in which the guide lumen is distal to the cannula.  In addition, Maquet is not estopped from contending that the "side-rigger" structure is infringed by such devices.

**B.**     **Judicial Estoppel**

    **1.**     **Background**

As part of the claim-construction process in this case, Abiomed filed a rebuttal brief.  In that brief, it stated:

> Maquet's assertion that Abiomed's construction [of the term 'elongate lumen associated with the cannula'] limits the terms to the preferred embodiment is incorrect.  Maquet Br. at 39.  The preferred embodiment in the patent requires that the lumen be formed *within* the wall of the cannula.  '437 at 14:35-39.  *Abiomed's construction is not so limited*, and captures the broader "side-rigger" design where the lumen is *formed along the outside* of the cannula.  Abiomed's construction thus encompasses not only the preferred embodiment (lumen within the cannula) but other side-rigger designs, such as where the lumen is *separate but permanently bolted on or attached* to the side of the cannula.

(Docket No. 193 ("Abiomed Rebuttal Claim Construction Brief") at 24, 25 (first emphasis in original)).  Abiomed also stated that its construction of the term "elongate lumen associated with the cannula" "captures not only a side lumen, i.e., where the lumen is formed in the wall of the cannula, as claimed in dependent claim 12, but also a lumen that passes through a piece separate from, but permanently connected to and running along the length of, the cannula, such as a bolted-on piece."  (*Id.* at 26).

At the *Markman* hearing, Maquet contended in oral argument that Abiomed's proposed construction of the "guide mechanism" term as a means-plus-function term with three claimed structures was "another . . . non-infringement argument [by Abiomed]."  (Docket No. 230 ("Apr.

24, 2018 Hearing Tr.") at 124).  The Court in its *Markman* order essentially adopted Abiomed's proposed construction, and, as noted, construed the "guide mechanism" term as a means-plus-function term with three claimed structures.  (Mem. and Order on Claim Constr. at 47).

The *Markman* order issued on September 7, 2018.  (Mem. and Order on Claim Constr.). On October 9, 2018, Maquet filed its First Supplemental Infringement Contentions, in which it alleged an equivalence theory based on the fact that the claims require "a guide carriage passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the sidewall" and "in the Impella Products, the guide carriage (pigtail) and its lumen are integrally formed at the distal end of the cannula—as opposed to the sidewall."  (Docket No. 475, Ex. 14 ("First Supp. Contentions") at App'x A, 6-9).

However, on May 31, 2019, in its Second Supplemental Infringement Contentions, Maquet stated that "the Impella's structures are identical to 'a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall,'" citing to discovery it had taken since filing its first supplemental infringement contentions.  (Docket No. 460, No. 14 ("Comparison of Second and Third Supp. Infringement Contentions") at 11 (emphasis omitted)).

### 2.    Legal Standard

Judicial estoppel prevents a litigant from pressing a claim that is directly inconsistent with a position taken by that litigant, and accepted by the court, in a prior legal proceeding.  *See Muskat v. United States*, 554 F.3d 183, 196 (1st Cir. 2009).  Judicial estoppel attaches only if (1) "the estopping position and the estopped position [are] directly inconsistent"; and (2) "the responsible party . . . succeeded in persuading a court to accept its prior position."  *Id.* at 181-82 (quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004)).  The purpose of the doctrine is to "protect the integrity of the judicial process by prohibiting parties

from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).  The doctrine bars "self-serving self-contradiction, or 'playing fast and loose with the courts.'"  *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 213 (1st Cir. 1987).

### 3.    Analysis

Maquet contends that the positions Abiomed took in its *Markman* rebuttal brief estop it from contending that the side-rigger requires a side lumen.  Abiomed, in turn, contends that Maquet's statements at the *Markman* hearing estop it from contending that Abiomed's devices infringe.

As an initial matter, Abiomed's statements in its rebuttal brief were made about the "elongate lumen associated with the cannula," which is a different set of terms from a different patent than the set of terms and the patent at issue here.  Therefore, it is not clear that any position as to the "guide mechanism" of the '100 patent could in fact be inconsistent with a position as to the "elongate lumen associated with the cannula" of the '437 patent.

But even assuming its earlier position applies to the side-rigger, Abiomed's positions appear to be consistent.  In its *Markman* brief, it contended that the "elongated lumen associated with the cannula" includes lumens formed "*within* the wall of the cannula" and also lumens that are "*separate but permanently bolted on or attached* to the *side* of the cannula."  (Abiomed Rebuttal Claim Construction Brief at 24, 25 (first emphasis in original)).  Here, it contends that it is entitled to summary judgment because, among other reasons, (1) Maquet has disclaimed devices in which the guide carriage lumen is not "within" the cannula sidewall; (2) the guidewire neither passes within the cannula sidewall nor within a lumen integrated along the cannula sidewall; and (3) the pigtail is not integrally formed along the cannula sidewall because it is glued to the distal end of the inflow cage and outflow cage, which is not a part of the cannula.

22

Its first ground is consistent with its earlier position, even assuming that earlier position applies to the side-rigger design. It contends that Maquet has disclaimed devices in which the guidewire does not pass within the cannula sidewall, and that it is estopped from contending that the "side-rigger" includes such devices; it does not contend that the claimed side-rigger structure does not include such devices. As to its other non-infringement positions, Abiomed contends both that the guide carriage lumens in the accused devices are not within the cannula sidewall and that they never pass along the side of the cannula.

Likewise, Maquet is not subject to judicial estoppel based on its statement at oral arguments in the *Markman* hearing or by its first supplemental infringement contentions. The Court permitted Maquet to amend its infringement contentions, and it is not estopped from raising a theory of literal infringement for essentially the same reasons stated in that order. (Dockets No. 380, 887). As to the *Markman* hearing, Maquet made the argument that Abiomed's proposed construction of the "guide mechanism" term as a means-plus-function term with three claimed structures was "another . . . non-infringement argument [by Abiomed]." (Apr. 24, 2018 Hearing Tr. at 124). The import of that statement is that Maquet expected that Abiomed would try to use such a construction to argue non-infringement. The Court will not interpret that statement to be a legally binding concession that if the Court did in fact adopt Abiomed's construction, and Abiomed later had the opportunity to make such an argument, it would necessarily succeed.

In summary, the doctrine of judicial estoppel does not apply either to Maquet's claims of infringement or Abiomed's defenses.

## C.   Infringement

The Court next turns to the substantive merits of the infringement issue. Abiomed contends that the accused devices are not literally infringing and do not employ the equivalent of

the "side-rigger" guide mechanism.  Maquet contends that the accused devices literally infringe because they perform the identical function of the disclosed structure and do so by using "a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall."  In the alternative, it contends those devices employ a structural equivalent of the side-rigger structure under § 112 ¶ 6 or under the doctrine of equivalents.

### 1.   Legal Standard

"Patent infringement, whether literal or by equivalence, is an issue of fact, which the patentee must prove by a preponderance of the evidence."  *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).

To literally infringe a means-plus-function limitation, "an accused device must (1) perform the identical function recited in the means limitation and (2) perform that function using the structure disclosed in the specification or an equivalent structure."  *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1548 n.8 (Fed. Cir. 1994) (internal quotation marks omitted); *see also Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).  "A structure in an accused device is equivalent to the disclosed structure . . . [of] a means-plus-function element if it is insubstantially different from the disclosed structure."  *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1359 (Fed. Cir. 2000).  One way to prove such an insubstantial difference is to show that the accused device "perform[s] the identical function in substantially the same way, with substantially the same result."  *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333-34 (Fed. Cir. 2006).  "Although the issue of whether an accused device includes a structural equivalent . . . is a question of fact, the district court may find the absence of an equivalent where no reasonable jury could have found that the accused device has an equivalent to the disclosed structure."  *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intern.,*

*Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004) (citations and internal quotation marks omitted).

Even if an accused device is not "equivalent" under § 112, ¶ 6, it may nevertheless be an "equivalent" under the doctrine of equivalents.  *Kemco Sales*, 32 F.3d at 1364.  Infringement is established under that doctrine by showing that "the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product."  *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).  Thus, "[the] key feature that distinguishes 'equivalents' under section 112, paragraph 6 and 'equivalents' under the doctrine of equivalents is that section 112, paragraph 6 equivalents must perform the *identical* function of the disclosed structure, while equivalents under the doctrine of equivalents need only perform a *substantially* similar function."  *Kemco Sales, Inc.*, 208 F.3d at 1548 (internal citations omitted) (emphasis added). Application of the doctrine of equivalents is precluded when it would result in the disputed limitation being entirely vitiated from the claim—that is, when the literal language of the claim cannot be substantially met by the accused device.  *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1320 (Fed. Cir. 1998).

There is no set formula for determining whether a finding of equivalence would entirely vitiate a claim limitation.  Rather, "courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1359 (Fed. Cir. 2005).  The doctrine protects the "definitional and public notice functions" of patent claims.  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997).

In applying the totality-of-the-circumstances test, the *Freedman Seating* court identified a

non-exclusive list of factors to be considered by the court—"the simplicity of the structure, the specificity and narrowness of the claim, and the foreseeability of variations at the time of filing the claim with the PTO."  It also indicated that courts should consider whether the difference between the claim limitation and the relevant aspect of the accused device is a "subtle difference in degree" or a "clear, substantial difference or difference in kind."  *Freedman Seating*, 420 F.3d at 1359-61.

### 2.     Whether the Cannula Includes the Inlet Cage

An initial question presented is whether the inlet cage is part of the cannula or a separate structure.  The potential significance of that issue, according to Abiomed, is that Maquet's theory of infringement collapses if the pigtail is not attached to the cannula, but rather to a separate inlet cage that itself is attached to the cannula.

The starting point is the structure of the device.  At the distal end of the Impella devices is a pigtail, which "assists with stabilizing the [accused products] in the correct position in [the right or left ventricles]."  (Impella 2.5, 5.0 & CP IFU at 32).  The pigtail is attached to a projection on the inlet cage, which is essentially a threaded nub.  (ECF 589, Ex. 9 ("Maquet Excerpts of Hastie Dep.") at 154-55).  That nub is at the distal end of the inlet cage; the inlet area "has four [or five, depending on the product] openings (windows)" that "allow blood to be drawn into the inlet and channeled through the cannula," and out through the outlet.  (Impella 2.5, 5.0 & CP IFU at 32).  (The distal end of the inlet cage is sometimes referred to as the "teardrop," based on its shape.)[10]  The inlet cage is attached to the cannula, which is a "spiral-shaped" tube through which the blood flows.  (*See, e.g.*, Impella 2.5, 5.0 & CP IFU at 32; Maquet Excerpts of Hastie

---

[10] Unfortunately, the terminology for the different parts is not always consistent.  The inlet cage is also referred to as an "inlet shroud" or simply "the inlet."  The threaded nub appears to be referred to interchangeably as the "teardrop screw"; the "thread of the teardrop"; the "screw" or the "thread."  (ECF 589, Ex. 15 ("Abiomed Engineering Summary") at 5 ("screw"); *id.* at 27 ("thread of the teardrop"); *id.* at 28 ("thread")).

Dep. at 154-55)).  Illustrations of the device and some of its parts are set out below.



(Impella 2.5, 5.0 & CP IFU at 82; Maquet Sur-R. at 2 (depicting the above photograph of the accused devices; ECF 589, Ex. 17 ("Anatomy of an Impella") at 6)).

On the accused devices, the pigtail is a separate structure, attached to the rest of the device by threading it onto the nub and affixing it with an adhesive.  (Abiomed R. SOF ¶ 42; *see, e.g.*, Docket No. 475, Ex. 22 ("Abiomed Excerpts of Corbett Dep.") at 161-62, 164, 334)).  According to Caitlyn Hastie, a senior project engineer for Impella products at Abiomed, "the pigtail is screwed . . . onto the thread o[f] the teardrop until it is fully seated onto the teardrop of the inlet cage."  (Maquet Excerpts of Hastie Dep. at 153).  An Abiomed engineering summary

explains that the pigtail is "screw[ed] [] on up to stop of [the] thread, so that no gap remains between [the] pigtail and [the] teardrop" and so that "one side of [the] pigtail touches [the] edge of [the] teardrop cage." (Abiomed Engineering Summary at 28).[11]

The area where the pigtail is attached to the rest of the device is referred to in one Abiomed document as the "pigtail-cannula bond." (*See* Docket No. 589, Ex. 16 ("Impella CP Tensile Test") at 5). Specifically, a report that documented a "tensile test . . . on [the] pump bond joints after 10 days" stated that the "peak tensile force for the *pigtail-cannula bond* for all test samples was greater than 30 N." (Docket No. 589, Ex. 16 ("Impella CP Tensile Test") at 3-4 (emphasis added); Corbett Dep. at 110-11 (testifying that "tensile testing" is "[w]here we grab one part and grab the other part and pull them apart and record how much force it takes" to prevent "leav[ing] a part behind in a patient")). Another Abiomed document refers to it as the "pigtail-teardrop junction" and the "pigtail-inflow cage bond." (Abiomed Engineering Summary at 5, 28).

Abiomed contends that the inlet cage is also a separate structure, manufactured separately, that is then affixed to the cannula. For example, Scott Corbett, Abiomed's manager of its advanced development group and lead designer of the Impella CP, testified as follows: "[if] [you] look at some of the pictures [in the IFU], the pigtail is attached to the *inlet*, which is attached to the *cannula*." (Abiomed Excerpts of Corbett Dep. at 208 (emphasis added)). In addition, both Corbett and Hastie testified that the inlet area is not part of the cannula. (*See* Abiomed Excerpts of Corbett Dep. at 123 ("There's no actual bond between the pigtail and the

---

[11] It is unclear whether there is a dispute as to whether the pigtail is permanently attached to the inlet cage. For example, Hastie testified that "the pigtail and the inlet cage" are "not permanently [attached]"—that is, "[she] could pull them apart," but that "[i]t is not the *intent for the inlet, the pigtail, and the cannula to come apart* during use in the patient" and that "[t]he entire pump is supposed to remain attached together which includes the pigtail, the inlet, and the cannula." (Maquet Excerpts of Hastie Dep. at 158 (emphasis added)). For present purposes, the Court will assume that the pigtail is permanently affixed by means of threads and glue.

cannula."), at 315 ("What I circled is where the pigtail was glued on to the inlet cage, not where the pigtail was glued on to the cannula."); Docket No. 475, Ex. 23 ("Abiomed Excerpts of Hastie Dep.") at 95 ("The pigtail is not attached to the cannula.  The pigtail is attached to the inlet cage. The inlet cage is attached to the cannula.")).  Hastie also testified that "[t]he pigtail is overlapping the threads, and the threads are part of the teardrop, which is part of the inlet cage." (Maquet Excerpts of Hastie Dep. at 154).

Nonetheless, certain Abiomed documents appear to refer to the inlet and outlet areas as parts of the "cannula."  For example, the instructions for use of the Impella 2.5, 5.0, and CP instruct that the "*pigtail is attached to the cannula* at the distal end of the inlet area" and that the pump "consist[s] of the motor, motor housing, *cannula with inlet and outlet*, and pigtail at the tip."  (Impella 2.5, 5.0 & CP IFU at 32, 249 (emphasis added); Abiomed Excerpts of Corbett Dep. at 206-208; *see also, e.g.*, Impella RP IFU at 26 ("The outlet area, located at the distal tip of the cannula, has 5 openings (windows) that allow blood to exit the cannula."); *id.* at 63 ("Position the outlet area of the cannula approximately 4 cm past the pulmonary valve annulus")).

Two related Abiomed patents also appear to refer to the inlet cage as part of the cannula. The first is U.S. Patent 9,872, 948 ("the '948 patent"), which Dr. Thorsten Siess, the Chief Technology Officer of Abiomed, testified "concern[s] a problem that [Abiomed] had with [the] first Impella 2.5 cases in patients."  That patent states that "a flexible projection is provided *at the can[n]ula distal of the inlet openings*" and "[that] flexible projection may comprise a *pigtail tip* . . . ."  (Docket No. 589, Ex. 8 ("Siess Dep.") at 119-21; Docket No. 589, Ex. 21 ("the '948 patent"), col. 1 ll. 50–52; col. 2 ll. 27-28 (emphasis added)).  The second is U.S. Patent 9,814,814 ("the '814 patent"), which Dr. Siess testified discloses an "easy guide lumen" to be

used with the devices.  That patent states that "[t]he cannula assembly includes a cannula and *a pigtail extension coupled to the cannula*"; "the cannula assembly includes a *cannula coupled to* a dual stiffness *pigtail extension*"; "the *cannula component may include* a blood inlet manifold . . . . [which] may include a plurality of *inlet openings*"; and that one of the "method[s] of manufacturing a cannula assembly" is "coupling a *pigtail extension to a cannula*."  (Siess Dep. at 156-58; Docket No. 589, Ex. 23 ("'814 patent"), Abstract, col. 4 ll. 25-26, col. 2 l. 60-col. 3 l. 13 (emphases added); *see also* Maquet Excerpts of Hastie Dep. at 74-75 (testifying that the figures in the '814 patent depict "Impella devices")).  Hastie testified that such statements "do [not] accurately describe in [her] opinion . . . how an engineer, [like] [herself] at Abiomed, would describe how the [] pigtail is attached to the cannula."  (Abiomed Excerpts of Hastie Dep. at 95; *see also id.* at 94-97 ("[I] wouldn't call the blood inlet manifold a part of the cannula.")).

The specification of the '100 patent states generally that "[t]he cannula [] preferably includes a plurality of ports or fenestrations [] about its distal region, as well as an end port [], which allow for the ingress or egress of blood into or from the cannula [] depending upon the operation of the blood pump []."  ('100 patent, col. 8 ll. 24-28; Docket No. 589, Ex. 11 ("Aboul-Hosn Dep.") at 172 (agreeing with that definition of the cannula)).  In its opening claim-construction brief, Abiomed included an annotation of Figure 1 of the '100 patent—which appears to show a "plurality of ports" distal to the cannula or in the "distal region of the cannula"—where green indicates the cannula and yellow indicates the blood pump.  (Docket No. 188 ("Abiomed Opening Claim Construction Brief") at 7).  The annotation and the original are depicted below.  Dr. Walid Aboul-Hosn, the first named inventor of the '100 patent, testified that as to that annotation, the "green" was an "accurate representation of a cannula"; that the "inlet area with holes with arrows going into it" in the annotation was "where the blood goes in"; and

that the area "distal to that inlet area" that was "a cone shape" was "also part of the cannula."

(Aboul-Hosn Dep. at 172-74).[12]

| **Abiomed's Annotation of Figure 1** | **Figure 1 of the '100 patent** |
| --- | --- |

(Abiomed Opening Claim Construction Brief at 7).

It is certainly true that Abiomed has presented evidence that (1) those statements referring to the inlet area as part of the cannula have been taken out of context, or involve instances of the speaker using shorthand rather than a precise description; (2) key Abiomed employees do not consider the inlet area as part of the cannula; (3) the inlet area and cannula perform different functions; and (4) the inlet area and the cannula are manufactured separately and then assembled.

Nonetheless, under the circumstances, it is clear that there is a disputed issue of material

---

[12] During an *inter partes* review proceeding, one of Abiomed's experts indicated that the distal openings of a figure in a prior-art reference (depicted below) were part of the cannula. (Docket No. 589, Ex. 20 ("Collins Decl. in '468 Patent IPR") at 141, 143; Maquet Opp. at 6-7)). It appears that Dr. Antaki was also asked about that figure in his deposition, and stated that it depicted "a lighthouse cannula" and that the "area at the distal end . . . [is] refer[red] to . . . as the tip of the cannula," although, from his perspective, "it seem[ed] like an exercise in semantics as to whether it is the cannula [or not]." (ECF 589, Ex. 12 ("Antaki Dep.") at 318-21). He further testified that that "tip is *integrated* into the cannula [by] glu[ing] it together or over-mold[ing] or something to that effect" and that "[he] would call it part of the cannula assembly." (*Id.* at 322 (emphasis added)).



(Collins Decl. in '468 Patent IPR at 143).

fact as to whether the inlet cage is a separate structure from the cannula, or is part of the cannula. Accordingly, the Court will, for purposes of its analysis, view those facts in the light most favorable to Maquet, the non-moving party, and will therefore assume that the inlet cage is part of the cannula, not a separate structure.

### 3. Whether the Disclosed Structure Requires a Side Lumen or a Lumen "Within" the Cannula Sidewall

The parties further dispute the disclosed structure to which the accused devices should be compared. Abiomed contends that "infringement can only be found if the accused products have the same or equivalent structure as the 'side rigger' design described in the patent's specification" and "the only disclosed 'side rigger' designs in the patent have a side lumen *within* the cannula sidewall." (Abiomed Supp. Mem. at 13 (emphasis added)). Thus, according to Abiomed, the accused devices do not infringe the '100 patent because, among other reasons, the accused devices do not have "a side lumen within the cannula sidewall." (Abiomed Supp. Mem. at 13, 14-15). Maquet contends that "a means-plus-function term . . . is not limited to the embodiments shown in the figures [illustrated in the patent], but instead, is entitled to all of the structures described in the specification that carry out the recited function" including, in this case, "the specification's much broader description [of] a 'guide carriage . . . formed along at least a portion of the cannula.'" (Maquet Sur-R. at 5; *see also* '100 patent at col. 12 ll.15-19).

"The law of infringement compares the accused product with the claims as construed by the Court." *Johnson & Johnson Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc). The Court in its *Markman* order construed the side-rigger guide mechanism as "a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall." Accordingly, that is the structure to

which the accused devices must be compared.[13]  That construction does not require that the

lumen be "within" the sidewall, although it certainly requires that it be "integrally formed along

at least a portion of the sidewall."

### 4.       Whether a Reasonable Juror Could Conclude that the Accused Devices Infringe

The Court turns finally to whether summary judgment is warranted as to the claim of

infringement—that is, whether a reasonable juror could conclude that the accused devices

infringe on Claims 16 and 17 of the '100 patent.  The basic task of that analysis is to "compar[e]

the properly construed claims to the device accused of infringing."  *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  It is undisputed that the accused devices

perform an identical function to the "guide mechanism" of the patent.  The dispute concerns

whether they infringe on the disclosed means—in other words, whether the accused devices meet

the limitations of the disclosed "side-rigger" structure, as construed by the Court in its *Markman*

order.

As noted, there appears to be only one disputed issue of material fact:  that is, whether the

inlet cage is part of the cannula.[14]  As set forth above, the Court must view that dispute in the

light most favorable to Maquet, the non-moving party.  It will therefore assume that the term

"cannula" includes the inlet cage.

The Court next turns to the language of the claim, as interpreted through the claim-

---

[13] "[A] sound claim construction need not always purge every shred of ambiguity[,] [and] [t]he resolution of some line-drawing problems . . . is properly left to the trier of fact."  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007); *see also GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372-73 (Fed. Cir. 2016) ("Where a district court has resolved the questions about claim scope that were raised by the parties, it is under no obligation to address other potential ambiguities that have no bearing on the operative scope of the claim.  This is because [s]uch an endeavor could proceed ad infinitum . . . ." (citations and internal quotation marks omitted)).

[14] Again, as to at least one of the accused devices, the inlet shroud is on the opposite end of the cannula. That distinction does not affect the Court's analysis.

construction process.  Again, the Court construed the patent as a means-plus-function patent, with three disclosed structures.  The relevant structure here is "a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall."  Several relevant conclusions flow directly from that language.

First, the cannula "sidewall," as the name suggests, must necessarily be on the "side" of the cannula.  It follows that the guide carriage that is integrally formed "along" the cannula sidewall must also be located on the side of the cannula.[15]  While the word "along" may have multiple meanings in multiple contexts, in this context it cannot mean that the guide carriage can be located entirely in the center of, or entirely proximal or distal to, the cannula.[16]  The guide carriage must also be "integrally formed" along the cannula sidewall.  It might be within the sidewall itself, or along the outside or inside of the sidewall, but it must be integral with the sidewall.[17]  For present purposes, the Court will assume (without deciding) that a structure that is permanently glued or affixed to another is sufficient to satisfy the "integrally formed" requirement.

The Court next turns to the features of the accused device.  Again, on the accused devices, the guide wire passes through the cannula; at the distal end of the cannula, there is a structure; that structure is in the form of an inlet cage; the distal end of the inlet cage has a flat surface with a threaded nub in the center; that nub has a hole, through which the guide wire

---

[15] For the sake of simplicity, the Court will use the term "sidewall" rather than "at least a portion of the cannula sidewall" except as otherwise noted.

[16] To use a simple analogy, a ceiling and a floor are attached to the walls of a room, but neither is "along" the walls.  A bookcase, under normal circumstances, is placed "along" a wall, but a free-standing bookstand in the middle of a room is not.

[17] To use the same analogy, a built-in bookcase is "integrally formed along" the wall of a room, but a moveable bookcase is not.

continues; there is a pigtail attached to the structure; and the pigtail has a lumen through which the guide wire slides.

The parties appear to agree that the pigtail forms part of the guide carriage for the accused device.  But the claim language, as construed by this Court, does not cover a guide carriage that is merely "attached" in some way to the cannula.  Again, it only covers a guide carriage that is integrally formed "along" a cannula "sidewall."

On its face, it is difficult to see how the lumen and guide carriage here can be said to be "along" the "sidewall" of the cannula, or even a portion of the sidewall.  There is simply no side lumen—indeed, there is no side structure at all.  The guide wire, and the lumen through which it slides, are always in the center of the device; they are never along the side.

It is unclear whether Maquet's argument to the contrary is an argument for literal infringement or a form of equivalence.  In any event, that argument appears to be, in substance, along the following lines.  Maquet notes that the pigtail is permanently affixed to the cannula, which it contends means that the pigtail is "integrally formed" with the cannula.  It further contends that the connection between the pigtail and the cannula is a tapered fit, and that there is a small overlap between the two at the point of connection.  It has submitted the following drawing, purporting to illustrate how the tapered male end (the cannula) fits into the tapered female end (the pigtail):



Based on that drawing, Maquet appears to argue (although it does not say so directly) that the

end of the pigtail is effectively "along" the tapered end of the cannula (and, thus, presumably, the cannula sidewalls) for a short section at the taper where they connect.

According to Maquet, therefore, part of the pigtail (which is part of the guide carriage) is "along at least a portion of the cannula sidewall," and it is "integrally formed" along that sidewall by being permanently affixed. There are, however, at least three obvious problems with that argument.

The first problem is that Maquet has submitted no actual evidence—or at least has not cited to any—that the connection is, in fact, a tapered fit. The photographs and technical drawings submitted by the parties, and the model devices provided to the Court at the hearing, in fact show something quite different; although the distal end of the inlet cage tapers slightly, the cannula (including the inlet cage) ends in a flat surface, on which is formed a small threaded nub with a hole for a guidewire:



The pigtail (the female end) is screwed onto the nub (the male end), and further affixed with adhesive.[18] That connection is *not* in the form of a taper. Maquet's argument thus does not match the evidence, and may be rejected on that basis alone.[19]

---

[18] Although the record is unclear, it is possible that on some devices the pigtail is the male end and screws into the nub. The Court's analysis is not affected by the distinction.

[19] It is possible that the different models of the accused device have different types of connections. There is, however, no record evidence that any of them have a tapered fit.

The second problem is that the pigtail is not attached to *any* portion of the cannula sidewalls.  Rather, it is attached to the threaded nub, which is attached to a flat surface, which is attached to the inlet cage at the distal end of the cannula.  The space between the threaded nub and the edge of the device forms a lip, onto which the proximal end of the pigtail rests.  The top of the flat surface may be thought of as a two-dimensional plane.  The cannula sidewalls lie entirely below (proximal) to that plane; the pigtail and threaded nub lie entirely above (distal) to it.  Thus, there is never any point in the structure where the pigtail or nub are "along" even a "portion" of the cannula sidewall.  If Maquet has a theory as to how the two overlap, such that female threaded end of the pigtail can be fairly said to be "along" a portion of the cannula sidewall when it is placed on the male threaded end of the nub, it has not argued that theory in its brief.

Finally, and most importantly, reading the claim language as a whole, and not as an isolated series of terms, the accused device simply does not fit within its scope.  There is no side lumen.  There is no guide carriage integrally formed along the cannula sidewall, or even a portion of the sidewall.  The lumen through which the guide wire slides is at all times central and coaxial to the cannula.  It is never, even for a short distance, anywhere else.

It is true that the pigtail is affixed to the threaded nub, which protrudes from the distal end of the inlet cage, which (the Court has assumed) is part of the cannula.  It is also true that the entire structure is attached to the cannula sidewalls, in the sense that it is connected distally and along the exterior circumference.  But it cannot be true that an attachment that is entirely distal and circumferential can plausibly be said to be an attachment "along" the sidewalls.  Such an interpretation strains the claim language to the breaking point.  Indeed, as Abiomed points out, that theory renders the claim terms meaningless; under that theory, *any* lumen through which a

guidewire is passed, regardless of its position relative to the cannula—in the center, along the sides, or anywhere else—would infringe.

In short, based on the undisputed record evidence, and in the absence of any argument to the contrary that is supported by record evidence, the accused devices do not literally infringe the remaining claims of '100 patent.

Again, it is unclear whether Maquet is arguing literal infringement or equivalence. To the extent it is arguing literal infringement, its argument as to equivalence is wholly inadequate. It simply appends language to its brief that raises, but only in general terms, the possibility that the accused devices may infringe by reason of equivalence under § 112, ¶ 6, or under the doctrine of equivalents. It likewise argues, again, in general terms, that there is a disputed issue of material fact that is relevant to those issues and that precludes summary judgment. Maquet bears the burden of establishing that either principle applies. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1582 (Fed. Cir. 1988) ("Infringement requires that every limitation . . . be found in the accused device either literally or equivalently. The party alleging infringement has the burden of proving infringement by a preponderance of the evidence." (citations omitted)). And although it states, multiple times, that there are factual disputes that will need to be resolved before those questions can be addressed, it fails to identify what those factual issues might be—other than to suggest, in general terms, that there may be such issues if the Court "were to reverse its earlier [claim] construction" decision. (Opp. at 31). Nor does it offer any theory as to how the accused devices might infringe as equivalents, even if they do not do so literally.

It is not enough simply to argue that an accused device *might* be equivalent to a disclosed structure, or to suggest that there *might* be disputed issues of fact that might bear on that question. Proof of infringement requires more. Under the circumstances, the Court cannot deny

summary judgment on that basis.

The Court therefore concludes, based on the undisputed record evidence, that the accused devices do not infringe claims 16 or 17 of the '100 patent, either literally or by any form of equivalence, and that summary judgment in favor of Abiomed should be granted.

**IV.    <u>Conclusion</u>**

For the foregoing reasons, the motion of Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH for summary judgment of noninfringement as to U.S. Patent No. 7,022,100 (Docket No. 472) is GRANTED.

**So Ordered.**


                                          <u>/s/ F. Dennis Saylor IV</u>
                                          F. Dennis Saylor IV
Dated: September 30, 2021                 Chief Judge, United States District Court