# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ABIOMED, INC., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) Civil Action No. |
| v. | ) 16-10914-FDS |
| | ) |
| MAQUET CARDIOVASCULAR LLC, | ) |
| | ) |
| Defendant/Third-Party | ) |
| Plaintiff/Counter-Defendant/ | ) |
| Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| ABIOMED EUROPE GMBH, | ) |
| | ) |
| Third-Party Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| ABIOMED R&D, INC., | ) |
| | ) |
| Third-Party Defendant/ | ) |
| Counter-Claimant. | ) |

## MEMORANDUM AND ORDER ON MAQUET'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is an action for patent infringement.  Defendant and counterclaim-plaintiff Maquet

Cardiovascular LLC owns six patents directed to guidable intravascular blood pumps and related

methods.  Plaintiff and counterclaim-defendants Abiomed, Inc.; Abiomed R&D, Inc.; and

Abiomed Europe GmbH (collectively, "Abiomed") manufacture the "Impella" line of

intravascular blood pumps.  Abiomed filed this action seeking a declaratory judgment that its

Impella products do not infringe Maquet's patents and that they are invalid.  Maquet has filed a counterclaim seeking a declaratory judgment and damages for infringement.  The scope of the case has been narrowed to Claims 16 and 17 of Maquet's Patent No. 7,022,100 ("the '100 patent").[1]

Maquet has moved for partial summary judgment on the following grounds:

(1)     Abiomed is barred from challenging the validity of the '100 patent under the doctrine of assignor estoppel;

(2)     Abiomed may not rely upon the unpublished thesis of Dr. Thorsten Siess as prior art;

(3)     Abiomed has improperly asserted "surprise" invalidity and damages theories, including (a) a theory of invalidity based on the indefinite nature of the term "proximate"; (b) theories of invalidity based on undisclosed prior art (Sammler Canada and Bagaoisan); and (c) a theory of damages based on non-infringing alternatives; and

(4)     the '100 patent is not invalid on the ground of obviousness-type double patenting.

(Docket No. 761).

For the following reasons, Maquet's motion for partial summary judgment will be granted in part and denied in part.

---

[1] This case originally concerned infringement of six patents owned by Maquet:  U.S. Patent Nos. 7,022,100; 8,888,728; 9,327,068; 9,545,468; 9,561,314; and 9,597,437.

I.      **Background**

        A.      **Factual Background**

The following facts are undisputed except as otherwise noted.[2]

        1.      **Parties**

Abiomed is a manufacturer of the "Impella" line of intravascular blood pumps, which it has been marketing in the United States since June 2008.  (Am. Compl. ¶¶ 4, 8).  Maquet is the owner of several patents directed to intravascular blood pumps, including the '100 patent.  ('100 patent).

        2.      **The Underlying Technology**

The '100 patent involves guidance systems for intravascular blood pumps—essentially, miniature pumps that are inserted through a patient's vasculature, typically into the heart, for medical purposes.  (*See* '100 patent, col. 1 ll. 48-51; *id.*, col. 17 ll. 52-59).  Intravascular blood pumps are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation."  (*Id.*, col. 1 ll. 22-27).

        Among the challenges in developing such pumps are miniaturization (that is, designing a pump that will work effectively but be small enough to be inserted); preventing the pump from damaging the heart or the blood (blood cells are delicate); and providing a method for guiding the device to the heart (such pumps are commonly inserted through the femoral artery in the thigh and guided through the body to the heart).  (*See id.*, col 1 l. 33-col. 2 l. 18).  The '100 patent principally addresses the third issue:  safely and effectively guiding the pump into the heart.

---

[2] Many of these facts are drawn directly from the Court's claim-construction order.

3.      **The '100 Patent**

Broadly speaking, the '100 patent is directed to "[a]n improved intravascular blood pump system . . . and related methods involving the broad inventive concept of equipping the intravascular blood pump . . . with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient." (*Id.*, Abstract).  It explains that a "significant drawback" of prior-art intravascular blood pumps is that they were "difficult to guide into the appropriate position within the circulatory system of a patient" because "the elongated catheter is incapable of providing the degree of control necessary to easily negotiate the pump through the tortuous pathways leading up to and into the heart." (*Id.*, col. 2 ll. 6-12).  The supplemental guide mechanisms then available had the disadvantage of taking up valuable extra space in the blood vessel and requiring a larger access wound than would otherwise be necessary.  (*Id.*, col. 2 ll. 19-39).  The patent purports to improve the prior art by equipping the pump with integrated guide mechanisms.  (*Id.*, col. 2 ll. 47-55).

The '100 patent issued from U.S. Patent Application No. 10/070,178 (the "'178 Application"), which was filed on September 1, 2000, and claims priority to U.S. Provisional Application No. 60/152,249 (the "'249 Provisional"), which was filed on September 3, 1999. (*Id.*, Cover Page; *id.*, col. 1 ll. 6-8).  The patent was granted on April 4, 2006.  ('100 patent, Cover Page).[3]

As the litigation has progressed, the claims have narrowed to encompass only Claim Limitations 16 and 17 of the '100 patent.  Those claims recite:

16.  An intravascular blood pump system comprising:  an intravascular blood pump having a cannula coupled thereto, a guide mechanism adapted to guide said intravascular blood pump and cannula to a predetermined location within the

---

[3] The priority date of the '100 patent is disputed by the parties, but that dispute is not relevant to the issue presently before the Court.

circulatory system of a patient, and a blood pressure detection mechanism to detect the pressure of the blood proximate at least one of the intravascular blood pump and cannula.

17.  The intravascular blood pump system of claim 16 and further, wherein said blood pressure detection mechanism comprises at least one of fluid filled column disposed within at least a portion of said cannula, a piezoelectric element coupled to at least one of the intravascular blood pump and cannula, and a strain gauge coupled to at least one of the intravascular blood pump and cannula.

('100 patent).

The Court's *Markman* order construed the terms "intravascular blood pump" and "blood pressure detection mechanism" according to their ordinary meaning.  (Mem. and Order on Claim Constr. at 20, 48-50).  It construed "guide mechanism" as a means-plus-function term with three claimed structures, where the function is "guiding said intravascular blood pump and cannula to a predetermined location within the circulatory system of the patient."  (*Id.* at 47).  Those claimed structures are:

(a) a guide wire passing slideably through a central lumen extending through a drive cable assembly, blood pump, and cannula; (b) a guide wire passing slideably through a lumen extending through a guide carriage integrally formed along at least a portion of the cannula sidewall; or (c) a conduit assembly, including guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly.

(*Id.* at 44-47).

Structure A is colloquially known as an "over-the-wire" guide mechanism, Structure B is known as a "side-rigger" or "rapid exchange" guide mechanism, and Structure C is known as a "guide catheter" guide mechanism.  (*Id.* at 4).  Maquet alleges that the Impella infringes on Structure B, the "side-rigger" or "rapid exchange" guide mechanism.  More specifically, it alleges that "the pigtail [of the Impella products] is a 'guide carriage integrally formed along' a portion of the cannula sidewall within the meaning of the claims, and contains a lumen through which the guidewire slides."  (Docket No. 460, Ex. 14 ("Maquet's Third Supp. Infringement

Contentions") App. A at 10; Docket No. 853, Ex. 10 ("Leschinsky Op. R.") ¶ 42).

### 4.   **The Accused Products**

Maquet contends that five products in the "Impella" line of intravascular blood pumps manufactured by Abiomed infringe the '100 patent:  the Impella 2.5, the Impella 5.0, the Impella CP, the Impella RP, and the Impella CP with SmartAssist.

The Impella line of products consists of FDA-approved guidable heart pumps that are used in hospitals and heart centers.  (Docket No. 764, Ex. 12 ("May 2019 Press Release") at 1).  Each of the accused products includes a sensor to detect blood pressure proximate to the pump.  (Maquet's Third Supp. Infringement Contentions at 24-31).  The Impella RP passes through the right atrium to provide right heart support.  (Docket No. 556, Maquet Reply to Motion for Leave to Serve Third Supp. Infringement Contentions at 1).  The Impella 2.5, 5.0, and CP are inserted into the left ventricle to provide left heart support.  (*Id.*).  The products vary in motor diameter, blood flow rate, and price.  (*Id.*).  Sales of the Impella CP have grown each year since its introduction in 2012, making it Abiomed's current best-selling left-heart support product.  (*Id.*).  Abiomed sold 17,819 units of the Impella CP in the 2019 fiscal year, which accounted for approximately 75% of its left-heart product sales.  (*Id.*; *see also* Docket No. 557, Ex. 15 ("Abiomed Revenue History—US customers") at 2-3).

The "Impella CP with SmartAssist," also known as the "Impella CP Optical" was introduced in 2019, and replaces the piezoelectric blood-pressure sensor of the Impella CP with an optical blood-pressure sensor.  (May 2019 Press Release at 1; *see also* Tr. of Oct. 25, 2019 Hearing at 15-16).  In all other respects, the two products appear to be identical.[4]  Abiomed

---

[4] Although the parties disagree in their characterizations of the Impella CP with SmartAssist—Maquet calls it a "mere iterative update" of the CP, while Abiomed calls it an "entirely new product"—both parties appear to agree that the only substantive difference between the CP with SmartAssist and the CP is "different features relating to pressure sensing."  (Docket No. 461, Maquet Mem. at 7; Docket No. 511, Abiomed Opp. at 1).

reported selling 1,214 units of Impella CP with SmartAssist in fiscal year 2019.  (Abiomed

Revenue History—US customers at 3).  Its press release stated that "the majority of Impella CP

heart pumps in the U.S. will be transitioned to SmartAssist over the next fiscal year."  (May 2019

Press Release at 1).

## 5. **The Present Dispute**

On September 8, 2017, Abiomed served preliminary invalidity contentions to 98 claims

Maquet had asserted against its products.  (Docket No. 219, Ex. B ("Abiomed's Preliminary

Invalidity Contentions") at 17; Docket No. 236 ("Mem. and Order on Mot. to Compel Maquet's

Rebuttal Validity Contentions") at 2).  On November 22, 2017, the Court issued an order on

claim narrowing.  (Docket No. 178 ("Mem. and Order on Claim Narrowing") at 2).  Among

other things, it ordered Maquet to select no more than 18 claims as to which discovery could take

place within 30 days of the Court's *Markman* order.  (*Id.* at 2).

On September 7, 2018, the Court issued the *Markman* order.  (Mem. and Order on Claim

Constr.).  On October 9, 2018, Maquet submitted its rebuttal validity and supplemental

infringement contentions.  (Docket No. 744, Ex. D ("Maquet's Rebuttal Validity Contentions")

at 10; Docket No. 286, Ex. H ("Maquet's Supplemental Infringement Contentions") at 8).

On June 23, 2019, the Court issued a scheduling order.  (Docket No. 317 ("June 23, 2019

Scheduling Order") at 2).  As relevant here, the Court ordered Abiomed to narrow its primary

prior art references to 12 and to amend its preliminary noninfringement and invalidity

disclosures on or before July 8, 2019.  (*Id.*).  Accordingly, on July 8, 2019, Abiomed submitted

its supplemental invalidity and noninfringement contentions, and identified 12 primary prior art

references.  (Docket No. 764, Ex. 32 ("Supp. Invalidity Contentions") at 20-23, 54).

On August 7, 2019, Abiomed responded to Maquet's fourth set of interrogatories.  Those

interrogatories included interrogatory number 20, which requested Abiomed to "describe in detail each and every legal and factual basis upon which Abiomed will rely related to the calculation of and/or rebuttal of damages . . . ."  (Docket No. 764, Ex. 40 ("Abiomed's Responses to Maquet's Fourth Interrogs.") at 3).  In response, Abiomed stated that "the limited contribution of the patents-in-suit is further demonstrable by the ability *to design around* these narrow patents (see insertion of the Accused Products without guide wires and Impella CP with SmartAssist)," among other items.  (*Id.* at 3-6 (emphasis added)).  Maquet's fourth set of interrogatories also included interrogatory number 22, which requested Abiomed to "describe in detail the complete chronology of the research, design, and development of the pigtail component of each Impella product."  (*Id.* at 8-9).  In response, Abiomed stated, among other items:  "[d]evelopment of the 'pigtail' had begun by at least 1996 during research and development activities related to the inflow tip design or 'n cap' particularly as a way to reduce suction and increase pump stability. . . . [which] was present in all of the Impella designs made by Dr. Siess . . . includ[ing] the Elect 100, 200, and Recover series pumps, which were developed and sold in the late 1990s."  (*Id.* at 8-9 (citations omitted)).

On September 6, 2019, fact discovery closed.  (June 23, 2019 Scheduling Order at 2).  Opening expert reports were due on January 27, 2020; depositions of those experts were scheduled for February 3, 2020; and rebuttal expert reports were due by March 12, 2020.  (Docket No. 633, Electronic Order Granting Mot to Amend Scheduling Order; Docket No. 701, Electronic Clerk's Notes (noting that the Court had extended the deadlines for the service of rebuttal expert reports, among other items)).

In essence, Maquet contends that Abiomed failed to disclose a theory of indefiniteness as to the term "proximate" and a theory of obviousness as to U.S. Patent No. 6,849,068

("Bagaoisan") until January 27, 2020, when it served Dr. James Antaki's report. (Maquet Supp. Mem. at 11-12). It further contends that Abiomed failed to disclose a theory of damages as to two non-infringing alternatives—a "no-pigtail" device and a device with an "expanded cannula"—until March 12, 2020, when it served the expert reports of Dr. Gregory K. Leonard and Timothy Maher. (*Id.* at 12-13).

### B.   Procedural Background

On May 19, 2016, Abiomed filed a complaint seeking a declaratory judgment that four of its Impella products do not infringe Maquet's patents: the Impella 2.5, Impella 5.0, Impella CP, and Impella RP. After amendments to the pleadings to add three newly granted patents, on November 20, 2017, Maquet filed an answer and amended counterclaim asserting that those four products infringe its patents. As the litigation has progressed, the claims have narrowed to encompass only Claim Limitations 16 and 17 of the '100 patent.

On September 7, 2018, the Court issued a memorandum and order on claim construction. On July 9, 2020, the Court permitted Maquet to supplement its infringement contentions to also accuse an Impella product released in May 2019, the Impella CP with SmartAssist, of infringing upon Claim 16 of the '100 patent.

On September 30, 2021, the Court granted Abiomed's motion for summary judgment on non-infringement.

Maquet has now moved for partial summary judgment on a variety of different grounds.

## II.   Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation mark omitted). Summary judgment is appropriate when the

moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

### III.   <u>Analysis</u>

Maquet has moved for partial summary judgment on the grounds that (1) Abiomed's invalidity defense is barred by the doctrine of assignor estoppel; (2) Abiomed may not rely on the unpublished thesis of Dr. Thorsten Siess as prior art; (3) Abiomed may not rely on certain "surprise" theories of invalidity and damages, including (a) a theory of invalidity based on the indefinite nature of the term "proximate," (b) two disputed items of prior art, Sammler Canada and Bagaoisan; and (c) a theory of damages based on non-infringing alternatives; and (4) Abiomed may not argue that the '100 patent is invalid because of the obviousness-type double patenting doctrine. Its arguments are based in part on claimed discovery violations and failures to comply with court-ordered disclosure requirements. In many instances, the relief sought

(summary judgment) does not align with the actual question presented (for example, whether a document or a contention was timely disclosed, or whether an exhibit can be authenticated). Under the circumstances, while the Court will address the underlying issues, it will make a ruling only as to whether summary judgment is appropriate.

### A.    <u>Assignor Estoppel</u>

#### 1.    <u>Background</u>

Maquet first contends that Abiomed's invalidity defense is barred by the doctrine of assignor estoppel. In substance, Maquet contends that Dr. Walid Aboul-Hosn, the inventor of the '100 patent, has been working as a paid consultant for Abiomed since 2007 and that Abiomed has availed itself of his knowledge and assistance to conduct infringing activity.

##### a.    <u>Dr. Aboul-Hosn's Alleged Role in Developing the Accused Products</u>

###### (1)    <u>Events Prior to 2007</u>

Dr. Walid Aboul-Hosn is the first-named inventor of the '100 Patent. As noted, that patent was filed on September 1, 2000, and granted on April 4, 2006. ('100 patent, Cover Page). In 1996, he founded A-Med Systems, Inc. ("A-Med"), where he worked as an employee until October 2000. (Docket No. 764, Ex. 3 ("Aboul-Hosn Dep.") at 20, 28). At that time, he left the company, but continued to work as a consultant for it. (*Id.* at 29; Docket No. 764, Ex. 4, Severance Agreement and Release at 2). In July 2002, he assigned his rights to the '100 patent to A-Med, and in January 2008, those rights were assigned to Maquet. (Docket No. 764, Ex. 5, Assignment Record at 3, 5).[5]

---

[5] Specifically, the assignment reads "[i]n consideration of one dollar ($1.00) and other good and valuable considerations, receipt of which is acknowledged, we, Walid N. Aboul-Hosn, William Kanz, and Bruce Baker, being the lawful owners, hereby sell and assign to A-Med Systems, Inc. its successors and assigns, the entire right, title and interest throughout the world in our invention in a Guidable Intravascular Blood Pump and Related

Dr. Thorsten Siess is the Chief Technology Officer of Abiomed.  (Docket No. 764, Ex. 7 ("Siess Dep.") at 64).  In 1997, he founded Impella Cardiotechnick ("Impella Cardio").  (*Id.* at 25).  Abiomed acquired that company in 2005, and Dr. Siess became its Chief Technology Officer shortly thereafter.  (*Id.* at 59-63, 64).

Dr. Siess and Dr. Aboul-Hosn first met at a conference in 1996.  (*Id.* at 200-02).  They saw one another again at a conference in 1998 or 1999.  (*Id.* at 203).  Dr. Siess testified that at that second conference, Dr. Aboul-Hosn informed him about the company he had founded, and said that they would now be "competitors in the space of right heart temporary assist."  (*Id.* at 200, 203).  Dr. Siess testified that after that conference, he made sure to follow Dr. Aboul-Hosn and his patent applications, and that he reviewed the PCT application that the '100 patent issued from when it was published in March 2001.  (*Id.* at 203-204, 267-68).

According to Dr. Siess, the Impella line of products was in development by the late 1990s.  He testified that the "Impella Elect," which he said looks similar to the Impella 5.0 and Impella RP, but was not inserted percutaneously, was first inserted into a patient in 1999.  (*Id.* at 30, 32, 35).  He further testified that the "Impella Recover" series and "Impella Acute" series were first introduced in 2000 and 2001.  (*Id.* at 26, 35, 40).

Dr. Siess testified that at some point he began working on addressing stability and suction issues that were occurring after the Impella pumps were positioned within the heart.  (*Id.* at 120-21, 125-26).  From February 2003 through October 2004, Abiomed conducted a clinical trial on the Impella 2.5 that studied in part those issues.  (Leschinsky Op. R. ¶¶ 82-83; Docket No. 848, Ex. D ("Dens Article") at 3, 5)).  An article describing that trial explained:

---

Methods, as described in the application 10/070,178, which claims priority to PCT/US00/24515 filed 1 September 2000, for United States patent[s], and in this and any and *all US and other patent applications* and *patents thereon*, and in all rights of priority thereto."  (*Id.*; *see also* '100 patent, Cover Page (reflecting as its "application number" 10/070,178)).

> During the trial, pump design modifications were performed to obtain a more stable position in the left ventricle cavity and to reduce the shear forces. The main adaptations were: 1. stiffening of the *cannula*, 2. adding a *pigtail* at the tip of the cannula 3. increasing the gap between the impeller vanes and the pump housing.

(Dens Article at 5 (emphasis added)).  The article further explained that "[i]n the first two patients the pump could not be placed over the aortic valve."  (*Id.* at 6).  But "[after] a 0.014 [inch] wire was placed in the left ventricle and the pump was advanced in an over-the-wire technique," the issue did not recur.  (*Id.*).

By August 2003, Impella Cardio had filed a patent describing the use of the "pigtail" in connection with its products which, according to Dr. Siess, solved the suction and stability issues the Impella products had been having.  (Leschinsky Op. R. ¶ 80; Siess Dep. at 119-23, 128-30, 137).[6]  That patent lists Dr. Siess as an inventor, and was later assigned to Abiomed, presumably upon its acquisition of Impella Cardio.  (Siess Dep. at 119-20).

When Abiomed acquired Impella Cardio in 2005, it had already obtained a Conformitè Europëenne ("CE") approval mark permitting the marketing of the Impella 2.5 and 5.0 in the EU.  (Docket No. 848, Ex. C ("Abiomed 2005 10-K") at 3, 8).  By December 15, 2006, Abiomed had submitted its first Impella product—the Impella 2.5—for FDA approval.  (Docket No. 481, Ex. 20 ("Impella 2.5 510(k)") at 1).

### (2)   Events after 2007

Dr. Aboul-Hosn testified that he began working for Abiomed as a consultant in October

---

[6] Dr. Siess testified:

> [T]he pigtail, as I mentioned, was put on for two purposes:  Primarily, keep it in place and reduce suction. That's number one.  Now, you still need to basically be able to place the pump . . . .  So it also needed to be able to be placed over a guide wire.  For that reason, as I described, right, so it elongates the pigtail, straightens it out.  But the guiding mechanism at that time, once the guide writer is used, is the guide wire.  Everything else follows the guide wire.

(*Id.* at 137-38).

2007.  (Aboul-Hosn Dep. at 9; Docket No. 764, Ex. 10, Consulting Agreement at 1).[7]  He

testified that "if [he] recall[ed] correctly," by the time he started at Abiomed, the Impella

intravascular blood pump was "[already] completed," and "was commercially available . . .  in

Europe [but] [had] not [gotten] FDA approval."  (Aboul-Hosn Dep. at 11).

Dr. Aboul-Hosn testified "yes" when asked whether he was hired because Abiomed

wanted his "help, knowledge, and assistance in the research and design of intravascular blood

pumps."  (*Id*. at 145).  But when he was asked whether he did, in fact, provide such assistance to

them, his attorney instructed him not to answer the question.  (*Id.* at 146).[8]  Indeed, he refused to

answer any question, in any form, concerning whether he participated in the creation of any

Impella product for Abiomed.  (*Id*. at 146-52).

For his part, Dr. Siess testified:

> I mean, we initially put him on things where I [thought] he would be of value,
> because I saw him always as someone -- he has a medical background, which is
> different from mine.  He's more a medical person than a technical person.  So I
> thought that he was best suited to I think help us maybe on some anatomical fits.
> We looked at intravascular phase pumps from the IVC, and which that device
> doesn't even exist today.  We haven't taken it any further.  But there was one idea
> to basically do a right-side assist instead of from the groin, from above, allowing
> basically for better patient mobilization.  So that was one thing he did.  And ever
> since, he's primarily helping us, and me, more or less as a patent scout on patents,
> because this is really what he loves.  I mean, this is -- he can sit in front of his
> computer all day and search the wor[l]d.  And in addition to that, also he comes to
> our meetings because so many times what has happened in the past, we're running
> so fast that so many times we invent things and we don't follow up.  So it's good
> to have him as a patent scout there.  And then whenever he sees something that he
> thinks we should patent, he comes to me, what's talked about here and there and
> there, shall we further elaborate on it, and that's what we then do.

---

[7] Dr. Aboul-Hosn was deposed in this matter in Brussels, Belgium, in August 2019.  He and Abiomed took
the position that he was an outside consultant for the company; he appeared voluntarily, as it appears he was not
subject to subpoena.  (Aboul-Hosn Dep. at 6-7).  He was represented by separate counsel.  (*Id*.).

[8] His counsel stated on the record that he objected to that line of questioning, because he thought "that goes
beyond the scope of what we're talking about . . . . [W]e have been very clear that is not something he is going to
answer, what he has done for Abiomed."  (Aboul-Hosn Dep. at 146).

(Siess Dep. at 206-07).[9]

In May 2008, Dr. Siess e-mailed William Bolt, who was at that time the head of Abiomed's engineering and regulatory departments, about Dr. Aboul-Hosn's role at Abiomed, among other items.  (Docket No. 764, Ex. 16 ("Bolt Dep") at 39-40); Docket No. 764, Ex. 19 ("Bolt & Siess Emails") at 3).[10]  He said that Dr. Aboul-Hosn would "to a large extent" work on "purge and auto-pilot [that is, a self-guided Impella]" and asked Bolt how to budget that work "since it [was] not "r[esearch] but [SPR] related work."  (Bolt & Siess Emails at 3; Bolt Dep. at 169-70 (defining "auto-pilot" as the self-guided Impella and stating that "purge" refers to "two lumens that are in the catheter:  [o]ne function [is] the pressure fluid-filled . . . [t]he other is that there is a fluid added that . . . keeps the shaft of the Impella patent, otherwise it would develop clots . . . .")).  According to an Abiomed PowerPoint presentation titled "System Problem Reporting," SPRs are a "critical component" of Abiomed's quality management system, and track "requests for improvements that occur during[] design, implementation, testing and clinical use."  (Docket No. 764, Ex. 20 ("May 2013 PowerPoint") at 8; *see also* Bolt Dep. at 159).  Bolt testified that he "push[ed] back" on Dr. Siess's claim that Dr. Aboul-Hosn's work would be SPR-related (which was part of Bolt's engineering budget rather than Dr. Siess's research budget).  (Bolt Dep. at 172-73).  Bolt wrote back:

> Walid [Aboul-Hosn] is costing 130k EU and he is not budgeted in the existing labor matrix at all.  That would put him in Research.  But per your input here, his efforts will be mostly [] in the resolution of SPRs.  If he is going to be budgeted here [in engineering] he must be visible to the team in what he is assigned to do. Some of his work (can you assign a percentage?) will be toward the [s]elf guided Impella.

---

[9] In February 2015, Dr. Aboul-Hosn was sent a spreadsheet on patent monitoring that contained a list of names of competitors and inventors, including A-Med, Maquet, and his own name.  (Docket No. 764, Ex. 18 at 2, 3, 5).

[10] In 2015, Bolt became the "Senior Vice President Regulatory and Clinical Programs," a role he held until his retirement from Abiomed in May 2019.  (Ex. 17, Abiomed 2018 8k, at 2; Bolt Dep. at 40, 43).

(Bolt & Siess Emails at 2).  Dr. Siess replied that Dr. Aboul-Hosn would be spending approximately "50% of his time [on] [] purge and 20% [on] the self-guided [I]mpell[a], which leaves us with some residual resources on cannula etc.  [His] [m]ilestone for the self guided Impella is a couple of builds and tests from animals.  Feasibility should be achieved on a guidewire based pressure signal."  (*Id.*).

Bolt testified that his recollection was that, after that e-mail exchange, the entire cost of Dr. Aboul-Hosn's salary ended up being assigned to research.  (Bolt Dep. at 174).  He further testified that he didn't remember "Dr. Aboul-Hosn ever [] working on SPR-related work," and that he "[didn't] remember him in any specific concrete contributions while [Bolt] was running [the] engineer[] [department] where he brought something forward as a design change []to the Impella."  (Bolt Dep. at 174-175).

As of May 2009, Dr. Aboul-Hosn was part of Abiomed's Research team, which included eight other members.  A PowerPoint presentation about that team stated that the "global challenges" it faced included "control[ling] hemolysis[] of all Impella products" and "creat[ing] a less burdensome approach to accelerate the CAPA [(Corrective and Preventive Action)] execution to reduce SPR[s]."  (Docket No. 764, Ex. 31 ("May 2009 PowerPoint") at 2, 3-5).[11]

Again, by 2005, the Impella 2.5 and 5.0 were already being sold and marketed in Europe. (Aboul-Hosn Dep. at 11; Abiomed 2005 10-K at 3, 8).  And in 2006, Abiomed submitted its first

---

[11] According to an Abiomed PowerPoint presentation, by 2013, Dr. Aboul-Hosn was considered a member of the extended team of the "Research Platform Core Team," which had six members and was led by Dr. Siess, and also had roles in "engineering" and "manufacturing."  (Docket No. 764, Ex. 15 at 44).  That slide deck listed the "[Impella] CP with improved positioning" and the "[Impella] RP with improved sensing and improved suction detection and positioning" as milestones for that research team.  (*Id.* at 44-46; Bolt Dep. at 183).  Bolt testified that the "Extended Core Team" members on the Research Platform Core Team "play a critical role in the execution of the [research] program," and are "general source of resources" that "support[] all of the programs in research." (Bolt Dep. at 181, 183-84).

Impella product, the Impella 2.5, for FDA approval.  (Impella 2.5 510(k) at 1).  However, the

first Impella product was not sold in the United States until June 2008.  The following table sets

forth the dates on which the accused products were first sold commercially in the United States:

| Product Name | First Commercial Sale in U.S. |
| --- | --- |
| Impella 2.5 | June 2008 |
| Impella 5.0 | April 2009 |
| Impella CP | September 2012 |
| Impella RP | January 2015 |
| Impella CP with SmartAssist | Approximately May 2019[12] |

(Docket No. 764, Ex. 11 ("Abiomed Interrogs.") at 3; May 2019 Press Release at 1).

Abiomed has modified the design of the accused products over time.  (*See generally*

Docket No. 545, Ex. 16 ("Change Orders Spreadsheet"); May 2013 PowerPoint at 27, 45;

Docket No. 764, Ex. 25 at 2, 3).[13]  For example, an "Impella 2.5+ Release Proposal" from

August 2008 stated that "timely product enhancements" would be "[r]elease[d] . . . as available"

including a "[n]ew guidewire," and new features like "[i]mproved kink-resistance."  (Docket No.

764, Ex. 23 ("2008 Impella Product Line Review") at 35).  And in May 2010, a meeting was

held on a project to improve the Impella 2.5, set to take place throughout fiscal year 2011, which

---

[12] A press release from May 2019 stated that the Impella CP with SmartAssist would be commercially available in 2019 through a controlled launch process at select sites.  (May 2019 Press Release at 1).  It also stated that the majority of Impella CP heart pumps in the United States would be transitioned to SmartAssist over the next fiscal year.  (*Id.*).  In addition, there had been a limited market release of the Impella CP with SmartAssist in 2018 after its approval by the FDA in March 2018.  (*Id.*).

[13] Maquet contends that the "accused features" of the products "such as the cannulas and pigtails" have been modified over time.  Abiomed contends that the core design of the products, including the design of those features, has remained consistent.  (Docket No. 868, Maquet Reply SMF ¶ 79).

Dr. Aboul-Hosn attended.  (Docket No. 764, Ex. 21 ("Email about Improved Impella 2.5") at 2, 5).[14]

The Impella CP, Abiomed's current best-selling left-heart support product, was designed in 2011, and appears to make use of designs of earlier products, such as the Impella 2.5 and 5.0 (the extent to which it does so is disputed).  (*See* Change Orders Spreadsheet at 25 (describing the change orders executed for each of the accused products by year, and listing 2011 as the earliest date for the Impella CP)).  An illustration of the Impella 2.5 from a 2006 article and an illustration of the Impella 2.5 and Impella CP from what appears to be a 2018 pamphlet are depicted below.  (*Compare* Dens Article at 2, *with* Docket No. 475 ("Abiomed's 2018 Instructions for Use and Clinical Reference Manual") at 3).

---

[14] Attendees of the meeting were asked to review "a red-lined copy of the User Needs" on the improved Impella 2.5 and provide feedback.  (Docket No. 764, Ex. 22 at 2-3).  Sections of that document titled "Introduction," "Implantation Procedure," and "Cannula Assembly" described the "ease of use and a fast and safe implantation of the device" using "minimal invasive percutaneous insertion via the femoral artery" and "a pigtail catheter . . . configured at the distal end of the cannula . . ." along with "a guidewire . . . to insert the Impella 2.5 via the femoral artery . . . ."  (*Id.* at 8, 9, 12).  It is not clear from the record whether Dr. Aboul-Hosn provided his feedback on the document.

According to the Change Orders Spreadsheet, in the end, the following modifications or additions were made to the Impella 2.5 during fiscal year 2011:  "cannula with radioopaque [sic] marker for better placement," "redesign of butterfly to fix with 'Stat Lock,'" "improved wound closure outer diameter," and "additional backloading lumen preset in pump."  (Change Orders Spreadsheet at 22).

**Impella 2.5 as of 2006**    **Impella 2.5 as of 2018**    **Impella CP as of 2018**


Figure 1. Recover® LP 2.5, initial study (left) and market design (right).





(*Id.*).

Caitlyn Hastie, a senior project engineer for Impella products at Abiomed, testified that she knew Dr. Aboul-Hosn's name, but had never met him in person.  (Docket No. 481, Ex. 3 ("Hastie Dep.") at 69).  She further testified that she attended meetings that he had also attended, but had never e-mailed or talked directly to Dr. Aboul-Hosn, and did not know what his role was at the company beyond that he worked with Dr. Siess.  (*Id.* at 69-70).  Scott Corbett, Abiomed's manager of its advanced development group and lead designer of the Impella CP, testified that he had met Dr. Aboul-Hosn once, on a trip to one of Abiomed's facilities in Germany, but had never spoken to him over the phone, did not believe he had ever e-mailed with him, and had never worked with him on the design or development of any of the Abiomed products.  (Docket No. 764, Ex. 52 ("Corbett Dep.") at 32-34).  Matthew Plano, the director of global production and supply chain for Impella devices as of 2007, testified that he did not have any "business interaction[s]" with Dr. Aboul-Hosn and that he "d[id] not know" what Dr. Aboul-Hosn does for Abiomed.  (Docket No. 481, Ex. 4 ("Plano Dep.") at 51-52).

Dr. Aboul-Hosn was still a consultant for Abiomed as of the time of his deposition in August 2019.  He works in the same building as Dr. Siess, and has a company e-mail address.

(Aboul-Hosn Dep. at 143-144, 152, 160).  During the twelve-year period he has been consulting

for Abiomed, Abiomed has paid him approximately €2 million.  (Aboul-Hosn Dep. at 155).  He

does not receive non-monetary benefits from the company, such as health care, although the

company pays for his business travel.  (Aboul-Hosn Dep. at 155-156).  He has never owned any

stock or had any other financial stake in the company, nor has ever had a managerial role at the

company.  (*Id.* at 155).

### 2.   **Analysis**

#### a.   **Assignor Estoppel Generally**

Assignor estoppel is an equitable doctrine that precludes a person who has assigned the

rights to a patent and those in privity with that assignor from later contending that the patent was

invalid.  *Minerva Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, 2304 (2021); *Shamrock Techs,

Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). The rationale is that,

generally speaking, when a person sells his patent rights, "he makes an (at least) implicit

representation to the buyer that the patent at issue is valid."  *Minerva*, 141 S. Ct. at 2309.

Assignor estoppel applies "when, but only when, [his] claim of invalidity contradicts [the]

explicit or implicit representations he made in assigning th[at] patent."  *Id.* at 2302.[15]

The doctrine is primarily concerned with "the balance of [] equities" between the parties,

and the "intrinsic unfairness" of allowing an assignor to challenge the validity of a patent that he

or she assigned for value.  *Shamrock*, 903 F.2d at 793 (quoting *Diamond Sci. Co. v. Ambico, Inc.*,

848 F.2d 1220, 1224-45 (Fed. Cir. 1988)) (balance of equities); *Mentor Graphics Corp. v.*

---

[15] Examples of activities that do not involve such contradiction include (1) assignments from employees to employers that assign patent rights in "any future inventions [the employee] develops during his employment," because the assignment in such a case cannot possibly contain a representation that the patent is valid; (2) a change in the law after the assignment, such that "previously valid patents become invalid"; and (3) "change[s] in patent claims" that most often arise "when an inventor assigns a patent application, rather than an issued patent" and the owner "returns to the PTO to enlarge the patent's claims" with the result that the "new claims are materially broader than the old claims."  *Id.* at 2310.

*Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1378 (Fed. Cir. 1998) (intrinsic unfairness).

Whether a party is in privity with the assignor also depends on the "balance of [] equities"

between the parties. *Shamrock*, 903 F.2d at 793. Where an accused infringer "availed itself of

the [assignor's] 'knowledge and assistance' to conduct [the] infringement," principles of privity

will estop the infringer as well as the assignor. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d

821, 839 (Fed. Cir. 1991) (quoting *Shamrock*, 903 F.2d at 794).

In *Shamrock*, the Federal Circuit identified eight factors to assist courts in making a

finding of privity:

> (1) the assignor's leadership role at the new employer; (2) the assignor's
> ownership stake in the defendant company; (3) whether the defendant company
> changed course from manufacturing non-infringing goods to infringing activity
> after the inventor was hired; (4) the assignor's role in the infringing activities; (5)
> whether the inventor was hired to start the infringing operations; (6) whether the
> decision to manufacture the infringing product was made partly by the inventor;
> (7) whether the defendant company began manufacturing the accused product
> shortly after hiring the assignor; and (8) whether the inventor was in charge of the
> infringing operation.

*MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1380 (Fed. Cir. 2016)

(discussing and applying the "*Shamrock* factors").

Privity can apply even if an assignor did not directly design the infringing features of the

accused product, as long as he or she was still involved in the development of the infringing

product. *Brocade Commc'ns Sys. v. A10 Networks, Inc.*, 2012 WL 2326064, at *5 (N.D. Cal.

June 18, 2012) ("Privity does not require that the assignor directly design the infringing features

of the accused product . . . [but that the alleged infringer] availed itself of [the assignor's]

knowledge and assistance to develop the accused [product].") (internal quotation marks omitted).

*But see Mikkelsen Graphic Eng'g Inc. v. Zund Am. Inc.*, 2014 WL 12654766, at *5 (E.D. Wis.

May 23, 2014) (noting that "[n]o evidence suggests that [the inventor] was involved in [the]

decision [to explore selling the infringing software], much less that he was the driving force behind it.  Once the decision was made to explore other software, [the inventor] was involved in testing the software and making suggestions for improving it, but no evidence suggests he played a major role in developing [it]."); *NuVasive, Inc. v. Alphatec Holdings, Inc.*, 2020 WL 1984061, at *8, *9 (S.D. Cal. Apr. 24, 2020) (noting that although the assignors were hired to "promote and increase" the alleged infringer's share in the relevant market for the accused product, "[when the inventors joined the company], the company was already deeply committed to[] manufacturing and promoting the accused system.").

### b.      Whether Abiomed Is in Privity with Dr. Aboul-Hosn

It is undisputed that Dr. Aboul-Hosn is the first of three named inventors on the '100 Patent; that he assigned all of his rights in that patent in 1999 to his then-employer, A-Med, Inc., for consideration; that the patent issued in April 2006; and that Maquet is the successor in interest to A-Med.  The rights he assigned to A-Med were those to the invention claimed in the '100 patent, not some amorphous future inventions; the governing law as to validity does not appear to have changed in the intervening period; and although he assigned the rights to a patent application (from which the '100 patent issued), the parties do not contend that the '100 patent materially broadened the application's claims after the assignment.  *Minerva*, 141 S. Ct. at 2310. It is therefore beyond dispute that Dr. Aboul-Hosn is personally estopped from asserting that the patent is invalid.  *See Diamond Sci. Co.*, 848 F.2d at 1226.

It is likewise undisputed that Dr. Aboul-Hosn entered into a consulting agreement with Abiomed in October 2007, and that he was still acting in that capacity as of August 2019.  The question is whether Abiomed "availed itself" of Dr. Aboul-Hosn's "knowledge and assistance" to conduct the alleged infringement.  *Intel*, 946 F.2d at 839.  If so, then Abiomed is in privity with Dr. Aboul-Hosn and is estopped from asserting that the '100 patent is invalid.

There is certainly substantial evidence from which a reasonable person could conclude that Dr. Aboul-Hosn directly contributed to the design and development of at least some of the accused Impella products, and that therefore Abiomed availed itself of his knowledge and assistance.

Dr. Aboul-Hosn has worked as a consultant for Abiomed for at least twelve years, during which time Abiomed paid him approximately €2 million for his services. During that same period, Abiomed not only brought the Impella line of products to market, but introduced modified and improved versions on four occasions. The Impella CP, Abiomed's best-selling product, was introduced in September 2012, when Dr. Aboul-Hosn had been consulting for the company for nearly five years. Virtually Abiomed's entire business—96% of its revenue in 2019—came from the sale of Impella pumps. (*See* Docket No. 871, Ex. 44, Abiomed 2019 10-K at 40).

Dr. Aboul-Hosn testified that he was hired because Abiomed wanted his "help, knowledge[,] and assistance in the research and design of intravascular blood pumps." (Aboul-Hosn Dep. at 145-46). An email chain from May 2008 between Bolt (who was at that time the head of Abiomed's engineering and regulatory departments) and Dr. Siess appears to reveal a debate over what Dr. Aboul-Hosn's role at Abiomed would be, and seems to indicate that Dr. Siess thought that he would "to a large extent" work on issues related to the Impella.

A further issue arises from the fact that Dr. Aboul-Hosn refused to answer questions concerning what work he has actually performed while at Abiomed. He appeared voluntarily for his deposition in Belgium, and his counsel set limitations on what questions he would answer. It may be entirely fair—although the Court does not now decide the issue—to draw an adverse inference from his refusal to discuss his work at Abiomed, and to assume that Dr. Aboul-Hosn in

fact worked on infringing activities.  And it may also be fair to draw that inference against Abiomed, which engaged him to do that work, as well as against Dr. Aboul-Hosn personally.

Abiomed nonetheless contends that there is insufficient evidence that Dr. Aboul-Hosn in fact directly contributed to the design of the accused products.   Dr. Siess testified that after Dr. Aboul-Hosn was hired, he worked on "intravascular phase pumps from the IVC," a device that no longer exists.  (Siess Dep. at 206-07)  He further testified that, other than that one project, "*ever since*, he's primarily helping us, and me, more or less as a patent scout on patents, because this is really what he loves."  (*Id.* (emphasis added).

Maquet contends that Dr. Aboul-Hosn "worked to improve the Impella 2.5" including, among other items, its "pigtail catheter . . . configured at the distal end of the cannula," because he attended a meeting on the "Improved Impella 2.5," and attendees of that meeting were asked to review a document that contained the statement "a pigtail catheter must be configured at the distal end of the cannula," among others, in a section titled "Cannula Assembly."  (Docket No. 764, Ex. 22 at 12).  But the document in question—titled "User Needs Impella 2.5 3rd generation"—does not indicate whether the "pigtail catheter . . . configured at the distal end of the cannula" was an improvement to the Impella 2.5, or merely an unchanged feature.  (*Id.*).  And it is unclear whether Dr. Aboul-Hosn actually did or said anything at the meeting, or engaged in any follow-up work.

Maquet also contends that Dr. Aboul-Hosn "worked on a number of 'global challenges' such as 'controlling hemolysis of all Impella products' and 'creating a less burdensome approach to resolving and reducing SPRs.'"  (Maquet Opp. at 8).  It draws that inference from the fact that by 2009, Dr. Aboul-Hosn was part of Abiomed's Research team, which included eight other members, and because a PowerPoint presentation about that team stated that the "global

24

challenges" it faced included "control[ling] hemolysis[] of all Impella products" and "creat[ing] a less burdensome approach to accelerate the CAPA [(Corrective and Preventive Action)] execution to reduce SPR[s]."  (May 2009 PowerPoint at 2, 3-5).[16]

Bolt testified that he didn't remember "Dr. Aboul-Hosn ever [] working on SPR-related work," and "[didn't] remember him in any specific concrete contributions while [Bolt] was running [the] engineer[] [department] where he brought something forward as a design change []to the Impella."  (Bolt Dep. at 172-75; Siess Dep. at 206-07).  In addition, three Abiomed employees involved in the design, engineering, and supply of the Impella devices, including the lead designer of the Impella CP, testified that they had never had any business communications with Dr. Aboul-Hosn.  (Hastie Dep. at 69-70; Corbett Dep. at 32-44; Plano Dep. at 51-52).  For example, the lead designer of the Impella CP testified that he had never worked with him on the design or development of any of the Abiomed products.  (Corbett Dep. at 32-34).

There is some evidence that the infringing features of the accused products were part of the design of those products before 2007, when Dr. Aboul-Hosn joined Abiomed.  Maquet alleges that the Impella infringes on the "side-rigger" guide mechanism because "the *pigtail* [of the Impella products] is a 'guide carriage integrally formed along' a portion of the cannula sidewall within the meaning of the claims, and contains a lumen through which the guidewire slides."  (Docket No. 589, Ex. 4, Maquet Second Supp. Infringement Contentions, App. A at 8; Maquet's Third Supp. Infringement Contentions, App. A at 10; Leschinsky Op. R. ¶ 42).  The

---

[16] According to an Abiomed PowerPoint presentation, by 2013, Dr. Aboul-Hosn was considered a member of the extended team of the "Research Platform Core Team," which had six members and was led by Dr. Siess, and had roles in "engineering" and "manufacturing."  (Docket No. 764, Ex. 15 at 44).  That slide deck listed the "[Impella] CP with improved positioning," among other items, as milestones for that research team.  (*Id.* at 44-46; Bolt Dep. at 183).  Bolt testified that the "Extended Core Team" members on the Research Platform Core Team "play a critical role in the execution of the [research] program," and are "general source of resources" that "support[] all of the programs in research."  (Bolt Dep. at 181, 183-84).  Maquet infers from this evidence that Dr. Aboul-Hosn was a "general source of resources" and worked on the "[Impella] CP with improved positioning" among other items.  (Maquet Opp. at 8).

guidewire and pigtail features were added during a clinical trial of the Impella 2.5 that took place from February 2003 to the end of October 2004, and Abiomed had filed a patent describing the use of a pigtail in connection with the Impella products in August 2003. (Leschinsky Op. R. ¶¶ 80, 82-83; Dens Article at 3, 5; Siess Dep. at 119, 123, 128, 130).

Under the circumstances, the Court concludes that there is a genuine dispute of material fact as to whether Abiomed availed itself of Dr. Aboul-Hosn's knowledge and assistance to conduct infringing activity, and therefore whether Abiomed is in privity with Dr. Aboul-Hosn for purposes of the application of the doctrine of assignor estoppel. Summary judgment on the issue of assignor estoppel will therefore be denied.

## B.      The Siess Thesis

Maquet has also moved for partial summary judgment as to "one of [Abiomed's] primary validity challenges"—specifically, the contention that a thesis written by Dr. Thorsten Siess is prior art to the '100 patent, and it both anticipates the asserted claims and renders them obvious. (Maquet Mem. at 10). The thesis in question was written in German, apparently in 1999. Maquet contends that the thesis has not been properly authenticated; that the English translation is inadmissible, both because it is unreliable and because the original document has not been produced; that the thesis was not sufficiently accessible to the public to qualify as prior art; and that the thesis should be excluded as a sanction for Abiomed's failure to provide discovery.

Maquet thus seeks to exclude the thesis on a variety of grounds, including failure to meet the requirements of the evidentiary rules and as a sanction for failure to comply with its discovery obligations. Its motion is not, however, framed as a motion *in limine* to exclude the thesis as an evidentiary matter, or as a motion to exclude as a discovery sanction under Fed. R.

Civ. P. 37.  Instead, Maquet seeks partial summary judgment in its favor to the extent that
Abiomed's invalidity argument rests on the Siess thesis.

It is true that Abiomed bears the burden of proving that the '100 patent is invalid by clear
and convincing evidence.  *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).  That
heightened burden applies even at the summary judgment stage.  *See Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 254 (1986) ("[I]n ruling on a motion for summary judgment, the judge must
view the evidence presented through the prism of the substantive evidentiary burden.").  And,
presumably, exclusion of the Siess thesis would not make Abiomed's task of proving invalidity
any easier.  But Maquet fails to show how exclusion of the thesis would *require* summary
judgment in its favor as to any invalidity defense raised by Abiomed.  Indeed, Maquet does not
even argue the point.[17]  For that reason alone, the motion for partial summary judgment as to the
Siess thesis will be denied.  Nonetheless, the Court will address the arguments made by Maquet
as to why the Siess thesis should be excluded as a matter of law.

### 1.    Background

On July 8, 2019, Abiomed served supplemental invalidity contentions.  (Docket No. 764,
Exs. 32-32B9 ("Supp. Invalidity Contentions")).[18]  Among other items, it asserted that the thesis
of Thorsten Siess, titled "System analysis and development of intravascular rotation pumps for
cardiac assist," anticipated the asserted claims or rendered them obvious alone or in combination
with other references, and that it was prior art because it was published in June 1999.  (Docket

---

[17] Dr. James Antaki, an expert for Abiomed, contends that the Siess thesis anticipated or rendered the
asserted claims obvious in combination with other references.  (Docket No. 764, Ex. 33).  But Maquet makes no
argument that Abiomed's entire invalidity defense rests upon the Siess thesis, so that exclusion of the thesis requires
the entry of summary judgment as to the invalidity defense.

[18] Abiomed's invalidity contentions noted that it "reserve[d] the right to amend, supplement, or materially
modify its Invalidity Contentions in view of expert discovery."  (*Id.* at 5).

No. 764, Ex 32-B8 ("Siess Thesis Invalidity Contentions") at 1).[19]

The thesis at issue is written in German.  On February 16, 2018, Maquet produced to Abiomed an apparent translation of that thesis.  (Docket No. 848, Exs. H-J ("Maquet Translation"); Ex. Z, ("February 16, 2018 Disclosures Cover Letter")).  Abiomed did not, apparently, produce the original thesis to Maquet.  However, on October 6, 2018, it produced its own purported English translation.  (Maquet Reply SMF ¶ 95; Siess Thesis Invalidity Contentions at 1); *see generally* Docket No. 764, Ex. 34 ("Abiomed Translation"); *id.* at 1; Maquet Reply SMF ¶ 51 (Abiomed's facts)).

Abiomed's translation was prepared by a professional translator for "Language Link." (Abiomed Translation at 1).  The managing director of Language Link signed the translation, and certified that it was "to the best of [the translator's] knowledge and belief a true and faithful rendering of the original German document."  (*Id.*).  The cover page states that the translation is of a document titled "Thornsten Siess, "Systemanalyse und Entwicklung intravasaler Rotationspumpen zur Herzunterstützung, Dissertation, Shaker 1999."  (*Id.*).

Abiomed also produced to Maquet a screenshot of an entry for the thesis in a catalog of Shaker Verlag, which is a German publishing house.  (Docket No. 745, Ex. 7 ("Shaker Verlag Catalog Entry")).  That entry appears to list (in German) the publication date of the thesis, which is June 1999, and the length of the thesis, which is 208 pages.  (*Id.* at 1).  Maquet's translation totals 208 pages; Abiomed's totals 201 pages, although the last numbered page is number 189. (*See generally* Maquet Translation; Abiomed Translation; *id.* at 200; Maquet Reply SMF ¶ 114). Abiomed's translation does not contain the foreword of the thesis, and also states in the header

---

[19] The citation Abiomed provided for the dissertation was, in full:  "Siess et al., 'System analysis and development of intravascular rotation pumps for cardiac assist,' Dissertation, Shaker Verlag, Aachen, 1999, 189 pages ('Siess Thesis')."  (*Id.* at 1).

that "3 unpaginated pages [were] omitted." (*See generally* Abiomed Translation; *id.* at 3;
Maquet Translation). On at least two pages of Abiomed's translation, the bracketed phrase
"[Type Text]" appears at the top of the page. (Abiomed Translation at 185-86).

Dr. Siess was shown the Abiomed translation at his deposition and was asked to
"identify" the document. (Docket No. 764, Ex. 7 ("Siess Dep.") at 82).[20] He responded:

> A. This is a translated document of my Ph.D. thesis. And I may say if we have
> the English translation already, good. If we don't, I would love to get it, because
> we never bothered to translate it in all detail into English. But that's nice. I don't
> know how good the English translation is, but at least it's an English translated
> version of my Ph.D. –
>
> Q. I'm sorry. Have you seen this before?
>
> A. Not in full detail. Because I've seen paragraphs on a different case where they
> translated something related to a clutch, and that was it.

(*Id.* at 82-83). Dr. Siess testified in English, and it therefore appears that he is fluent in both
English and German.

Marika Just and Ortrud Deister are a librarian and a research and information manager,
respectively, at a White & Case LLP office in Frankfurt, Germany. They signed a declaration,
dated September 5, 2019, in which they "depose[d] and sa[id]" that the library at their office
"maintains custody of an original copy of 'Systemanalyse und Entwicklung intravasaler
Rotationspumpen zur Herzunterstützung' by Thorsten Siess." (Docket No. 764, Ex. 38 ("White
& Case Declaration") at 2). They also stated that "[a]s best [they] could determine . . . the
publication was publicly available at the Deutsche Nationalbibliothek ('DNB') in 1999," and
attached a screenshot of the front cover, which is stamped with the call number "1999 A 34878,"
and the copyright page, which states "copyright Shaker Verlag 1999." (*Id.* at 2-4). They stated

---

[20] Abiomed's Rule 26 disclosures did not identify anyone who would have personal knowledge of the
Abiomed translation or the original document, other than possibly Dr. Siess. (Maquet Reply SMF ¶ 129 (citing
Docket No. 764, Ex. 36, Abiomed's Second Supp. Rule 26(a)(1) disclosures)).

that in their experience, call numbers are "assigned to a publication upon entry [in]to the DNB," and "include[] the year [in] which the publication entered the library and became available to the public." (*Id.* at 2). They also attached a screenshot of the online entry for the thesis in DNB's online catalog, which shows a call number of "1999 A 34878." (*Id.* at 5).

### 2.    Maquet's Request for a Rule 30(b)(6) Deposition

In January 2018, Maquet noticed the deposition of a Rule 30(b)(6) witness as to "Abiomed's general knowledge of any of the publications or systems identified as purported prior art to the Patents-in-Suit." (Docket No. 405, Mem. Supp. Maquet's Mot. to Compel at 2, 6). In July 2019, it also noticed the deposition of a Rule 30(b)(6) witness as to the "facts supporting any of Abiomed's affirmative defenses." (*Id.* at 7-8).

Maquet moved to compel the appearance of witnesses for that deposition on September 6, 2019. On November 22, 2019, the Court granted that motion as to those topics. On December 6, 2019, Abiomed filed an objection to that order, and on January 13, 2020, Maquet apparently noticed the deposition for January 24, 2020. On January 23, 2020, Abiomed moved to stay the order granting the motion to compel. On January 24, Maquet appeared for the deposition, but Abiomed did not. On August 28, 2020, the Court denied the motion to stay as moot.

### a.    Analysis

#### (1)    Whether the Challenge to the Siess Thesis Is Untimely

As an initial matter, Abiomed contends that Maquet's challenge to the Siess thesis should be rejected as untimely.

On September 8, 2017, Abiomed served preliminary invalidity contentions that cited to patents and publications it alleged were prior art. The list of prior art included the Siess thesis. (Docket No. 219, Ex. B at 17). On October 9, 2018, Maquet submitted its rebuttal validity contentions. (Docket No. 744, Ex. D at 10). On July 8, 2019, Abiomed submitted its

30

supplemental invalidity contentions, and identified twelve primary prior-art references, one of which was the Siess thesis.  (Supp. Invalidity Contentions, Ex. 32 at 20-23).  On September 6, 2019, fact discovery closed.

Abiomed contends that Maquet never raised any issues with the Siess thesis until March 12, 2020, when it served a rebuttal expert report.  Unfortunately, however, the Court cannot conclude from the record whether that is in fact the case, because neither party seems to have provided the Court with a full copy of the exhibits to Maquet's rebuttal validity contentions. Those exhibits apparently "respond[] to the prior art references asserted in the corresponding exhibit[] [of] Abiomed's Preliminary Invalidity Contentions," which the Court likewise does not have.  (Maquet's Rebuttal Validity Contentions at 3).  And Maquet's October 2018 rebuttal validity contentions state that one of those exhibits responds specifically to "Abiomed's argument that Dr. Thorsten Siess invented the subject matter of the asserted claims prior to the named inventors of the patents-in suit," which it contended was "unsupported by the prior art references relied upon by Abiomed."  (*Id.* (citing to "Exhibit A5")).[21]

Thus, it is possible that Maquet may in fact have responded to Abiomed's contentions as to the Siess thesis in its rebuttal validity contentions.  But on this record, the Court has no way to conclude one way or the other.

In any event, except for alleging (without sufficient evidence) that a delay occurred, Abiomed has not provided the Court with any reason that summary judgment should be denied based on the untimeliness of Maquet's challenge to the Siess thesis.  Among other things, the Court cannot ascertain whether there was any substantial prejudice that cannot be fairly cured.

---

[21] The Court was able to locate Maquet's rebuttal validity contentions and Abiomed's invalidity contentions, which were attached to other motions; however, they were not attached to Abiomed's opposition to Maquet's motion for partial summary judgment.  The exhibit in question was not attached to Maquet's motion for partial summary judgment nor, as far as the Court is aware, to any other pending motion.

The Court therefore cannot conclude that such a sanction is warranted, and will not deny the motion on that basis.

### (2)      Whether the Siess Thesis Can Qualify as Prior Art

Maquet contends that the Court should rule as a matter of law that the Siess thesis does not qualify as prior art because, among other reasons, (1) Abiomed cannot authenticate the thesis; (2) Abiomed cannot prove that the translation of the thesis is accurate; (3) a translation is not admissible without the original document, and Abiomed has not produced the original; and (4) there is no evidence that the thesis was publicly accessible by the priority date of the '100 patent.

#### (a)      Whether the Translation Can Be Authenticated

To authenticate a document, the proponent of that document must produce evidence "sufficient to support a finding that [it] is what the proponent claims it is." Fed. R. Evid. 901(a). "Authentication [] is rarely onerous[, and] in many instances, a single sentence will suffice, indicating that the document is what it appears to be." *Goguen v. Textron, Inc.*, 234 F.R.D. 13, 16-17 (D. Mass. 2006).

At his deposition, Dr. Siess was shown the Abiomed translation, and responded, "[t]his is a translated document of my Ph.D. thesis." (Siess Dep. At 82). As noted, he appears to be fluent in both German and English.

It is true that he also stated "I don't know how good [this] English translation is." (*Id.* at 83). Nevertheless, such testimony is sufficient, at a minimum, to support a finding that the document is what it purports to be, and therefore, that the document can be authenticated.

#### (b)      Whether There Is Sufficient Evidence That the Translation Is Accurate

Maquet further contends that even if Abiomed can authenticate the thesis, it cannot verify

that the translation is accurate.  *See United States v. Sutherland*, 656 F.2d 1181, 1201 (5th Cir. 1981) (when a proffered document "contains a translation into English of [an original text] in a foreign language, the proponent must introduce the testimony of a qualified witness to authenticate and verify the translation.")

As noted, the translation is signed by a person purporting to be a professional translator, certifying that it was a "true and faithful rending of the original German document."  (Abiomed Translation at 1).  Nonetheless, Maquet contends that there is circumstantial evidence casting doubt on the accuracy of the translation.

First, Maquet contends that the screenshot of the Shaker Verlag catalog shows that the original thesis has 208 pages, while Abiomed's translation only has 201 pages, and that "Abiomed [cannot] explain[] this discrepancy."  (Maquet Supp. Mem. at 12).  As an initial matter, some of the page discrepancy has been explained.  For example, Abiomed's translation does not appear to contain the foreword of the thesis, which is available in Maquet's translation, and states in the header that "3 unpaginated pages [were] omitted."  (*See generally* Abiomed Translation; *id.* at 3; *see generally* Maquet Translation).  It is also likely that the pagination of an original document and its translation would not line up perfectly.  And while it is certainly possible that the page discrepancy may affect the accuracy or completeness of Abiomed's translation, it does not warrant a conclusion of law that no reasonable juror could find that the translation is accurate.

Maquet also notes that on at least two pages of Abiomed's translation, the bracketed phrase "[Type Text]" appears at the top of the page, which in Maquet's view "likely indicates" that the translation is to a draft thesis or is otherwise inaccurate.  (Abiomed Translation at 185-

86).[22]  Without seeing the original thesis, there is no basis to conclude as a matter of undisputed

fact that such phrases necessarily render the entire translation inaccurate, or necessarily mean

that the translation is of a draft document.[23]

Those issues, while perhaps a basis for cross-examination—and, conceivably, to exclude

the document at trial—are not sufficient to require exclusion of the translation for purposes of

summary judgment.  Accordingly, the motion will not be granted on that basis.

(c)      **Whether the Best Evidence Rule Applies**

Maquet further contends that a translation is not inadmissible without the original it

translates, and because Abiomed has not produced the original version, it is entitled to a finding

as a matter of law that the Siess thesis is not prior art.

Under the "best evidence rule," "an original writing . . . is required in order to prove its

content."  Fed. R. Evid. 1002; *Rodríguez v. Señor Frog's De La Isla, Inc.*, 642 F.3d 28, 34 (1st

Cir. 2011) ("[T]he best-evidence rule requires a party trying to prove the 'content' of a written

document to introduce the document itself.").[24]  Therefore, because a translation is offered to

---

[22] Dr. Boris Leschinsky, Maquet's expert, stated in his rebuttal report that "consistent with [his] experience, it would have been highly unusual for [the bracketed phrase 'typed text'] to have appeared in a final thesis publication as final thesis publications typically go through several rounds of proofreading prior to their publication" and that it "could indicate that the document that was translated was a draft and not the final version of a thesis that was published" or "that the translation is not an accurate representation of the original German document that was translated."  (Leschinsky Rebuttal R. ¶¶ 2, 95).

[23] Maquet also contends that the Abiomed translation is inaccurate because Dr. Antaki's report includes images that are of "markedly different quality" than Abiomed's translation.  (Maquet Supp. Mem. at 13).  However, while the images do appear to be of different quality, they do not appear to be different in substance.  (Antaki Dep. at 93-97).  A reasonable conclusion to be drawn from a comparison of the images in Dr. Antaki's report and Abiomed's translation is that the images simply came from a higher quality copy of the translation (or from the original thesis) than the translation that Abiomed produced to Maquet.

[24] Maquet did not cite to Rule 1002 in its briefs or in oral argument.  Instead, it stated in general terms that "At the heart, this is a question of evidence and admissibility.  Without the thesis in evidence, there's nothing to authenticate. . . . [A] translation is just an aid for the jury to interpret an original document[,] but is not evidence itself."  (Aug. 20, 2020 Tr. at 73; *see also* Maquet Slide Deck at 53 ("The thesis is not admissible.").  Of course, a party has a duty "to spell out its arguments squarely and distinctly. . . [rather than being] allowed to defeat the system by seeding the record with mysterious references . . . hoping to set the stage for an ambush should the ensuing ruling fail to suit."  *McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 22 (1st Cir. 1991).  Nonetheless, the Court will consider the issue on its merits.

prove the content of an original writing, the rule requires that the original writing be introduced in evidence along with a translation.  Accordingly, Abiomed's contention that "[the fact that] Abiomed did not produce the original German version of the Siess thesis is irrelevant . . . [because it] produced a certified translation" is not in fact correct.  (Abiomed Opp. at 16).  To be admissible at trial, absent a stipulation, the original must be provided.

It appears that the German original is readily available; indeed, Maquet appears to have a copy in its possession.  Even assuming a discovery violation, it is difficult to see why there is any substantial prejudice arising from the failure to produce the original.[25]  In any event, Maquet has moved for summary judgment in its favor on the defense of invalidity based on the theory that the Siess thesis must be excluded.  Again, however, Maquet does not argue why exclusion of thesis compels summary judgment in its favor as to the invalidity defense.  Therefore, under the circumstances, Maquet's partial motion for summary judgment will not be granted on the ground that Abiomed failed to produce the German-language original of the Siess thesis.

---

[25] To the extent Maquet is contending that Abiomed violated its discovery obligations by failing to produce the original German thesis, the motion will be denied.  Maquet failed even to cite Fed. R. Civ. P. 37, much less attempt to demonstrate that the requirements of the rule are satisfied.

The Court notes that Abiomed's duty to produce the thesis is not obviated by the fact that Maquet appears to have had the original thesis since 2016, or the fact that the thesis is publicly available (although, it may mean that the failure to do so was inadvertent or harmless).  *Cf. Martino v. Kiewit N.M. Corp.*, 600 Fed. App'x 908, 911 (5th Cir. 2015) ("[E]ven if a document is publicly available or in the opposing party's possession, a party must still disclose it under Rule 26(a)(1)(A) to provide notice of evidence central to its claims or defenses."); *Ochoa v. Empresas ICA, S.A.B. de C.V.*, 2012 WL 3260324, at *5 (S.D. Fla. Aug. 8, 2010) ("Whether the documents are available to Plaintiffs through due diligence does not control whether [a litigant] should be compelled to produce them."); *Dushkin Publ'g Grp., Inc. v. Kinko's Serv. Corp.*, 136 F.R.D. 334, 335 (D.D.C. 1991) (noting that "discovery *need not be required* of documents of public record which are equally accessible to all parties," but denying a party's motion to exclude public "records of which it was aware and which it had authority to obtain") (emphasis added) (internal quotation marks omitted).

**(d)**    **Whether the Thesis Was Sufficiently Accessible to the Public**

Maquet further contends that the Court should rule as a matter of law that the Siess thesis does not qualify as prior art because there is no evidence that it was publicly accessible by the priority date of the '100 patent.

A patent is invalid if it is anticipated by or is obvious in light of prior art as defined by section 102.  Pre-AIA 35 U.S.C. §§ 102, 103.  As relevant here, section 102 provides:

A person shall be entitled to a patent unless –

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States[.]

Pre-AIA 35 U.S.C. §§ 102(a), (b).

"The [] phrase 'printed publication' has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art."  *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989) (internal quotation marks omitted).  An academic paper of a student, such as a thesis, can be such a "printed publication" as long as it was indexed, cataloged, and shelved in a meaningful way before the critical date.  *Id.* at 1160-61.  For example, in *Cronyn*, the court concluded that three undergraduate student theses were not "publicly accessible" because on the critical date in question they were only indexed in the library based on the students' names, which did not "bear [any] relationship to the subject of the student's thesis."  *Id.* at 1161; *see also SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 376 F. Supp. 3d 369, 388-89 (S.D.N.Y. 2019), *overruled on other grounds* (finding that thesis was not publicly accessible where there was no evidence it was ever published, let

36

alone cataloged or filed); *Intellectual Ventures I, LLC v. Canon Inc.*, 143 F. Supp. 3d 143, 166-67 (D. Del. 2015) (finding that a thesis was not publicly accessible because it had not yet been cataloged or placed on the shelves on the relevant date); *Application of Bayer*, 568 F.2d 1357, 1361 (C.C.P.A. 1978) (finding that a thesis was not publicly accessible because "[that] thesis could have been located in the university library only by one having been informed of its existence by the faculty committee, and not by means of the customary research aids available in the library").

Abiomed cites essentially three categories of evidence that, in its view, establish that the thesis was publicly accessible as of June 1999.

First, it has produced a screenshot of an entry for the thesis in a Shaker Verlag catalog that reflects a publication date of June 1999.  (Shaker Verlag Catalog Entry at 1).

Second, Abiomed has submitted a declaration from two employees who work at the White & Case library in Frankfurt stating that "the library maintains custody of an original copy of 'Systemanalyse und Entwicklung intravasaler Rotationspumpen zur Herzunterstützung' by Thorsten Siess."  (White & Case Declaration at 2).  That declaration includes a screenshot of an entry for the thesis in the online catalog for the Deutsche Nationalbibliothek, the German National Library, which includes a 1999 call number, and shows that the thesis is listed under several "subject groups"—translated from "sachgruppe(n)"— and "tags"—including, among others, "medicine" ("medizin") and "Hemopump."  (White & Case Declaration at 5-6).  The employees stated that in their experience, call numbers are "assigned to a publication upon entry [in]to the DNB," and "include[] the year [in] which the publication entered the library and became available to the public."  (*Id.* at 2).  A screenshot of the copyright page of the thesis attached to the declaration also states "[c]opyright Shaker Verlag 1999."  (*Id.* at 2-4).

Finally, Abiomed notes that a screenshot of Maquet's translation indicates that the thesis was defended in June 1998, which is somewhat consistent with Dr. Antaki's testimony that "[he] knew that [Dr. Siess] graduated—or defended his thesis in 1999." (Antaki Dep. at 78-79; Maquet Translation at 2).[26]

Taken as a whole, that evidence would appear to be sufficient (if believed) to establish that the thesis was in fact publicly accessible, and therefore that there is a disputed issue of fact as to that issue.

Maquet contends, however, that the White & Case declaration is an unsworn witness statement and thus cannot be accepted by a court in opposition to a motion for summary judgment. It is true that the declaration was not sworn to and is not in the form of an affidavit. In addition, the screenshots attached to the declaration are not authenticated. While an attorney attested that the exhibit containing the declaration of the White & Case employees was "a true and correct copy" of that declaration, he did not attest to the screenshots themselves (nor is it clear that he would have personal knowledge of them). (Docket No. 764, Decl. of Wade G. Perrin, Esq. at 7).

The declaration and its exhibits are not competent evidence for the purpose of *opposing* summary judgment. Nonetheless, as noted, there is not a sufficient basis for *granting* summary judgment to Maquet as to the issue of invalidity, even if the Siess thesis were to be excluded in its entirety. And the Court has no reason, on the present record, to believe that Abiomed would be unable to call the witnesses at trial to testify under oath as to the contents of the declaration, should that be required.

---

[26] The screenshots attached to the declaration of the White & Case employees also seem to show the foreword of the original thesis, which likewise indicates that the thesis was defended in June 1998. (White & Case Declaration at 4).

**(e)**    **Whether the Thesis Should Be Excluded as a Discovery Sanction for Failure to Produce a Witness**

Finally, Maquet contends that it was entitled to summary judgment as to the Siess thesis because Abiomed failed to produce a witness for its Rule 30(b)(6) deposition.  Abiomed contends that it objected to an order compelling that deposition, and moved to stay the deposition.  The motion to stay has since been denied as moot.  Again, even assuming that the thesis should be excluded as a discovery sanction, Maquet has not established that summary judgment is therefore warranted.  And there is authority suggesting that an opposite conclusion may be warranted.  *See ABS Global, Inc. v. Inguran, LLC*, 2016 WL 4009987, at *5 (W.D. Wis. July 25, 2016) ("[E]ven if [the plaintiff's] objection was improper, [the defendant] never followed up on it, and even if it had, barring evidence on this issue would be inappropriate because [the plaintiff] provided [the defendant] with other forms of discovery related to its evidence and claims of non-infringement.").

In summary, while Maquet raises substantial issues concerning the admissibility of the Siess thesis, it has not established that summary judgment in its favor is required.

**C.**    **"Surprise" Theories of Invalidity and Damages**

Maquet has also moved for partial summary judgment on the ground that Abiomed has improperly asserted a number of "surprise" invalidity and damages theories, including (1) a theory of invalidity based on the indefinite nature of the term "proximate"; (2) theories of invalidity based on undisclosed prior art (Sammler Canada and Bagaoisan); and (3) a theory of damages based on non-infringing alternatives.

**1.**    **Indefiniteness – the Term "Proximate"**

Maquet contends that Abiomed did not disclose a theory of indefiniteness as to the use of

the term "proximate" in claim 16 until January 27, 2020, when it produced Dr. Antaki's expert report.  Specifically, Dr. Antaki opined that claim 16 was indefinite due to the following use of the term "proximate":  "a blood pressure detection mechanism to detect the pressure of the blood *proximate* at least one of the intravascular blood pump and cannula."  (Docket No. 764, Ex. 33 ("Antaki Report") ¶¶ 184-85 (emphasis added)).  Maquet argues that because of that late disclosure, the Court should find as a matter of law that claim 16 is not indefinite due to its use of the term "proximate."

As noted, on July 8, 2019, Abiomed submitted its supplemental invalidity contentions. (Supp. Invalidity Contentions at 54).  Those contentions asserted that other terms in claims 16 and 17 of the '100 patent were indefinite and therefore rendered the asserted claims invalid.  It did not identify the blood-pressure detection mechanism term or its use of the term "proximate" as indefinite.  (*Id.* at 40).  Abiomed did, however, assert that claims 6, 10, and 15–17 of the '728 patent were indefinite due to the following use of the term "proximate" by such claims:  "a blood pressure detection mechanism comprising a fluid column disposed within the catheter and configured to detect the pressure of the blood pump *proximate* the intravascular blood pump." (*Id.* at 41).[27]

Abiomed nonetheless contends that the Court in its memorandum and order on claim construction "confirm[ed] that Abiomed was contending that the 'proximate' term in the '100 patent was indefinite."  (Abiomed Opp. at 20)  That order stated that as to the '100 patent and '728 patent's use of that term, "Abiomed [] contends that the term[] 'proximate' . . . [is]

---

[27] It also contended that claims 1–8, 10, 12–23, 25–27, and 29–30 of the '314 patent were indefinite because of the following use of the term "proximate":  "a pressure sensing element configured to sense pressure proximate the intravascular blood pump."  (*Id.* at 47).

It further listed other claims in other patents that use the term "proximate" as invalid due to indefiniteness, but did not specifically emphasize the word "proximate" as to those claims (and thus, may not have been contending that the word "proximate" rendered those claims indefinite).  (*Id.* at 43, 45, 46).

Case 1:16-cv-10914-FDS   Document 1000   Filed 06/15/23   Page 41 of 64

ambiguous and that the specification fails to clarify what [it] mean[s]" and that Abiomed was "free to argue that the claims are indefinite [on that basis] at the *appropriate time*." (Mem. and Order on Claim Constr. at 65, 67). The order thus stated that Abiomed *could* contend in its supplemental invalidity contentions that the claims were indefinite due to the use of the term "proximate." It did not state that Abiomed had necessarily raised a defense of invalidity simply because it had argued that the claim was ambiguous in the context of claim construction. (*See* Mem. and Order on Claim Narrowing at 2 ("The Court will not address Abiomed's contentions that certain terms are indefinite at the claim-construction stage.")).[28] Nevertheless, Abiomed's contentions at the claim-construction stage did provide some notice to Maquet of the theory of indefiniteness at issue here.[29]

Abiomed further contends that Maquet was on notice that it would contend that the term "proximate" rendered claim 16 indefinite because it raised indefiniteness in its supplemental invalidity contentions as to the use of the term "proximate" in the '728 patent—specifically, in the phrase "to detect the pressure of the blood pump proximate the intravascular blood pump." That use of "proximate" is not identical to the use that Dr. Antaki contends renders claim 16 invalid. As to claims 6, 10, and 15–17 of the '728 patent, the blood pressure detection mechanism must be configured to detect the pressure of the blood pump proximate the

---

[28] At least some courts have held that while the reasons for indefiniteness claims are "sometimes very closely intertwined" with claim construction, at other times those reasons "may not be so intertwined," and therefore courts should determine on a claim-by-claim basis whether to analyze indefiniteness contentions as a part of claim construction or at a later point. *Cipher Pharm. Inc. v. Actavis Lab'ys FL, Inc.*, 99 F. Supp. 3d 508, 513 (D.N.J. 2015).

[29] The parties have also addressed indefiniteness as to the "proximate" term in a companion case to this case, further putting Maquet on notice of Abiomed's position. There, Abiomed contended both in its *Markman* brief and at oral argument that claims 3 and 24 of U.S. Patent No. 10,238,783 were indefinite due to the use of the term "proximate" in the terms "detect a pressure of blood *proximate* the intravascular blood pump" and "sense pressure *proximate* the intravascular blood pump." *Maquet v. Abiomed*, 1:17-cv-12311 ("Abiomed II"), Docket No. 137 ("Abiomed *Markman* Brief") at 13, 16-18; Abiomed II, Docket No. 184 ("*Markman* Hearing Tr.") at 98-101 ("We are arguing that these terms are indefinite because they fail to define the scope of the invention with reasonable certainty.").

intravascular blood pump, while as to claim 16 of the '100 patent, the blood pressure detection

mechanism must be proximate to *at least one* of the intravascular blood pump and cannula (and

thus does not have to be proximate to the intravascular blood pump).

It is true that the '100 patent and the '728 patents are part of the same family, and their

specifications appear to be identical.  As noted, the '100 patent issued from the '178 Application,

which was filed on September 1, 2000, and claims priority to the '249 Provisional, which was

filed on September 3, 1999.  ('100 patent, Cover Page; *id.*, col. 1 ll. 6-8).  The '728 patent also

claims priority to the '249 Provisional, and issued from U.S. Patent Application No. 12/772,810,

filed on May 3, 2010, which was a continuation of an application that was a divisional

application of the '178 Application.  ('728 patent, col. 1, ll. 5-15).[30]  But the '728 patent and the

'100 patent are not the same thing.

In short, Abiomed contends that Maquet was on notice that the indefiniteness of the term

"proximate" was an issue because it raised the issue at the claim-construction stage, and raised it

as to the '728 patent.  It does not dispute, however, that it did not raise the issue when required to

do so by the Court in its supplemental invalidity contentions.  Under the circumstances, the

Court sees no reason to give Abiomed a pass on its failure to abide by its obligation to identify

its invalidity contentions by the court-ordered deadline, and with appropriate specificity.

Abiomed is represented by highly capable counsel, and there is no apparent reason for the

omissions other than simple neglect.  Abiomed will therefore be precluded from asserting a

defense of invalidity based on the contention that claim 16 is indefinite due to its use of the term

---

[30] More specifically, the '728 patent issued from U.S. Patent Application No. 12/772,810 which is "a continuation of application Ser. No. 11/375,926, which is a divisional of U.S. patent application Ser. No. 10/070,178, filed Jul. 19, 2002, now U.S. Pat. No. 7,022,100, which claims the benefit of PCT/US00/24515 filed Sep. 1, 2000, which claims the benefit of provisional U.S. patent application Ser. No. 60/152,249 filed Sep. 3, 1999." ('728 patent, col. 1 ll. 5-15).

"proximate."

### 2.     The Sammler Canada Reference

Maquet next contends that Abiomed failed to timely disclose a theory of invalidity as to

Canadian Patent No. 2,295,951 ("Sammler Canada"), the Canadian counterpart to U.S. Patent

No. 6,544,216 ("Sammler US"), and should therefore be precluded from relying upon that patent

as prior art.  The dispute is significant because, at least according to Abiomed, Sammler Canada

is entitled to a priority date that is earlier than any of the priority dates to which Maquet contends

the '100 patent is entitled.

### a.     Background

On February 21, 2017, Abiomed served interrogatories on Maquet.  (ECF 208-1 at 11).

Interrogatory No. 3 requested:

> a complete chronological description of the development of the claimed subject
> matter from conception to actual reduction-to-practice, including identification of
> any alleged dates of conception and actual reduction-to-practice, and for each date
> stated, identify the person(s) involved with or having knowledge of the
> conception and the reduction-to-practice, identify all documentary or other
> evidence (if any) supporting such conception and reduction-to-practice, and
> describe in detail the specific role of each person in the conception and reduction-
> to-practice of each claim.

(*Id.* at 9).  Interrogatory No. 8 requested "the priority dates that Maquet is relying on [for Claims

16 and 17 of the '100 patent]" and "any information and documents that support those priority

claims and the person(s) most knowledgeable."  (*Id.* at 10).

On March 27, 2017, Maquet objected to those interrogatories, but stated that it was

conducting an "ongoing reasonable search and investigation responsive to [those]

Interrogator[ies]" and would "produce relevant, nonprivileged documents in its possession,

custody or control."  (ECF 208-2 at 9-10, 13-15).

On July 3, 2017, Maquet responded to Interrogatory No. 8, stating that "the asserted

claims . . . of the Patents-in-Suit . . . have a priority date of at least September 1, 2000." (ECF 744-3 at 2-3; ECF 930-2 at 3).

On September 8, 2017, Abiomed served noninfringement and invalidity contentions as to 98 claims Maquet had asserted against four of its products. (ECF 219-2 at 52; ECF 236 at 2). In those contentions, Abiomed cited to 84 prior-art references, including Sammler US and an application of Sammler under the Patent Cooperation Treaty No. WO 99/58170 ("Sammler PCT"). (ECF 219-2 at 10-11). The disclosure listed April 8, 2003, as the "Issue / [Publication] Date" for Sammler US, and November 18, 1999, as the "Issue / [Publication] Date" for Sammler PCT. (*Id.*). Abiomed did not, however, cite to Sammler Canada.

Also on September 8, 2017, Abiomed served additional interrogatories on Maquet. Interrogatory No. 16 requested that Maquet state the basis of any disagreement with Abiomed's invalidity contentions, including "any position that any cited prior art . . . is not prior art." (ECF 210-1 at 14; ECF 210-3 at 1-2). On October 9, 2017, Maquet objected to answering it. On April 18, 2018, Abiomed moved to compel a response.

On May 22, 2018, Maquet supplemented its response to Interrogatory No. 8, and stated that "the asserted claims . . . of [the '100 patent [have] [a] priority date[] at least as early as . . . November 11, 1999," and cited to 14 documents as "Documentary Support." Those documents included Provisional Application No. 60/152,249 (the provisional application filed by Dr. Aboul-Hosn that the '100 patent cites on its cover page), two other U.S. patents, and what the parties assert are several laboratory notebooks. (ECF 744-3 at 3; Mot. Strike Reply at 3-4; Mot. Strike Opp. at 10-11).

On August 24, 2018, this Court ordered Maquet to respond to Interrogatory No. 16 within 30 days of the Court's *Markman* order.

44

On September 7, 2018, the Court issued its *Markman* order.  On October 9, 2018, Maquet responded to Interrogatory No. 16.  Its response stated that "Sammler" (which it did not define) failed to disclose certain elements of Claims 16 and 17 of the '100 patent.  Maquet did not contend, however, that "Sammler" was not prior art.  (ECF 744-4 at Ex. A6, at 3-4).  Also on October 9, 2018, Maquet responded to Interrogatory No. 3 by identifying '100 Patent claims 16 and 17 as having "Dates of Conception & Reduction to Practice" of "at least as early as" November 11, 1999, and cited to the same documents that it identified in response to Interrogatory No. 8.  (ECF 621-1 at 4).

On June 23, 2019, the Court issued a scheduling order.  As relevant here, the Court ordered Abiomed to narrow its primary prior-art references to twelve and to amend its preliminary noninfringement and invalidity disclosures on or before July 8, 2019.

On July 8, 2019, Abiomed submitted its supplemental invalidity contentions.  It identified twelve primary prior-art references, including Sammler US.  (ECF 764-30 at 20-23; ECF 764-33 (specific chart about Sammler US)).[31]

On September 6, 2019, fact discovery closed.  Opening expert reports were due on January 27, 2020; depositions of those experts were scheduled for February 3, 2020; and rebuttal expert reports were due by March 12, 2020.

On January 27, 2020, Abiomed served Maquet with the expert report of Dr. James Antaki.  (ECF 764-36 at 60).  The report states, in relevant part:

> 71.  I have been asked to assume that a prior art reference for the Asserted Claims is a reference predating the September 1, 2000 priority date of the PCT application to which the '100 Patent claims priority.[]

---

[31] Abiomed's supplemental invalidity contentions stated that "Sammler" was one of its twelve primary references.  (ECF 764-30 at 22).  "Sammler" was defined in the document as the Sammler PCT application.  (*Id.* at 11, 27).  However, in the invalidity chart it attached providing more detail as to its assertions regarding the Sammler reference, it defined Sammler US as "Sammler," and did not refer to the Sammler PCT application.  (ECF 764-33).

[footnote 2 in report]  I understand that Maquet may not be entitled to this priority date.  I have also been informed that Maquet has previously asserted without basis a November 11, 1999 priority date and the '100 patent lists a priority date of September 3, 1999.

. . .

129.  I understand U.S. Patent No. 6,544,216 to Sammler et al. ("Sammler") qualifies as prior art at least because it has a priority date of *May 30, 2000*, [which] predates the earliest priority date of the '100 Patent.  In addition, alternatively, I understand that [*Sammler Canada*] . . . has a priority date of May 13, 1998, and published *November 18, 1999.*  I understand Sammler [sic] [was] published on November 18, 1999, and I have been informed that Sammler [sic] qualifies as prior art at least because its publication date of *November 18, 1999* predates the September 1, 2000 filing date of the '100 patent.

(*Id.* ¶¶ 71, 129 (emphasis added)).

On March 12, 2020, Maquet served Abiomed with a rebuttal expert report from Dr.

Boris Leschinsky.  (ECF 744-7 at 133).  The report states, in relevant part:

57.  I understand that the Asserted Patent claims the benefit under 35 U.S.C. § 119 to the priority date of U.S. Provisional Patent Application No. 60/152,249 (the "[']249 application"), filed *September 3, 1999.*

58.  In addition, I have reviewed lab notebooks and other materials evidencing that the inventors of the Asserted Patent conceived of the inventions at issue at least as of the filing date of the [']249 application (*September 3, 1999*) and before the effective filing date of the application leading to the Asserted Patent (September 1, 2000) and diligently worked to reduce the conceptions to practice as well up until that 2000 date.

59.  Entries in these lab notebooks before the September 3, 1999 filing of the [']249 application clearly evidence that the inventors had conceived of the claimed invention at least by that time.  Moreover, entries dated after the filing of the [']249 application show a continuous progression of work on the project up to and including the September 1, 2000 filing date of the PCT application from which the Asserted Patent issued.

[discussion of lab notebook and other evidence omitted]

62.  In my opinion, these materials establish a constructive and/or actual reduction to practice of the Asserted Claims of at least as early as September 3, 1999, for at least the reason that they evidence that the inventors of the Asserted Patent conceived of the inventions at issue before that date and diligently worked to reduce the conceptions to practice.

69. Moreover, as discussed below . . . , the Sammler reference does not qualify as prior art under 35 U.S.C. § 102 against the Asserted Claims.

264. I understand that Sammler does not qualify as prior art under 35 U.S.C. 102(a) or (b), at least because it issued after the September 1, 2000 effective filing date of the Asserted Patent.

265. I understand that the determination of whether a U.S. Patent claiming the benefit of a filing date of a PCT International Application of earlier than November 29, 2000 qualifies as a reference under 35 U.S.C. § 102(e) is based on the version of that statute in force on November 28, 2000, which was:

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

266. For example, I understand that 35 U.S.C. § 371(c)(4) requires filing "an oath or declaration of the inventor (or other person authorized under chapter 11) complying with the requirements of section 115 and with regulations prescribed for oaths or declarations of applicants" with the USPTO.

267. The cover page of the Sammler reference indicates that the requirements of § 371(c)(1), (2) and (4) with regard to that patent were first fulfilled on May 30, 2000 . . . .

268. As discussed above . . . , however, the invention date of the invention claimed by the Asserted Claims was before May 30, 2000 . . . .

(*Id.* ¶¶ 57-62, 69, 264-68 (citations omitted) (emphases added)).

### b.   Legal Standard

#### (1)   Fed. R. Civ. P. 26 and 37

Pursuant to Fed. R. Civ. P. 26(e), "[a] party who has . . . responded to an interrogatory . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." *Id.*

Rule 37 provides sanctions for violations of Rule 26.  "If a party fails to provide

information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use

that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  "[T]he required

sanction in the ordinary case is mandatory preclusion."  *Poulis-Minott v. Smith*, 388 F.3d 354,

358 (1st Cir. 2004) (alteration in original) (internal quotation marks omitted) (quoting *Klonoski*

*v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998)).  But "preclusion is not a strictly mechanical

exercise; district courts have some discretion in deciding whether or not to impose that onerous

sanction."  *Santiago-Díaz v. Laboratorio Clínicio y de Referencia del Este*, 456 F.3d 272, 276

(1st Cir. 2006).  In determining the proper sanction, the court should consider "(1) the party's

justification for the late disclosure; (2) the opposing party's ability to overcome any prejudice;

(3) the impact on the court docket; (4) the party's history of litigation abuse; and (5) the party's

need for the late evidence."  *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit*

*Sharing Plan & Tr. v. State Street Bank & Tr. Co.*, 290 F.R.D. 11, 17 (D. Mass. 2013) (citing

*Harriman v. Hancock Cty.*, 627 F.3d 22, 30 (1st Cir. 2010)); *see also Gagnon v. Teledyne*

*Princeton, Inc.*, 437 F.3d 188, 191 (1st Cir. 2006).

### c.    <u>Analysis</u>

#### (1)    <u>Priority Dates Generally</u>

An inventor may not obtain a patent if the claimed subject matter would have been

obvious to one of ordinary skill in the art or if it is anticipated.  35 U.S.C. §§ 103(a), 102(a).

"Prior art" for purposes of 35 U.S.C. § 103 encompasses *"at least* the statutory material named

in 35 U.S.C. § 102."  *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir.

2003).  The version of § 102 applicable to the asserted claims states in part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented

48

or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

. . .

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent . . . .

35 U.S.C. § 102 (effective until November 28, 2000).

Accordingly, "under section 102(a) and 103 a patent, publication, or use does not qualify as prior art unless it was publicly available prior to the date of invention." *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 2010 WL 2403041, at *2 (E.D. Mich. June 9, 2010) (analyzing a patent with a priority date of October 29, 1997).

Generally speaking, an invention is presumed to have been invented on the date when the patent application was filed. 1–3 Chisum on Patents § 3.08 ("[T]he date of invention of the applicant or patentee . . . is presumed to be the date he files a complete patent application."); *In re NTP, Inc.*, 654 F.3d 1268, 1276 (Fed. Cir. 2011). But the filing date is not dispositive. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("Section 102(a) explicitly refers to invention dates, not filing dates."). An earlier date of invention may be established by showing that, prior to the filing date, the inventor either reduced the invention to practice or conceived of it and exercised reasonable diligence toward reducing it to practice at a later date. *Id.* at 1577. Establishing an earlier date of priority for these purposes requires only that the inventor demonstrate that he or she reduced to practice at least one embodiment of the

claimed invention.  *In re Jolley,* 308 F.3d 1317, 1322 (Fed. Cir. 2002).

In addition, if a patent satisfies 35 U.S.C. § 119(e)(1), it may claim priority to the filing

date of its provisional application.  *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d

1290, 1294 (Fed. Cir. 2002).  That section provides:

> [a]n application for patent filed under section 111(a) or section 363 of this title for
> an invention *disclosed in the manner provided by the first paragraph of section
> 112* of this title in a provisional application filed under section 111(b) of this title,
> by an inventor or inventors named in the provisional application, *shall have the
> same effect, as to such invention, as though filed on the date of
> the provisional application* filed under section 111(b) of this title . . . .

35 U.S.C. § 119(e)(1) (emphasis added).  In other words, to satisfy § 119(e)(1), the specification

of the "*provisional* [application] must 'contain a written description of the invention and the

manner and process of making and using it, in such full, clear, concise, and exact terms' to

enable an ordinarily skilled artisan to practice the invention *claimed* in the *non-

provisional* application."  *New Railhead,* 298 F.3d at 1294 (emphasis in original).

### (2)      Overview of the Dispute

Maquet has moved for partial summary judgment on the ground that Abiomed failed to

timely raise its theory that Sammler Canada is prior art, and should therefore be precluded from

relying on it at trial.  The dispute is significant because, at least according to Abiomed, Sammler

Canada is entitled to a priority date that is earlier than any of the priority dates to which Maquet

contends the '100 patent is entitled.

Maquet contends that Abiomed never disclosed its theories as to Sammler Canada until it

served the report of Dr. Antaki on January 27, 2020.  It contends that it would be prejudicial to

permit Abiomed to rely on it because of the "crucial implications" of its priority date, which

appears to be either November 18, 1999, or May 13, 1998.  (Reply Mot. Summ. J. at 11).[32]

Abiomed does not dispute that it failed to disclose Sammler Canada.  It contends, however, that its failure to do so is harmless (1) because it disclosed Sammler PCT, which has the same November 18, 1999 publication date as Sammler Canada, and (2) because the cover page of Sammler US indicates that there was a related application in Germany with a priority date of May 13, 1998, which Abiomed contends is also Sammler Canada's priority date. (*Compare* ECF 189-32, Sammler US, Cover Page (listing "May 13, 1998 (DE) . . . 198 21 307" under "Foreign Application Priority Data") *with* ECF 754-10, Sammler Canada Patent Summary at 2 *with* ECF 754-7, Sammler Canada Cover Page; *see also* ECF 942, Tr. of Aug. 20, 2020 Hearing at 89-90 (noting Sammler US's reference to the German application)).

The parties agree that Sammler US has a priority date of May 30, 2000.  (*Compare* ECF 764-36, Antaki Report, at 60 *with* ECF 744-7, Leschinsky Rep. ¶¶ 267-68).  That date predates the filing date of the asserted claims, which is September 1, 2000.  But it is after the date that Leschinsky contends is the priority date of the asserted claims (September 3, 1999) and the date that Maquet disclosed as the priority date in May 2018 (November 11, 1999).  If Sammler Canada's priority date is May 13, 1998, as Abiomed contends, it appears to be prior art to the '100 patent.

### (3)   Analysis

It is undisputed that the reference to Sammler Canada was not timely disclosed.  It should have been disclosed on September 8, 2017, when Abiomed served its preliminary invalidity

---

[32] Abiomed contends that Sammler Canada "claims priority to PCT filing, WO1999/58170," that its priority date is May 13, 1998, and that it was published on November 18, 1999.   (ECF 873 at 39-40).  It is not clear whether Maquet agrees.  (*See* ECF 873, Reply SMF, Mot. Summ. J. Invalidity ¶ 30 (Maquet stating that it "disputes" Sammler's priority date, but only citing to Leschinsky's report and its motion for summary judgment of validity as to Sammler Canada)).

contentions, or (at the latest) on July 8, 2019, when Abiomed served its supplemental invalidity contentions. Instead, it was not disclosed until January 27, 2020, when it appeared in Dr. Antaki's report. The question then becomes whether preclusion is required under Fed. R. Civ. P. 37, or for failure to comply with the Court's order concerning disclosure of invalidity contentions.

Abiomed's justification for the late disclosure is essentially that it was inadvertent. (Tr. of Aug. 20, 2020 Hearing at 91). That is hardly a compelling justification. Again, Abiomed is represented by sophisticated and experienced counsel; while it is true that all counsel make mistakes from time to time, it seems particularly egregious to fail to disclose what is claimed to be one of the most significant items of prior art in this dispute.

Abiomed's contention that Maquet had constructive notice of the May 13, 1998 and November 18, 1999 dates is not particularly persuasive. Abiomed disclosed Sammler PCT and Sammler US, not Sammler Canada. A party may not rely on a PCT application on its own as prior art, but rather, must rely upon "a patent granted on . . . an international application [PCT application] . . . ." 35 U.S.C. § 102(e) (effective until November 28, 2000). More importantly, in the context of complex litigation concerning disputes of prior art involving a myriad of patents, patent applications, and related patents, it is unfair to expect that an opposing party will simply be able to understand all the implications of the actual information disclosed.

It also appears that Maquet would be prejudiced by the late disclosure. Assuming that Abiomed is correct that the priority date of Sammler Canada is May 13, 1998, that date is more than two years earlier than that of Sammler US, and predates all of the dates that Maquet has (timely or untimely) disclosed to Abiomed as the '100 patent's priority date. Maquet contends that it would have tried to antedate the '100 patent over Sammler Canada and requested

discovery on that issue, had it known that Abiomed intended to rely on it. (Tr. of Aug. 20, 2020 at 93). And, of course, fact discovery and expert discovery both concluded long ago.

It is perhaps true that Maquet may have become aware of the existence of Sammler Canada along the way, and therefore may not have been truly surprised by the late disclosure. But patent litigation is complicated enough without requiring adherence to disclosure requirements and timetables. Again, a party should not have to guess at whether its adversary intends to rely upon a particular item of prior art, even other patents in the same family. Discovery is not supposed to be "a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses . . . ." *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1322 (10th Cir. 2011). If Abiomed intended to rely on Sammler Canada as prior art, it should have said so.

Under the circumstances, the Court finds that preclusion of Sammler Canada is warranted as a sanction for failure to comply with the Court's orders requiring the disclosure of alleged prior art. It does not follow, however, that partial summary judgment in favor of Maquet is warranted. It may be the case that Abiomed's anticipation and obviousness arguments collapse without Sammler Canada, but Maquet has not made that argument, and there is no basis in the current record to conclude that it is correct. Summary judgment as to Abiomed's invalidity defense on that basis will therefore be denied.

### 3.     The Bagaoisan Reference

Maquet further contends that Abiomed failed to timely disclose U.S. Patent No. 6,849,068 ("Bagaoisan") as a prior-art reference. Dr. Antaki's January 27, 2020 expert report contends that Bagaoisan, in combination with (1) the thesis of Dr. Thorsten Siess, (2) U.S. Patent No. 5,921,913 ("Siess '913"), (3) W. Flameng, *Temporary Cardiac Assist with an Axial Pump*

*System*, Springer (1991), or (4) U.S. Patent No. 6,248,091 ("Voelker"), renders the asserted

claims obvious and therefore invalid.  (Antaki Report ¶¶ 74, 135, 137, 139, 143).  Maquet

contends that Dr. Antaki's report was essentially the first time that Abiomed raised such

contentions, and that the Court should therefore enter a judgment as a matter of law that the

claims are not invalid due to any combination of prior-art references including Bagaoisan.

Abiomed's initial noninfringement and invalidity contentions in this case included 84

prior-art references as to 98 claims that Maquet had asserted against four of Abiomed's products.

The Court issued an order on the schedule for claim narrowing, which directed Maquet to narrow

its claims to 18, and directed Abiomed to narrow its primary prior-art references to twelve.

As noted, on July 8, 2019, Abiomed submitted its supplemental invalidity contentions,

and identified twelve primary prior-art references.  (Supp. Invalidity Contentions at 20-23).  In

the body of the document, Abiomed stated that it "reserve[d] the right" to assert that certain

"secondary . . . references"—which Maquet contends numbered "over 100"—rendered the

asserted claims obvious in combination with those primary references.  (*Id.* at 8-11).  Bagaoisan

was one of the identified secondary references.

Abiomed also attached charts for each of its twelve primary prior-art references,

"demonstrating how this prior art anticipates and/or renders obvious each of the [a]sserted

[c]laims."  (Supp. Invalidity Contentions at 20).  At the outset of each of those charts, Abiomed

included a list of "secondary references" it contended rendered the asserted claims invalid in

combination with the primary reference in question.  (*See generally* Docket No. 764, Ex. 32B4-

B9; Maquet Reply SMF ¶ 159).  For example, the invalidity chart for Voelker included a list of

more than 30 secondary references.  (*See* Docket No. 764, Ex. 32-B4, Invalidity by Voelker at 1-

2).  Bagaoisan was not included as a secondary reference in Abiomed's invalidity charts for any

of the four primary references (the Siess thesis, Siess '913, Flameng, or Voelker) that it now

asserts render the asserted claims invalid in combination with Bagaoisan.

Abiomed contends that notwithstanding that omission, the parties "have repeatedly

discussed Bagaoisan during these proceedings," and therefore, Maquet had sufficient notice of

that reference.  (Abiomed Opp. at 22).  Specifically, it contends that "Bagaoisan was cited

repeatedly as prior art in the prosecution history of related U.S. Patent Nos. 8,888,728 (the '728

Patent) and 9,327,068" and that Maquet "amended its claims [in order to] distinguish [the] 'guide

mechanisms' [of the asserted claims] over [Bagaoisan]."  (*Id.*).  It points to (1) an office

communication from the PTO regarding U.S. Patent Application No. 12/772,810 (which became

the '728 Patent) stating that claims 2-4, 15, 20, and 21 of that application were rejected in light

of Bagaoisan and (2) an information disclosure statement submitted by Maquet to the

Commissioner for Patents that included a list of patents and other publications that were

"previously cited by or submitted to the office in . . . parent applications [12/772,810, 11/375,926

and 10/070,178]," which included Bagaoisan.  (Abiomed Opp. at 22; Docket No. 788, Ex. 1,

U.S. PTO Office Communication at 2; Docket No. 189, Ex. 8, Information Disclosure Statement

at 3, 7).

The Court's memorandum and order on claim construction explained the prosecution

history in relevant part as follows:

> [Claim 15 of the '728 patent] first appeared in the application that later issued as
> the '728 patent . . . as the following:  'wherein said guide mechanism is
> configured to accept a guide wire for passage through a side lumen formed in said
> distal portion of said intravascular blood pump system.'  Maquet did not point to
> any particular part of the specification as support for this claim—it asserted only
> that '[n]o new matter has been added.'  The examiner rejected the claim by citing
> Bagaoisan (U.S. Patent No. 6,849,068), which shows a side lumen for a guide
> wire attached to the outside of the cannula[.]
> . . .
> Maquet responded by amending the claim as follows:  'wherein said guide

mechanism is <u>positioned along a length of the cannula and interior to a region delimited by the outer cannula surface, wherein the guide mechanism is</u> configured to ~~accept~~ <u>allow for</u> a guide wire <u>to slideably advance therealong</u> ~~for passage through a side lumen formed in said distal portion of said intravascular blood pump system~~.'

(Mem. and Order on Claim Constr. at 34-36 (citations omitted)).

Maquet contends that such a disclosure of a reference in the prosecution history is insufficient, and that Abiomed is "essentially ask[ing] the Court to set aside its prior order on case narrowing and allow it to fall back on any prior art rattled off in the generic cover pages to its prior art claim charts," which it calls the "leftover pile."   (Maquet Reply at 11; Tr. of Aug. 20, 2020 Hearing at 87).

It is unclear why Abiomed failed to list Bagaoisan as a primary reference.  It now contends that it should have been obvious to Maquet that Bagaoisan was critically important prior art; if so, it also should have been obvious to Abiomed.  The Court is not aware of any reason why a more complete disclosure could not have been made.

Nonetheless, unlike Sammler Canada, the Bagaoisan reference was, in fact, disclosed.  It is true that it was disclosed only as a secondary reference, not tied to any of the four identified primary references.  And there is considerable force to the argument that Bagaoisan was effectively buried in a list of dozens of references, which if nothing else violates the spirit of the Court's order requiring disclosure.  But the Court will not exclude Bagaoisan on that basis.

Furthermore, it is unclear whether Maquet has suffered any prejudice from the non-disclosure.  Bagaoisan was the subject of prior proceedings before the PTO, and it seems unlikely that Maquet was actually unaware of its existence.  It is true, of course, that under Rule 37, Abiomed (not Maquet) is the party required to prove that the non-disclosure was justified or harmless, but the issue here is not a failure to provide discovery, but a failure to comply strictly

with an order of the Court.

Under the circumstances, and with some misgivings, the Court will not exclude Bagaoisan as a prior art reference.  Accordingly, summary judgment as to Abiomed's invalidity defense on that basis will be denied.

### 4.   Theory of Damages as to Non-Infringing Alternatives

Maquet next contends that Abiomed failed to make timely disclosures of its damages theories as to non-infringing alternatives, and that it is entitled to summary judgment on that issue, as well.

According to Maquet, Abiomed first disclosed a damages theory as to two non-infringing alternatives—an alternative with an expandable cannula and an alternative with no pigtail—on March 12, 2020, in the rebuttal reports of Dr. Leonard and Maher.  It further contends that those non-infringing alternatives were not identified in Abiomed's response to an interrogatory requesting that it "describe in detail each and every legal and factual basis upon which [it] will rely related to the calculation of and/or rebuttal of damages . . . ."  (Maquet Supp. Mem. at 25).[33]

The relevant portions of Maher and Dr. Leonard's reports are as follows:

- Maher's assertion that "if the pigtail *were removed* from the [a]ccused [p]roducts, the devices could still be placed in the exact same way and such placement would . . . be easier without the pigtail" and that "Dr. Siess actually entertained different options for a stabilizing feature, including an *expandable cannula*, before ultimately deciding on the pigtail."  (Docket No. 764, Ex. 39, Maher Report ¶¶ 111, 274).

- Dr. Leonard's assertion that "[he] underst[oo]d that Abiomed *could have integrated an expandable cannula*," based on the deposition testimony of Dr. Thorsten Siess, and that "[he] underst[oo]d from *Mr. Maher* . . . . [that] the *pigtail is unnecessary* for the guidance of the Impella devices."  ((Docket No. 764, Ex.

---

[33] The expandable cannula is one example of a no-pigtail alternative.   (*See* Docket No. 764, Ex. 10 ("Siess Dep.") at 123 ("Going with an expandable cannula was [one option] . . . . [but] [t]hen we realized, hey, we can solve the problem . . . [with] a patent with regards to distal pigtail."); *see also* Tr. of Aug. 20, 2020 Hearing at 92 ("[T]hen he talks about the expandable cannula, which is honestly just a form of the no pigtail alternative.")).

13, Leonard Report ¶¶ 116, 197 (citing the testimony of Dr. Siess) (emphasis added)).

Abiomed responds that Maher is not a damages expert, and was only rebutting the opinions of Boris Leschinsky, Maquet's infringement and validity expert. Leschinsky opined in a January 27, 2020 report that the accused Impella products infringe Maquet's patents. (Maher Report ¶¶ 3-4; Docket No. 853, Ex. 10 ("Leschinsky Op. R.") ¶ 3). Specifically, in a section titled "Infringement," Dr. Leschinsky opined:

> [T]he design and material of the pigtail itself are specifically tailored to improve the guidance function of the pigtail. [sic]
> . . .
> As the Dens Article reports, '[i]n the first two patients the pump could not be placed over the aortic valve.' The article explains that '[i]nitially, investigators, trying to advance the cannula across the aortic valve directly, encountered problems of kinking of the cannula. This kinking resulted in failure of crossing the aortic valve (in 2 patients).' As a result, '[d]uring the trial, pump design modifications were performed to obtain a more stable position in the left ventricle cavity . . . . The main adaptations were: . . . *adding a pigtail* at the tip of the cannula . . . .' Following this modification, 'a 0.014 [inch] wire was placed in the left ventricle and the pump was advanced in an over-the-wire technique. Since then this problem has not recurred.'

(Leschinsky Op. Report ¶¶ 46, 82 (quoting Docket No. 848, Ex. D ("Dens Article"))).

The Court agrees that Maher's report was prepared in rebuttal to Dr. Leschinsky's contention that the pigtail is "specifically tailored to improve the guidance function." (Leschinsky Op. R. ¶ 46). Maher stated in his report that "Mr. Leschinsky also erred by not considering whether simply removing the pigtail, which Maquet asserts is essential for infringement, would have an effect on the guidance of the device into the body" and that "[t]he pigtail was [] added for reasons that have nothing to with guidance . . . . [but with] pump stability." (Maher Report ¶¶ 272-73). Maher also noted that Abiomed also considered using an expandable cannula or no-pigtail device, which is the portion of his testimony with which Maquet takes issue. (*Id.* ¶¶ 274, 275). Nevertheless, even if Maher's testimony was intended as

58

rebuttal, and not as a damages analysis, Dr. Leonard is a damages expert.  And even if his

testimony incorporates Maher's, it appears from his report that he is contending that Abiomed

had non-infringing alternatives available to it at the time it would have negotiated a royalty rate

with Maquet.  (*See* Leonard Report ¶ 116 (discussing a "pigtail-less" device in a section titled

"Abiomed's Maximum Willingness to Pay")).  Therefore, the issue is not resolved by concluding

that Maher's report was proper rebuttal to Dr. Leschinsky's opinions.

Abiomed further contends that it did, in fact, timely disclose its damages theory as to the

expandable cannula and pigtail-less devices.  First, it points to its response to interrogatory

number 20, which requested that Abiomed "describe in detail each and every legal and factual

basis upon which Abiomed will rely related to the calculation of and/or rebuttal of

damages . . . ."  In its August 7, 2019 response, Abiomed stated that "the limited contribution of

the patents-in-suit is further demonstrable by the ability *to design around* these narrow patents

(see insertion of the Accused Products without guide wires and Impella CP® with

SmartAssist™)."  (Abiomed's Responses to Maquet's Fourth Interrogs. at 3-6 (emphasis

added)).  Otherwise, however, that response did not mention a device without a pigtail or an

expandable cannula as alternative designs.

Abiomed further points to a different interrogatory that requested, among other things,

that it "describe in detail the complete chronology of the research, design, and development of

the pigtail component of each Impella product."  Its August 7, 2019 response to that

interrogatory stated:  "Development of the 'pigtail' had begun by at least 1996 during research

and development activities related to the inflow tip design or 'n cap' particularly as a way to

reduce suction and increase pump stability. . . . [which] was present in all of the Impella designs

made by Dr. Siess . . . includ[ing] the Elect 100, 200, and Recover series pumps, which were

developed and sold in the late 1990s." (*Id.* at 9).

Finally, Abiomed points to the deposition of Dr. Siess, in which he testified as follows:

Going with an *expandable cannula* was [one option], [and] *you may find another patent application* more or less at the same time [August 2003] where we worked with the idea of an expandable inflow, because then I could make the cannula longer because then I would reduce the losses. So that was one version, but we realized much harder to do.

Then we realized, hey, we can solve the problem basically by just if a non-sucking extension distal of the inlet area, just by increasing the contact length along the ventricle, which became, in one way, *a patent with regards to distal pigtail.*

(Siess Dep. at 123 (discussing Abiomed's U.S. Patent 9,872,948, filed in August 2003)

(emphasis added)).

Abiomed's response to interrogatory number 20 was certainly sufficient to put

Maquet on notice that Abiomed might contend that non-infringing alternatives reduced

any damages to which Maquet may have been entitled; the issue is whether it should have

identified *all* the specific non-infringing alternatives on which it intended to rely (in

addition to devices without guide wires and Impella CP with SmartAssist, which it

identified as examples). The interrogatory itself was broad—it requested that Abiomed

"describe in detail each and every legal and factual basis upon which Abiomed will rely

related to the calculation of and/or rebuttal of damages"—and thus, it is not entirely

surprising that Abiomed's response was also general. Moreover, in light of the fact that

Dr. Siess had testified about the expandable cannula more than two years earlier, and the

fact that Maquet was aware that earlier Impella products did not use the pigtail, under the

circumstances, it does not appear that Maquet would suffer unfair prejudice if Abiomed

were permitted to raise the alternatives at issue at trial. At the very least, the Court will

not grant partial summary judgment to Maquet as to the issue of non-infringing

alternatives on the grounds that the expandable cannula and no-pigtail devices were untimely disclosed.

## 5.   **Obviousness-Type Double Patenting**

Finally, Maquet has moved for partial summary judgment on the ground that the asserted claims of the '100 patent are not invalid due to application of the obviousness-type double patenting ("ODP") doctrine.  Abiomed contends that the ODP doctrine should apply to the '100 patent because its subject matter overlaps with the '728 patent and will expire later.

The application for the '100 patent was filed on September 1, 2000.  ('100 patent, Cover Page).  The patent issued on April 4, 2006.  (*Id.*).  The patent's term was "extended or adjusted" by 407 days under 35 U.S.C. § 154(b), which provides "the term of [an original] patent shall be extended" when its issue is "delayed due to the failure of the Patent and Trademark Office." (*Id.*).  The application for the '728 patent was filed on May 3, 2010.  ('728 Patent, Cover Page). The patent issued on November 18, 2014.  (*Id.*).  The term of the '728 patent was "extended or adjusted" by 98 days, also under 35 U.S.C. § 154(b).  (*Id.*).   Both patents claim a priority date of September 1, 2000, and therefore, without the extensions, both would have expired on September 1, 2020.  *See* 35 U.S.C. § 154(a)(2).  However, the § 154 extension of the '100 patent will cause it to expire after the '728 patent.

"The prohibition against double patenting is a longstanding doctrine of patent law." *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1212 (Fed. Cir. 2014).  "The judicially-created doctrine of [ODP] . . . prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent."  *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001).  The "key purpose" of the ODP doctrine is to prevent a patent owner "from extending

the exclusivity rights over his invention beyond a full patent term"—for example, by claiming different effective filing dates for different patents. *Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1367 (2018).

In *Novartis AG v. Ezra Ventures LLC*, the Federal Circuit considered whether to apply the ODP doctrine to a drug patent whose term had been extended by statute. 909 F.3d 1367 (Fed. Cir. 2018). In that case, a patentholder owned two drug patents with overlapping subject matter. *Id.* at 1370. One patent was extended under 35 U.S.C. § 156, which allows extension of a patent term to make up for a product's time spent in regulatory review. *Id.* at 1369; *see* 35 U.S.C. § 156. The court held that ODP did not invalidate the extended patent. *Id.* at 1375. First, the court noted that the language of § 156 mandated a term extension. *Id.* at 1373. Second, the court found that the patentholder had not engaged in gamesmanship "through structuring of priority claims" to extend the term of its patent; it had inadvertently benefitted from the FDA's delay in approving its product. *Id.* at 1375.

This case, on its face, is analogous to *Novartis AG*. Like § 156, § 154 appears to mandate extensions under appropriate circumstances. *See* 35 U.S.C. § 154(b) ("[T]he term of the patent *shall* be extended . . ." (emphasis added)). And Abiomed does not—and could not— contend that Maquet engaged in prohibited gamesmanship to extend the term of the '100 patent. *See Novartis Pharms.*, 909 F.3d at 1367. The '100 patent and '728 patent, as originally filed, would have expired on the same date. By the time that the '728 patent was filed on May 3, 2010, the extended expiration date of the '100 patent was clear.

Abiomed attempts to distinguish *Novartis AG* in three ways. None is persuasive. First, Abiomed contends that failing to apply the ODP doctrine here would allow patentees to obtain varying, extended terms for multiple patents that claim obvious variations of the same invention.

But the *Novartis AG* court contemplated such a situation, and declined to "cut off a statutorily-authorized time extension" where the patentee had not engaged in prohibited gamesmanship. *Novartis AG*, 909 F.3d at 1375.  Even if Abiomed were right that such an extension is unfair to the public, the statutory text commits the task of correcting that unfairness to Congress, not courts applying a judicially-created doctrine.

Second, Abiomed contends that the exclusions of § 154 suggest that Congress did not intend to insulate patents benefitting from § 154 from the ODP doctrine.  Section 154(b)(2)(B) states that "no patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer."  Abiomed argues that because terminal disclaimers are often used to overcome ODP challenges, this language indicates that *any* patent extended by § 154 cannot be extended past another patent claiming overlapping subject matter.  But that argument overreads the statutory language.  The exclusion prevents a patentholder from binding itself with a terminal disclaimer and then benefitting from § 154.  Abiomed does not content that Maquet has done so.

Finally, Abiomed contends that § 154 and § 156 serve different purposes.  Section § 154 applies to regulatory delays and § 154 applies to PTO delays.  Section 156 is restricted to only one patent, *see* 35 U.S.C. § 156(c), and only covers the specific use or manufacturing method approved by the FDA; by contrast, § 154 can apply to an entire patent.  Those differences, however, are not persuasive reasons to ignore the statutory text.

In sum, the Court will adhere to the language of § 154, which requires that the term of the '100 patent be extended because of the PTO's delay.  The gamesmanship concerns that underly the ODP doctrine are not present here.  Accordingly, the Court will grant partial summary judgment to Maquet on the ground that the asserted claims of the '100 patent are not invalid due

to application of the ODP doctrine.

**IV.**     **<u>Conclusion</u>**

For the foregoing reasons, the motion of defendant Maquet Cardiovascular LLC for partial summary judgment (Docket No. 761) is GRANTED to the extent that it seeks to preclude Abiomed from asserting a defense of invalidity based on the contention that claim 16 is indefinite due to its use of the term "proximate"; GRANTED to the extent that it seeks to preclude Abiomed from asserting a defense of invalidity based on obviousness-type double patenting; and is otherwise DENIED.

**So Ordered.**

                                                      /s/ F. Dennis Saylor IV
                                                      F. Dennis Saylor IV
Dated:  June 15, 2023                                 Chief Judge, United States District Court